Ruchit Kumar Agrawal (SBN 299290)
KUMAR LAW
6525 Crown Blvd. #20072
San Jose, California 95160
Tel:  (408) 601-0586
*Ruchit@kumarlawsv.com*

Counsel for Plaintiff Eurosemillas, S.A.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUROSEMILLAS, S.A., a Spanish corporation, <br><br> Plaintiff, <br><br> v. <br><br> PLC DIAGNOSTICS, INC., a Delaware corporation; NATIONAL MEDICAL SERVICES, INC. dba NMS LABS, a Pennsylvania corporation; LDIP, LLC, a Delaware limited liability company; REUVEN DUER; ERIC RIEDERS; and Does 1 through 10, inclusive, <br><br> Defendants. | Case No. 17-cv-3159-MEJ <br><br> OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT <br><br> Date:   September 7, 2017 <br> Time:  10:00 a.m. <br> Place:  450 Golden Gate Ave. <br> Courtroom B – 15th Floor <br> San Francisco, CA <br><br> Judge:  Maria-Elena James |

# LEGAL DISCUSSION

Plaintiff Eurosemillas, S.A. hereby responds to and opposes the Motion to Dismiss (Dkt 20) filed by Defendants PLC Diagnostics, Inc., National Medical Services, Inc. dba NMS Labs; LDIP, LLC, Reuven Duer and Eric Rieders.

Defendants' omnibus motion asks the Court to dismiss the entire First Amended Complaint (**"FAC"**) (Dkt 17) because Eurosemillas fails to allege even one legally cognizable claim.

## A.   Legal Standard.

Dismissal under Fed. R. Civ. P. 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."[1]

Unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court may not consider material outside of the complaint (*e.g.*, facts presented in briefs, affidavits, or discovery materials).[2]

A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed under Federal Rule of Evidence 201.[3] For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6).[4] As a general rule, leave to amend a complaint that has been dismissed should be freely granted, unless "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."[5]

---

[1]   *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990).

[2]   *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach (In re American Continental Corporation/Lincoln S&L Secs. Litig.),* 102 F.3d 1524, 1537 (9th Cir. 1996).

[3]   *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 986 (9th Cir. 1999); *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir. 2001).

[4]   *United States v. City of Redwood City,* 640 F.2d 963, 966 (9th Cir. 1981).

[5]   *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir. 1986); Fed. R. Civ. P. 15(a).

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

**B.     Whether an enforceable Intercreditor Agreement exists is a question of fact not appropriate for resolution in a motion to dismiss.**

Defendants' primary argument that runs through their entire motion to dismiss is that Defendant NMS never signed the Intercreditor Agreement and for that reason no valid contract exists. If a valid contract does exist, it binds only the parties that signed it. Defendants further contend that Plaintiff nowhere alleges that the parties had ever even entered into such a binding contract. Not so.

*Plaintiff does not allege that NMS never signed the Intercreditor Agreement* because Plaintiff's claims do not turn on whether NMS signed the agreement. The recitals quoted below and Defendants' course of performance evince the existence of a valid Intercreditor Agreement.

Paragraph 63 of the First Amended Complaint alleges:

> NMS never challenged the existence or validity of the Intercreditor Agreement until after iNDx declared bankruptcy. Attached as <u>Exhibit D</u> is an email dated, March 11, 2016, from counsel for NMS forwarding to Plaintiff a redlined document titled "Amended and Restated Intercreditor Agreement." NMS wanted to amend the existing Intercreditor Agreement for the reasons stated in the draft redlined document. NMS would not have asked for such an amendment if NMS did not believe the Intercreditor Agreement existed or was not valid.

The following recitals appear in the "Amended and Restated Intercreditor Agreement" attached as <u>Exhibit D</u> to the complaint (only the "clean version" of the redlined document is quoted):

> WHEREAS, **iNDx, PLC and NMS** signed that certain Intercreditor Agreement, dated as of October 28, 2014, as amended by the First Amendment to the Intercreditor Agreement, dated on or about June 2, 2015, collectively, the **"Original Intercreditor Agreement"**);

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

WHEREAS, SpanCo [Plaintiff Eurosemillas, S.A.] extended credit to iNDx in the amount of $250,000 (the "SpanCo Loan") evidenced by iNDx's Convertible Note, dated as of January __, 2015 (as the same may [be] modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, the "SpanCo Note"); and

WHEREAS, as a condition to making the SpanCo Loan, SpanCo required that iNDx's obligations under the SpanCo Note and related documents be secured by a pledge of the Collateral pursuant to a Security Agreement dated as of January __, 2015 from iNDx to NMS (as the same may [be] modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, the "SpanCo Security Agreement"); and

WHEREAS, as a further condition to making the SpanCo Loan, SpanCo required that SpanCo's lien on the Collateral be of equal priority to the liens of PLC and NMS on the Collateral; and

WHEREAS, **iNDx, PLC, NMS and SpanCo entered into that certain Intercreditor Agreement, dated January __, 2015 (the "Existing Intercreditor Agreement"), which such Existing Intercreditor Agreement superseded the Original Intercreditor Agreement**; and

WHEREAS, as a condition of NMS making the Fourth NMS Loan, NMS required that iNDx's obligations under the Third NMS Note, the Fourth NMS Note and any other loans made to iNDx by NMS as evidenced by a promissory note or otherwise be secured the Collateral pursuant to the NMS Security Agreement; and

WHEREAS, as a further condition to the making of the Fourth NMS Loan, NMS required that the parties hereto enter into this Agreement; and

WHEREAS, the parties intend that this Agreement supersede the Existing Intercreditor Agreement.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

These recitals acknowledge that some version of the Intercreditor Agreement existed between Plaintiff, NMS and PLC as of January 2015. NMS proposed and circulated a draft Amended and Restated Intercreditor Agreement in March 2016 because NMS wished to secure the unsecured loans that NMS had made to iNDx Lifecare, Inc. (*"iNDx"*) and further wanted these additional loans to be on equal footing as the prior loans that PLC and Plaintiff had made to iNDx Inexplicably, Defendants completely ignore the plain meaning of these recitals and do not recognize that they too are part of the complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Defendants ask the Court to dismiss the action in its entirety because Plaintiff nowhere alleges the existence of an Intercreditor Agreement between Plaintiff, NMS and PLC. They insist that "none of those recitals [in Exhibit D] refer to the existence of what Plaintiff alleges was an already-existing October 22, 2014 Intercreditor Agreement." Motion to Dismiss (5:12-13). Defendants' wildly distorted reading of the allegations and recitals in the Amended and Restated Intercreditor Agreement border on the absurd.

The parties' understanding of which version of the Intercreditor Agreement they intended to bind them is a factual issue that is not appropriate for resolution in a motion to dismiss. Granted, there appear to be some inconsistencies in the dates that the documents cite, but that does not mean that the parties never entered into such an agreement.

Defendants attack a straw man of their own creation that bears no relation to the actual claims alleged in the FAC. Whether NMS signed the contract but never delivered an executed copy to the parties, or intended to sign and never got around to it, are factual issues that Plaintiff will explore in discovery.

## C. The parties' course of performance is relevant to their understanding of the agreement they entered into, which Plaintiff will explore through discovery.

NMS contends that NMS is not bound by the Intercreditor Agreement because Plaintiff cannot produce a copy signed by NMS. If discovery reveals that NMS neglected to sign the agreement, Plaintiff should be allowed to show that NMS is bound due to its acceptance of the Intercreditor Agreement.

Courts often consider the course of performance because of the commonsense belief that when the parties perform under a contract, without objection or dispute, they are fulfilling their understanding of the terms of the contract. This is true regardless of the actual language of the contract, as long as the parties' interpretation is reasonable.

If the parties to a contract have harmoniously performed the contract in a way that reflects a particular, reasonable understanding of the terms of the contract, that performance is relevant to determining the meaning of the contract. It should not matter whether the parties' agents who originally drafted the contract participated in the performance, or have long since left the scene.

If parties harmoniously performed for some time under a particular understanding of the contract, there is no reason why that performance should be considered irrelevant to the meaning of the contract even if later the parties cannot produce a fully-executed copy of the contract. Moreover, under California Uniform Commercial Code section 1303, course of performance evidence can supplement, qualify, or modify contrary terms in the contract.

To determine the intended scope of secured obligations, courts look to the reasonable expectations of the parties. To this end, courts use general principles governing commercial agreements as well as specific rules pertaining to secured transactions. Under the Commercial Code, an agreement means the bargain of the parties in fact, as found in their language or inferred from other circum-

stances, including course of performance, course of dealing, or usage of trade as provided in Commercial Code § 1303. *See* Com. Code § 1201 (b)(3).

Not only is a course of performance relevant in ascertaining the meaning of the parties' agreement, it may supplement or qualify the terms of the agreement, as indicated in Commercial Code § 1303 (d), or show a waiver or modification of any term inconsistent with the course of performance. Com. Code § 1303 (f). Without citation to any legal authority, PLC and NMS contend that "[e]ven if there were not an express requirement [that all parties sign the Intercreditor Agreement for it to valid], the nature of the contract would permit no other conclusion. The annals of commercial law jurisprudence hold no precedent for the partial enforcement of an [I]ntercreditor [A]greement against less than all of the intended parties where it would have that effect." Motion to Dismiss (9:22 – 10:1-2).

Defendants' bald assertions fly in the face of long-established principles of law applied to the interpretation and enforcement of contracts, which include intercreditor agreements like the one at issue in this case. Whether the parties intended to be bound, even if not all of them signed the Intercreditor Agreement, is another issue of fact that Plaintiff is entitled to explore in discovery.

"[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention."[6]

---

[6]   *Universal Sales Corp. v. Cal. etc. Mfg. Co.*, 20 Cal.2d 751, 761–762 (1942).

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

"The conduct of the parties after execution of the contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions."[7]

"This rule of practical construction is predicated on the common sense concept that 'actions speak louder than words.' Words are frequently but an imperfect medium to convey thought and intention. When the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent."[8]

An inference of the parties' common knowledge or understanding that is based upon their course of performance is a question of fact.

### D. **Plaintiff will introduce parol evidence to help the court interpret and enforce the Intercreditor Agreement if the court finds that the agreement is ambiguous.**

California recognizes a broad exception to the parol evidence rule. "No contract should ever be interpreted and enforced with a meaning that neither party gave it," which is why "parol evidence may be introduced to show the meaning of the express terms of the written contract."[9]

The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.[10]

---

[7] *Kennecott Corp. v. Union Oil Co.*, 196 Cal. App. 3d 1179, 1189 (1987).

[8] *Crestview Cemetery Assn. v. Dieden*, 54 Cal.2d 744, 754 (1960); *Warner Constr. Corp. v. City of Los Angeles*, 2 Cal.3d 285, 296 (1970) ("The principle of 'practical construction' applies only to acts performed under the contract before any dispute has arisen.").

[9] *Brinderson-Newberg Joint Venture v. Pac. Erectors,* 971 F.2d 272 (9th Cir. 1992) (citations omitted).

[10] *Pac. Gas. & Elec. v. G.W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 37 (1968).

No doubt Defendants will point out that a party to a contract may not use extrinsic evidence to add to, detract from, or vary the express terms of the agreement. At this stage of the proceedings, however, the Court may not dismiss, out of hand, Plaintiff's contention that extrinsic evidence will show that the parties never considered, must less intended, for the agreement to be valid only if everyone signed. [11] Courts must interpret a contract after undertaking "at least a preliminary consideration of all evidence offered to prove the intention of the parties."[12]

As the Ninth Circuit has stated, "it matters not how clearly a contract is written, nor how completely it is integrated, nor how carefully it is negotiated, nor how squarely it addresses the issue before the court: the contract cannot be rendered impervious to attack by parol evidence. If one side is willing to claim that the parties intended one thing but the agreement provides for another, the court must consider extrinsic evidence of possible ambiguity. If that evidence raises the specter of ambiguity where there was none before, the contract language is displaced and the intention of the parties must be divined from self-serving testimony offered by partisan witnesses whose recollection is hazy from passage of time and colored by their conflicting interests." [13]

Plaintiff does not believe the Intercreditor Agreement can reasonably be interpreted to require all parties to sign the agreement for the contract as a whole to be valid or to bind at least the parties who do sign.  At best, the agreement is silent and ambiguous on this point. Plaintiff should be allowed to introduce

---

[11] *See id.* at 39.

[12] *Id.*

[13] *Trident Ctr. v. Connecticut Gen. Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988); *see also, A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., Bumble Bee Seafoods Div.*, 852 F.2d 493, 497 n.2 (9th Cir. 1988) ("courts may not dismiss on the pleadings when one party claims that extrinsic evidence renders the contract ambiguous").

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

parol evidence to respond to Defendants' contention that the agreement requires otherwise—the "annals of commercial law jurisprudence" not withstanding.

### E. The complaint properly alleges the "the who, what, when, where, and how" of the fraud that Defendants committed.

1. WHO: Defendant Reuven Duer, shareholder and director of PLC, who was a member of the Board of Directors of iNDx (FAC ¶ 7)

Defendant Eric Rieders who was the Chairman of NMS's Board of Directors and was retained by iNDx to serve as a Management Consultant and Chairman of iNDx's Board of Directors. (FAC ¶ 8)

2. WHAT: "Reuven Duer and Eric Rieders knowingly and willfully conspired and agreed among themselves to harm Plaintiff by engaging in a pattern of intentional, willful, and malicious misrepresentations to induce Plaintiff to lend $250,000 to iNDx based on the false promise that PLC and NMS would share joint ownership of the Collateral as co-tenants if iNDx defaulted on the notes." (FAC ¶ 98)

"Defendants never intended to give Plaintiff *pari passu* rights in and to the Collateral as they had promised they would under the terms of the Intercreditor Agreement." (FAC ¶ 99)

3. WHEN: "As early as October 2014 and in the months that followed, Reuven Duer and Eric Rieders promised and assured Plaintiff that PLC and NMS would, and did, enter into the Intercreditor Agreement and that PLC and NMS would fulfill their obligations under this contract, but now deny that they ever intended for PLC and NMS to fulfill those promises at the time they were made." (FAC ¶ 96)

"In October 2014, Plaintiff provided bridge financing to iNDx in the form of a loan evidenced by a Secured Convertible Promissory Note, dated January 28, 2015, in the principal amount of $250,000, with a maturity date of March 31, 2016." (FAC ¶ 22)

"On or around March 11, 2016, Eric Rieders instructed counsel for NMS to send to Plaintiff a draft of an amendment to the Intercreditor Agreement, which, in light of Defendants' denial of the existence of this agreement, must have been meant to continue the subterfuge of deception intended to mislead Plaintiff that NMS recognized that a valid and enforceable Intercreditor Agreements existed between the parties." (FAC ¶ 97)

"PLC and NMS conducted a public foreclosure sale of the Collateral on November 4, 2016 where they purportedly purchased the Collateral secured by iNDx's obligations to NMS, PLC and Plaintiff." (FAC ¶ 46) "PLC and NMS proceeded with the sham foreclosure in knowing and in conscious disregard for Plaintiff's rights, and did so with malice and oppression as defined in Civil Code section 3294." (FAC ¶ 89)

<u>WHERE</u>:  "[A]ll acts alleged in this Complaint occurred in San Francisco County and Santa Clara County." (FAC ¶ 14)

<u>HOW</u>:  "Reuven Duer and Eric Rieders knowingly and willfully conspired and agreed among themselves to harm Plaintiff by engaging in a pattern of intentional, willful, and malicious misrepresentations to induce Plaintiff to lend $250,000 to iNDx based on the false promise that PLC and NMS would share joint ownership of the Collateral as co-tenants if iNDx defaulted on the notes." (FAC ¶ 98)

Defendants breached their fiduciary duties to iNDx in pursuit of their own interests to the detriment of iNDx, which in turn diminished the value of the Collateral and, by extension, the value of Plaintiff's pro rata share to the Collateral. Paragraphs 32 to 58 of the FAC describe in detail the acts Defendants committed as they "conspired and colluded with each other to devise a plan to plunder iNDx's intellectual property," which violated the spirit of the Intercreditor Agreement the parties entered into to assist and support iNDx to succeed.

### F. Plaintiff's Unfair Competition claim is not facially invalid because Defendants believe Plaintiff cannot prove the predicate claims.

Defendants argue that the claim for violation of Business & Professions Code 17200 fails because Plaintiff cannot prove any of the other claims and there is nothing for the Court to enjoin as an ongoing unlawful, unfair or fraudulent business act or practice. Defendants contend that "[t]he only ongoing practice that could theoretically be enjoined is Defendants' continuing rejection of Plaintiff's claim that it has an interest in the Collateral notwithstanding the foreclosure sale that vested title in PLC and NMS (and now LDIP).

"If Plaintiff were to establish that it does somehow have an interest in the Collateral notwithstanding the foreclosure, and if Defendants then refused to acknowledge it, there might be something to enjoin. Until then, Plaintiff has no claim based on Defendants' statements that LDIP owns the Collateral." Motion to Dismiss (14: 7-12) Defendants either do not understand how a Rule 12(b)(6) motion works, or just do not wish to accept that, at this early stage of the proceedings, all the "allegations of the complaint must be accepted as true."[14]

That means Plaintiff must be deemed to have an interest in the Collateral. That's enough to proceed with the claim for violation of Business and Professions Code section 17200 as alleged.

### G. Defendants say nothing of substance to challenge Plaintiff's request for attorneys' fees under the "tort of another" doctrine.

Defendants quote Code of Civil Procedure section 1021.6, which codifies the tort of another doctrine, cite a case regarding implied indemnity, and state in summary fashion without explanation that "[t]his is not an implied indemnity action and CCP § 1021.6 is not even conceptually applicable." Motion to Dismiss (Motion to Dismiss (14:15 – 15:2). Without more, Plaintiff cannot respond to this

---

[14] *Cruz v. Beto*, 405 U.S. 319, 322 (1972).

conclusory statement except to say that, again, Defendants seem not to understand the underlying legal basis for the relief requested.

Defendants do not dispute that Plaintiff was forced to act to protect its interests by defending against the Defendants' actions taken in the iNDx bankruptcy proceeding and in bringing this action. Nor do they dispute that Plaintiff is without fault in connection with Defendants' wrongful claims that PLC, NMS and/or LDIP own all the interest in and to the Collateral.

The fact is, as the complaint alleges and must be deemed true, Plaintiff has been required to defend against these claims and to bring this action solely as a result of the tortious conduct of each of the Defendants.

Whether Plaintiff was forced to incur attorneys' fees and costs to protect its joint ownership interest in the Collateral is a determination that, upon motion, this Court will consider "after reviewing the evidence in the principal case" and finds that "the indemnitee through the tort of the indemnitor has been required to act in the protection of the indemnitee's interest by brining an action against or defending an action by a third party person." *Unocal Corp. v. United States*, 222 F.3d 528, 543 (9th Cir. 2000).

Defendants' request to strike Plaintiff's request for attorneys' fees under Code of Civil Procedure section 1021.6 is premature; they may renew their request after the case ends.

Dated:  August 10, 2017         Respectfully submitted,

                                KUMAR LAW

                                _____
                                Ruchit Kumar Agrawal
                                Counsel for Plaintiff Eurosemillas S.A.

# CERTIFICATE OF SERVICE

I hereby certify that the above document was filed electronically with the Clerk of the United States District Court for the Northern District of California, and was served via hyperlink generated by the court's CM/ECF system, which was sent electronically to:

Maxim B. Litvak
Harry D. Hochman
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
T:  415.263.7000
F:  415.263.7010
*mlitvak@pszjlaw.com*
*hhochman@pszjlaw.com*

I declare under penalty of perjury, under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated:  August 10, 2017   _____
Ruchit Kumar Agrawal