# ATTACHMENT TO SUMMONS

Ruchit Kumar Agrawal (SBN 299290)
KUMAR LAW
6525 Crown Blvd. #20072
San Jose, California 95160
Tel: (408) 601-0586
*Ruchit@kumarlawsv.com*

Counsel for Plaintiff Eurosemillas, S.A.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUROSEMILLAS, S.A., a Spanish corporation, | Case No. 17-cv-3159-MEJ |
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| v. | [DEMAND FOR JURY TRIAL] |
| PLC DIAGNOSTICS, INC., a Delaware corporation; NATIONAL MEDICAL SERVICES, INC. dba NMS LABS, a Pennsylvania corporation; LDIP, LLC, a Delaware limited liability company; REUVEN DUER; ERIC RIEDERS; and Does 1 through 10, inclusive, | |
| Defendants. | |

**INTRODUCTION**

1.      This is an action by Plaintiff Eurosemillas, S.A. for judicial declaration of ownership rights and to quiet title to certain patents and related intellectual property.

2.      Plaintiff further seeks damages for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud in the inducement, unfair competition under California Business and Professions Code § 17200 *et seq.*, injunctive relief, and damages for undermining Plaintiff's ownership rights to intellectual property.

**PARTIES**

3.      Eurosemillas, S.A. ("***Plaintiff***") is, and at all times relevant to this Complaint has been, a Spanish corporation. The company has a place of business and offices located at Paseo de la Victoria 31, 1º A, 14004 Córdoba, Spain. Plaintiff is a minority shareholder of iNDx Lifecare, Inc. ("***iNDx***").

4.      PLC Diagnostics, Inc. ("***PLC***") is, and at all times relevant to this Complaint has been, a Delaware corporation authorized to operate by the State of California and qualified to do business in California. PLC is headquartered and has its offices located at 9568 Topanga Canyon Blvd., Chatsworth, California 91311.  PLC is a majority shareholder of iNDx.

5.      National Medical Services, Inc. dba NMS Labs ("***NMS***") is, and at all times relevant to this Complaint has been, a Pennsylvania corporation, having a place of business and offices located at 3701 Welsh Road, Willow Grove, Pennsylvania 19090.

6.      LDIP, LLC ("***LDIP***") is, and at all times relevant to this Complaint has been, a Delaware limited liability company created and operated by PLC and NMS. Plaintiff is informed and believes that LDIP is headquartered and has its offices located at 192 Odebolt Drive, Thousand Oaks, California 91360.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

7.      REUVEN DUER is an individual who, at all times relevant to this Complaint, was a shareholder and director of PLC. He was a member of iNDx's Board of Directors from December 2014 until he resigned in June 2016.

8.      ERIC RIEDERS is an individual who, at all times relevant to this Complaint, was the Chairman of NMS' Board of Directors. iNDx retained Rieders as a Managing Consultant and he served as Chairman of iNDx Lifecare, Inc.'s Board of Directors from February 2016 through May 2016.

### DOES 1 - 10

9.      Plaintiff is unaware of the true names and capacities of defendants sued as Does 1 through 10, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when they have been ascertained.

10.      Each Doe defendant contributed to or caused the damages to iNDx. Each Doe defendant acted as the principal, agent, employer, employee, alter ego, co-conspirator or aider and abettor of each named defendant or other Doe defendant.

11.      Every defendant, including Does 1 through 10, will be collectively referred to as "Defendants."

### JURISDICTION
### AND VENUE

12.      This Court has original jurisdiction over this action under 28 U.S.C. section 1332(a) because this civil action is between citizens of the United States and a citizen of a foreign state.

13.      The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14.      Venue is proper because all acts alleged in this Complaint occurred in San Francisco County and Santa Clara County.

**FACTUAL BACKGROUND**

15.     PLC and iNDx Technology, Inc. entered into a Joint Venture Agreement ("***JV Agreement***") pursuant to which they agreed to create iNDx Lifecare, Inc. (**"*iNDx*"**).

16.     iNDx was founded to develop, produce, and sell diagnostic devices and tests based, initially, on technology developed by PLC and certain computer programs to which iNDx Technology, Inc. had access or had been developing for commercialization.

17.     In August 2013, as part of the due diligence before the parties entered into the JV Agreement, PLC and Defendant Duer represented to Mohan Uttarwar of iNDx Technology, Inc., that the PLC technology had passed the sample tests in the PSA (Prostate Specific Antigen) test kit that had been sent to them in July 2013, in a commercially reasonable manner (*i.e.* without tuning and adjusting the system for each sample). They further represented that the technology would be ready to bring to market within six (6) months after execution of the JV Agreement. These representations later turned out to be false.

18.     Under the terms of the JV Agreement, PLC assigned and transferred to iNDx all ownership rights of its patents and related intellectual property, and in exchange iNDx issued a Secured Convertible Promissory Note, dated December 27, 2013, in the principal amount of $3,100,000.00 and a maturity date of December 31, 2018.  PLC represented to iNDx that the estimated market value of the patents and intellectual property assigned to iNDx far exceeded the amount of the note.

19.     Under a Security Agreement from iNDx to PLC, dated December 27, 2013, attached as <u>Exhibit A</u>, iNDx's obligations under PLC's Note and related documents were secured by a pledge of the patents identified in that agreement together with all right, title and interest to these inventions and related intellectual property (collectively, the **"*Collateral*"**).

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

20.     Based on the representation of the readiness of the technology (*i.e.* that it would be ready to go to market in six months) made by PLC and Defendant Duer, iNDx raised $2,100,000 in Series A equity financing in March 2014. iNDx was valued at $6,000,000 pre-money. Relying on PLC's and Defendant Duer's representations, Plaintiff participated in this financing with an investment of $200,000.

21.     In August 2014, NMS became a strategic partner of iNDx. NMS and iNDx agreed to develop, market and sell small molecule assay products based on their respective technologies and expertise.

22.     NMS provided secured debt financing to iNDx in the form of a loan evidenced by a Secured Convertible Note, dated November 15, 2014, in the principal amount of $1,000,000.00, with a maturity date of December 31, 2015.

23.     Under a Security Agreement from iNDx to NMS, dated November 15, 2014, iNDx's obligations under the NMS Notes and related documents were secured by a pledge of the same Collateral as was pledged to PLC.

24.     NMS provided additional secured debt financing to iNDx in the form of a second loan evidenced by a Secured Convertible Note, dated May 27, 2015, in the amount of $500,000.00, with a maturity date of March 31, 2016.

25.     Under a Security Agreement from iNDx to NMS, dated May 27, 2015, iNDx's obligations under the NMS Notes and related documents were secured by a pledge of the same Collateral as was pledged to PLC.

26.     Plaintiff provided secured debt financing to iNDx in the form of a loan evidenced by a Secured Convertible Promissory Note, dated January 28, 2015, in the principal amount of $250,000, with a maturity date of March 31, 2016.

27.     Under a Security Agreement from iNDx to Plaintiff, dated October 24, 2014, iNDx's obligations under Plaintiff's Note and related documents were secured by a pledge of the same Collateral as was pledged with PLC's Note and NMS' two notes.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

28.     Plaintiff, NMS and PLC agreed to hold *pari passu* rights, title and interest in and to the Collateral pursuant to the contract identified and described as "Existing Intercreditor Agreement" (***"Intercreditor Agreement"***) in the recitals of the blacklined document titled "Amended and Restated Intercreditor Agreement" attached as <u>Exhibit B</u>.

29.     Plaintiff never would have agreed to loan $250,000 to iNDx had PLC and NMS not consented and entered into the Intercreditor Agreement.

30.     iNDx defaulted on all the notes.

31.     Starting in 2015, Defendant Duer began to criticize the management of iNDx. He grew increasingly agitated over time, and began to undermine all efforts made to keep the company solvent. Both directors that served on iNDx's board of directors that were appointed by PLC blocked every proposed financing option presented to the Board while Defendant Duer did everything he could to sabotage iNDx so that the company would not succeed.

32.     In or around September 2015, Defendant Duer and PLC rejected an offer that would have resulted in a $2,000,000 round of debt financing that would have ensured iNDx's continued financial viability. In or around March 2016, Defendant Duer and PLC also rejected an offer of $3,000,000 in equity financing.

33.     Defendant Duer refused to explain why PLC rejected the financing options presented—the reasons for which eventually later became evident:  PLC sought to make iNDx insolvent so that PLC could foreclose on its fraudulently-induced $3,100,000 note and take back the intellectual property that PLC had transferred to iNDx when PLC and iNDx Technology, Inc. entered into the JV Agreement, technology that had been enhanced using the loans and Series A investment.

34.     Because iNDx's intellectual property secured NMS' two convertible notes, PLC began to collude and conspire with NMS to devise a plan where they would both share the rights to iNDx's intellectual property to the exclusion and

1   detriment of the company and its other shareholders.

2       35.     In or around February 2016, iNDx entered into a consulting

3   agreement with Defendant Rieders pursuant to which he assumed the role of

4   Managing Consultant to manage iNDx's business affairs and assumed the role of

5   Chairman of the Board for iNDx, and served continuously until he resigned in

6   May 2016.

7       36.     In or around April 2016, iNDx and NMS began negotiations to

8   explore ways to keep iNDx afloat financially so that iNDx could continue to

9   develop its core technology. iNDx management was confident that such

10  development would enable iNDx to secure additional financing from

11  prospective investors.

12      37.     Defendant Rieders of NMS directed and actively participated in the

13  negotiations. In early June 2016, NMS tendered an offer that iNDx accepted in

14  which NMS and iNDx agreed that, among other things:

15          a.      NMS would assume specified iNDx liabilities;

16          b.      NMS would purchase certain iNDx tangible property; and

17          c.      iNDx would waive the confidentiality agreements entered

18  into by its employees so that NMS could hire these iNDx employees to continue

19  work they were performing at iNDx.

20      38.     The terms of the above agreement were memorialized in an Asset

21  Purchase Agreement that NMS prepared.

22      39.     As NMS and iNDx negotiated and finalized the terms of the Asset

23  Purchase Agreement, NMS took possession of iNDx's tangible property, hired

24  iNDx's employees and continued to give the impression that NMS was

25  genuinely interested in going forward with the agreement.

26      40.     NMS hired iNDx's employees through Evanescent Diagnostic

27  Systems, LLC, which Plaintiff is informed and believes is wholly owned and

28  controlled by NMS.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

41.     For reasons that later became known, NMS rescinded its offer and ceased all negotiation discussions after it took possession of iNDx's assets and hired iNDx's employees. On or around July 14, 2016, PLC and NMS then jointly informed iNDx that iNDx's intellectual property would be sold at a "public auction" to be conducted at the law offices of their attorneys to pay off their respective notes.

42.     PLC and NMS gave the notice of foreclosure on the same day that iNDx's current Managing Consultant, Piyush Gupta, informed them that he was going to be in India until August 11, 2016. Gupta was negotiating the terms of the Asset Purchase Agreement with NMS.

43.     PLC and NMS scheduled the auction at 10:00 a.m. on August 12, 2016, the day after Gupta was scheduled to return to the United States.

44.     Plaintiff is informed and believes that PLC and NMS conspired and colluded with each other to devise a plan to plunder iNDx's intellectual property.

45.     PLC blocked iNDx's efforts to obtain debt or equity financing. NMS took possession of iNDx's tangible property, and hired iNDx's employees as NMS feigned to negotiate the terms of the Asset Purchase Agreement with iNDx. Once everything was in place, PLC and NMS moved to foreclose on their notes.

46.     On or around July 14, 2016, PLC and NMS gave notice to iNDx that PLC and NMS were going to sell the Collateral at a public auction on August 12, 2016.

47.     iNDx declared bankruptcy on August 11, 2016.

48.     Because iNDx was unable to secure financing to resume business operations, the bankruptcy court lifted the automatic stay on October 19, 2016, pursuant to a stipulation entered into between iNDx, PLC and NMS.

49.     Plaintiff did not receive notice of the stipulation until after the order issued by the bankruptcy court that lifted the automatic stay was entered.

50.     On or after October 21, 2016, counsel for NMS and PLC, Pachulski Stang Ziehl & Jones LLP, mailed to Plaintiff an Amended Notice of Disposition of Collateral By Public Foreclosure Sale scheduled for 10:00 a.m. on November 4, 2016. As stated in the Amended Notice, NMS and PLC purported to foreclose on "all of the Debtor's right, title and interest, on a worldwide basis, in and to Collateral," which is identified as all Technology and Intellectual Property Rights related to the listed patents and patent applications.

51.     On October 31, 2016, counsel for Plaintiff wrote to Maxim Litvak, counsel for NMS and PLC, to object to the foreclosure sale because NMS and PLC purported to sell all of iNDx's right, title and interest in the Collateral, contrary to the express terms of the Intercreditor Agreement.

52.     Plaintiff further objected to the numerous terms of the auction that made the Amended Notice facially defective because it would be commercially unreasonable, in violation of Commercial Code sections 9610 and 9627.

53.     Attached as Exhibit C is a true and correct copy of the letter dated October 31, 2016, that Plaintiff's counsel, Gayle M. Athanacio, sent to Maxim Litvak, counsel for NMS and PLC.

54.     Plaintiff requested that NMS and PLC cancel the November 4, 2016 foreclosure and to contact Plaintiff's counsel so that the parties could attempt to resolve their dispute.

55.     Having received no response to the October 31, 2016 letter, on November 2, 2016, Plaintiff's counsel contacted counsel for NMS and PLC to address the issues with their proposed November 4 auction.  Advised that NMS and PLC would not postpone the foreclosure sale, Plaintiff sought to discuss the manner in which it could make and preserve its objections at the proposed auction in a reasonable manner, and to ensure any potential bidders were advised of Plaintiff's claims with regard to the Collateral so that no successful bidder purchased any or all of the Collateral unaware of Plaintiff's claims.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

56.     In November 2016, iNDx offered to PLC, NMS and Plaintiff a deed in lieu of foreclosure or assignment in lieu of foreclosure pursuant to Section 7 of the Intercreditor Agreement. PLC and NMS rejected the deed in lieu of foreclosure. Plaintiff, however, accepted iNDx's offer for a deed in lieu of foreclosure.  On December 24, 2016, iNDx executed the Quit Claim Assignment attached as <u>Exhibit D</u>.

57.     PLC and NMS proceeded with the sham foreclosure in knowing and in conscious disregard for Plaintiff's rights, and did so with malice and oppression as defined in Civil Code section 3294.

58.     Defendants' wrongful conduct committed fraud and negligence against Plaintiff thereby nullifying the wrongful foreclosure in its entirety, or, at a minimum, as to Plaintiff's *pari passu* pro rata share to the Collateral under the terms of the Intercreditor Agreement.

59.     PLC and NMS conducted a public foreclosure sale of the Collateral on November 4, 2016 where they purportedly purchased the Collateral secured by iNDx's obligations to NMS, PLC and Plaintiff.

60.     PLC and NMS announced at the foreclosure sale that they had assigned all their interest in the collateral to LDIP.

61.     Plaintiff objected to the commercially unreasonable manner in which the auction was conducted.

62.     Plaintiff further objected to the sale of ***ALL the rights, title and interest in and to the Collateral*** on grounds that Plaintiff, NMS and PLC hold *pari passu* rights, title and interest in and to the Collateral, under the terms of the Intercreditor Agreement.

63.     The ostensible purchase by PLC and NMS of the Collateral through LDIP, LLC (based on a $1,000,000 credit bid "capital contribution") did not, and could not, as a matter of law and equity, impair Plaintiff's *pari passu* rights, title and interest in and to the Collateral.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

1    64.    NMS, PLC and Plaintiff share joint ownership of the Collateral as

2  tenants in common, with the indivisible right to exploit the Collateral however

3  they wish.

4    65.    Each Defendant aided and abetted and rendered substantial

5  assistance in the wrongs alleged in this Complaint.

6    66.    In taking such actions to substantially assist the commission of the

7  wrongdoing alleged in this Complaint, each Defendant acted with knowledge of

8  the primary wrongdoing, substantially assisted the accomplishment of that

9  wrongdoing, and was aware of his, her, its overall contribution to and

10  furtherance of the wrongdoing.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

**FIRST CAUSE OF ACTION**

**Breach of Contract**

**Against PLC and NMS**

67.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Complaint.

68.    Plaintiff, PLC and NMS entered into the Intercreditor Agreement under which they hold *pari passu* rights, title and interest in and to the Collateral.

69.    PLC and NMS breached the Intercreditor Agreement when they:

a.    denied, and continue to deny, that the agreement exists;

b.    purported to sell and purchase the Collateral at the sham fore-closure they conducted on November 4, 2016 in San Francisco, California; and

c.    refused to recognize that NMS, PLC and Plaintiff share joint ownership of the Collateral as tenants in common, with the indivisible right to exploit the Collateral however they wish.

70.    NMS did not return a fully executed copy of the Intercreditor Agreement to iNDx or Plaintiff. Contrary to California law, PLC and NMS contend that no such valid contract exists because Plaintiff cannot provide a fully executed contract signed by all the parties. *See Angell v. Rowlands,* 85 Cal. App. 3d 536, 541 (1978) ("[A] contract is invalid if not signed by all parties purportedly bound only when it is shown, either by parol or express condition, that the contract was not intended to be complete until all parties had signed. Conversely, in the absence of a showing that the contract is not intended to be complete until signed by all parties, the parties who did sign will be bound.").

71.    The iNDx Board approved Plaintiff's $250,000 Promissory Note on the same terms, and *pari passu* with, the PLC and NMS Notes in a board meeting held at the iNDx office in Los Gatos, California on January 28, 2015.

72.    On January 29, 2015 at 9:30 a.m. PST, in a phone call, Mohan Uttarwar of iNDx informed Defendant Rieders of NMS of the iNDx Board's

1   approval of Plaintiff's $250,000 loan to iNDx at the same *pari passu* terms as PLC

2   and NMS. Defendant Rieders of NMS welcomed the additional investment and

3   expressed that the relationship would be useful to iNDx.

4       73.    On February 18, 2015 at 10 a.m. PST, in a phone call, Mohan

5   Uttarwar informed Pierre Cassignuel of NMS of iNDX's Board's approval of

6   Plaintiff's $250,000 loan to iNDx at the same *pari passu* terms as PLC and NMS.

7   Pierre also expressed his strong approval and welcomed Plaintiff's investment.

8       74.    Defendant NMS expressly consented to the Intercreditor

9   Agreement, and at all times behaved as if NMS was bound by it.

10      75.    On February 17, 2016, between 6 p.m. - 7 p.m. PST, the members of

11  iNDx's Board convened via telephone to discuss, among other things, the terms

12  of additional bridge financing that NMS considered providing to iNDx at the

13  time. During that meeting, Defendant Rieders expressly acknowledged the *pari*

14  *passu* rights that Plaintiff, PLC and NMS had to the Collateral pursuant to the

15  terms of the Intercreditor Agreement. He made clear that any additional

16  financing extended to iNDx would be contingent on all three existing secured

17  creditors—PLC, NMS and Plaintiff—amending the Intercreditor Agreement.

18      76.    On February 12, 2016, Defendant Rieders sent an email to Javier

19  Cano of Eurosemillas that states as follows:

> A bridge funding mechanism was approved last December by INDx Board,
> but despite NMS' expectations, these funds are not secured under the
> terms of that bridge. NMS has indicated that moving forward we will not
> provide any additional funds without security and PLC has agreed that is
> will be acceptable to them for those funds to be given security **pari passu**
> **with the already existing notes (your, NMS' and PLC's). I would observe**
> **that you will also have to agree to sign an amendment to the inter-**
> **creditor agreement to allow this funding, in which participation is limited**
> **to PLC, NMS and Eurosemillas.**

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

77.     On February 16, 2016, Defendant Rieders sent a follow-up email to Javier Cano where he states;

> **In order for the (secured) bridge to operate, all note-holders (i.e. including Eurosemillas) must sign an amendment to the inter-creditor agreement** (which will be provided you shortly). Also, there are some formalities that you should be taking since you have not called your note.

78.     In an email dated, March 11, 2016, counsel for NMS forwarded to Plaintiff a blacklined document titled "Amended and Restated Intercreditor Agreement." NMS wanted to amend the existing Intercreditor Agreement for the reasons stated in the blacklined document. A true and correct copy of this email is included in the attached Exhibit B.

79.     The following recitals appear in the Amended and Restated Intercreditor Agreement. Only the "clean version" of the blacklined document is quoted. Plaintiff is referred to as SpanCo (*i.e.* Spanish Company):

> WHEREAS, iNDx, PLC and NMS signed that certain Intercreditor Agreement, dated as of October 28, 2014, as amended by the First Amendment to the Intercreditor Agreement, dated on or about June 2, 2015, collectively, the "Original Intercreditor Agreement");

> WHEREAS, **SpanCo [Plaintiff Eurosemillas, S.A.]** extended credit to iNDx in the amount of $250,000 (the "SpanCo Loan") evidenced by iNDx's Convertible Note, dated as of January __, 2015 (as the same may [be] modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, the "SpanCo Note"); and

> WHEREAS, as a condition to making the SpanCo Loan, SpanCo required that iNDx's obligations under the SpanCo Note and related documents be secured by a pledge of the Collateral pursuant to a Security Agreement dated as of January __, 2015 from iNDx to NMS (as the same may [be]

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, the "SpanCo Security Agreement"); and

WHEREAS, as a further condition to making the SpanCo Loan, SpanCo required that SpanCo's lien on the Collateral be of equal priority to the liens of PLC and NMS on the Collateral; and

WHEREAS, **iNDx, PLC, NMS and SpanCo entered into that certain Intercreditor Agreement, dated January __, 2015 (the "Existing Intercreditor Agreement"), which such Existing Intercreditor Agreement superseded the Original Intercreditor Agreement**; and

WHEREAS, as a condition of NMS making the Fourth NMS Loan, NMS required that iNDx's obligations under the Third NMS Note, the Fourth NMS Note and any other loans made to iNDx by NMS as evidenced by a promissory note or otherwise be secured the Collateral pursuant to the NMS Security Agreement; and

WHEREAS, as a further condition to the making of the Fourth NMS Loan, NMS required that the parties hereto enter into this Agreement; and

**WHEREAS, the parties intend that this Agreement supersede the Existing Intercreditor Agreement.**

80.    The reference to "Existing Intercreditor Agreement" in the Amended and Restated Intercreditor Agreement expressly identifies Plaintiff as a party to a valid and enforceable Intercreditor Agreement between Plaintiff (*i.e.* SpanCo), NMS, PLC and iNDx as of January 2015.

81.    As Defendant Rieders explained in his February 2016 emails to Javier Cano, NMS proposed and circulated the draft Amended and Restated Intercreditor Agreement in March 2016 because NMS wished to secure the unsecured loans that NMS had made to iNDx and further wanted these and any

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

additional loans made to iNDx to be on equal footing (*pari passu*) with iNDx's prior promissory notes payable to PLC, NMS and Plaintiff.

82.     On April 9, 2016, Defendant Rieders sent an email to Javier Cano where he expressly represents that he is communicating in his capacity as Consultant to iNDx and as its Board Chairman and made the following statements:

> In response to your comment that this Board or its members prevented existing funding mechanisms to be implemented that would resolve these issues, I must tell you that in fact to date no such funding has been blocked. **The establishment of a secured bridge is somewhat complicated by the nature of the [I]ntercreditor [A]greement between the three secured noteholders (Eurosemillas, PLCD and NMS Labs)** and required review and approval by all three parties.

83.     On May 10, 2016, Piyush Gupta, a director on iNDx's Board nominated by iNDx's Series A investors, met with Defendant Rieders for lunch at Siam Thai Restaurant (located at 1080 S. De Anza Blvd., San Jose, California) to discuss the terms of an Asset Purchase Agreement that iNDx and NMS were negotiating. During their discussion, Defendant Rieders again expressly acknowledged Plaintiff's *pari passu* rights to the Collateral under the Intercreditor Agreement between Plaintiff, PLC and NMS.

84.     Piyush Gupta suggested an alternative in case PLC blocked the Asset Purchase Agreement, where by PLC, NMS and Plaintiff could own and have unrestricted access to the Collateral and proceed independently.

85.     Piyush Gupta further represented that the Series A shareholders were aligned with Plaintiff.  Defendant Rieders expressed his preference for this alternative and said it would be possible only because Series A's ally, Plaintiff, holds the ***pari passu*** trump card.

86.     NMS never challenged the existence or validity of the Intercreditor Agreement until after iNDx declared bankruptcy.

87.     As parties to the Intercreditor Agreement, PLC and NMS bound their assignees to the obligations undertaken by PLC, NMS and Plaintiff with respect to the parties' ownership interests in the Collateral.

88.     Plaintiff is informed and believes that PLC and NMS assigned to LDIP their interest in and to the Collateral.

89.     Plaintiff is further informed and believes that PLC and NMS assigned to LDIP their rights and liabilities under the Intercreditor Agreement.

90.     LDIP challenges the validity of Intercreditor Agreement and refuses to recognize Plaintiff's joint ownership rights in the Collateral.

91.     PLC and NMS are liable for LDIP's breach of the Intercreditor Agreement, as PLC and NMS specifically agreed in Section 10(c) of the agreement to be responsible for their assignees' compliance with the terms and conditions of the Intercreditor Agreement, and that PLC and NMS would be fully liable for any breach of the agreement by any such assignee.

92.     Plaintiff performed all conditions, covenants and promises required on its part to be performed under the Intercreditor Agreement, except for those that have been excused and/or waived by PLC and NMS as a result of their breach of the agreement.

93.     As a direct, proximate and foreseeable cause of the breach of the Intercreditor Agreement by PLC and NMS, Plaintiff has been damaged in an amount to be proven at trial.

94.     If the Court finds that Plaintiff's claim for breach of contract fails, Plaintiff hereby requests the alternative relief of restitution of the unjust enrichment Defendants have enjoyed by forcing them to disgorge their ill-gotten gains by making restitution to Plaintiff.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

95.     As detailed above, PLC and NMS have breached their obligations under the Intercreditor Agreement.

96.     Defendants have been enriched by Plaintiff's performance of its obligations under the Intercreditor Agreement.

97.     Specifically, Defendants benefitted from the $250,000 loan that Plaintiff made to iNDx that helped enhance the value of the Collateral until Defendants plundered the Collateral from iNDx. That enrichment was conferred with a resulting impoverishment to Plaintiff.

98.     Plaintiff is informed and believes that Defendants have obtained, or will soon obtain, financing from private investor(s) to exploit the Collateral and have therefore enjoyed the benefit of a bargain for which, on information and belief, they had no intention of meeting their reciprocal obligations, apparently intending rather to circumvent the letter and spirit of the Intercreditor Agreement by the conduct described above.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Against PLC and NMS

99.     Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Complaint.

100.    PLC and NMS breached the Intercreditor Agreement by the conduct described above. *Brown v. Superior Court,* 34 Cal. 2d 559 n. 5 (1949) ("In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.").

101.    Plaintiff, PLC and NMS had a special relationship arising out of the fiduciary duty of loyalty that PLC and NMS owed to Plaintiff as a minority iNDx shareholder. PLC is a majority shareholder of iNDx and, under the terms of the JV Agreement, appointed two directors to iNDx's board of directors.

102. Defendant Rieders of NMS served as Managing Consultant and Chairman of iNDx's Board during the relevant time period.

103. PLC and NMS sought to take advantage of Plaintiff's extensive business connections in Europe and Latin America to gain access to the European and Latin American markets. NMS courted Plaintiff and even hosted Plaintiff's representatives, Javier Cano and Ricardo Merino, at NMS' facility in Pennsylvania on December 9 and 10, 2015 because PLC and NMS hoped to enter into a long-term business partnership with Plaintiff.

104. In or around April 2016, Pierre Cassigneul, President and CEO of NMS, spoke with Javier Cano by phone and reiterated NMS' interest in partnering with Plaintiff to leverage their business connections in Europe and Latin America.

105. During the April 2016 call, Pierre Cassigneul asked Javier Cano not to call Plaintiff's $250,000 secured note. Because of Plaintiff's *pari passu* rights to the Collateral, NMS and/or PLC would have to pay iNDx's debt obligation to Plaintiff (so PLC and NMS would not share ownership rights to the Collateral with Plaintiff), which Pierre Cassigneul said NMS would rather not do.

106. When Plaintiff invested $200,000 in iNDx's Series A financing round in March 2014, Plaintiff relied on Defendant Duer's representation that PLC's technology had passed, in a commercially reasonable manner, the sample tests in the PSA (Prostate Specific Antigen) test kit sent to them in July 2013 and would be ready to bring to market within six (6) months following the execution of the JV Agreement.

107. When Plaintiff made the $250,000 loan to iNDx and entered into the Intercreditor Agreement, Plaintiff relied on the representations made by Defendant Duer of PLC regarding how advanced the development of the technology of the underlying Collateral was to justify the $3,100,000 amount of PLC's secured note payable by iNDx as payment for this technology.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

108. As late as May 2016, however, PLC's technology was not working, contrary to Defendant Duer's earlier representations.

109. On June 3, 2015, Mohan Uttarwar had a 1:1 meeting at the iNDx office in Los Gatos, California, with Yunpei Chang, who was the senior scientist at PLC when the PSA tests were conducted at PLC in August 2013. At this meeting, Yunpei Chang disclosed to Mohan Uttarwar that, in August 2013, the PLC system had been manually tuned and adjusted to pass the tests in the PSA test kit.

110. On February 12, 2016 during a 7:00 a.m. PST teleconference iNDx Board meeting, Defendant Rieders informed the Board that the PLC technology would not be ready for commercialization until 2018, at the earliest.

111. Relying on the repeated assurances given by Defendants Duer and Rieders to Plaintiff via phone calls and emails in January, February, March and April of 2016 that PLC and NMS would work with Plaintiff to help iNDx succeed, Plaintiff did not initiate foreclosure proceedings against iNDx for non-payment of the $250,000 note that Plaintiff had called due in April 2016.

112. Plaintiff did not know that PLC and NMS did not intend to honor the Intercreditor Agreement at the time they negotiated this agreement, as more specifically described in the Third Cause of Action for Fraud in the Inducement.

113. Nor did Plaintiff know that PLC and NMS had contrived to be the sole co-owners of the Collateral, and therefore needed Plaintiff not to foreclose for nonpayment of its $250,000 secured note while they completed their plan, which included:

a. Incorporating LDIP, which they planned eventually to own the Collateral. According to the Delaware Secretary of State's public online records, LDIP (File No. 6120258) was incorporated on August 10, 2016. LDIP is wholly owned and controlled by PLC and NMS.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

b.     NMS taking possession of iNDx's tangible property, hiring iNDx's employees, while giving iNDx the continued impression that NMS was genuinely interested in going forward with the Asset Purchase Agreement being negotiated in May and June 2016.

114.    Plaintiff is informed and believes that Defendant Rieders withheld NMS' executed copy of the Intercreditor Agreement so that NMS and/or PLC could later challenge Plaintiff's *pari passu* rights to the Collateral by claiming that the entire contract is invalid because NMS never signed it.

115.    Such deceptive conduct constitutes, among other things, a breach of the implied covenant of good faith and fair dealing.

116.    Monetary damages are inadequate; only injunctive relief can redress Defendants' breach of the implied covenant of good faith and fair dealing.

### THIRD CAUSE OF ACTION

### Fraud in the Inducement

### Against Reuven Duer, Eric Rieders, PLC and NMS

117.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Complaint.

118.    Tortious fraud occurs when a party "willfully deceives another with the intent to induce him to alter his position to his injury or risk." Cal. Civ. Code § 1709. The elements for fraud and intentional misrepresentation are:  (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity; (c) intent to defraud, *i.e.,* to induce reliance; (d) justifiable reliance; and (e) resulting damage. *Lazar v. Superior Court*, 12 Cal. 4th 631,635 (1996).

119.    Intent may be established by inference from the acts of the parties because direct proof of intent for fraud is often impossible. *Continental Airlines, Inc. v. McDonnell Douglas Corp.*, 216 Cal.App.3d 388, 402 (1989).

120.    Defendants Duer and PLC falsely represented to Plaintiff and iNDx's other shareholders the state of development of the technology underlying the Collateral that PLC assigned to iNDx in exchange for the $3,100,000 secured promissory note that PLC received from iNDx. PLC's intentionally overinflated value of these assets induced Plaintiff to participate in iNDx's Series A financing round with a $200,000 investment and subsequent $250,000 loan to iNDx via its *pari passu* note. PLC's overinflated valuation also reduced Plaintiff's relative *pari passu*, pro rata ownership share to the Collateral.

121.    On December 9, 2013, at a meeting held at PLC's office located at 9568 Topanga Canyon Blvd., Chatsworth, California 91311, Defendant Duer misrepresented to Ricardo Merino of Eurosemillas the state of the PLC technology underlying the Collateral, and assured him that the technology would be ready for market in six (6) months. On October 21, 2014 in a meeting at 4:00-6:45 pm PST at iNDx's office in Los Gatos, Defendant Duer again misrepresented the readiness of the PLC technology underlying Collateral and reassured Javier Cano of Eurosemillas that the technology would be delivered in Q1 2015. Defendant Duer further assured Javier Cano that iNDx's existing secured creditors would enter into the Intercreditor Agreement.

122.    Based on Defendant Duer's representation during the October 21, 2014 meeting, Javier Cano persuaded Plaintiff's board of directors to approve a $250,000 loan to iNDx in January 2015. Plaintiff discovered the fraudulent misrepresentations made by Defendant Duer of PLC when:

a.    Plaintiff discovered that PLC had fraudulently misrepresented the state of development of the PLC technology underlying the Collateral when Defendant Rieders (iNDx's Managing Consultant and Chairman) informed the iNDx Board by phone on February 12, 2016 that the technology would not be ready to go to market until 2018, at the earliest.

b.  PLC and NMS (through LDIP) credit bid only $1,000,000 for the Collateral at the foreclosure sale conducted on November 4, 2016.

123.  In January 2015, Defendant Duer informed Mohan Uttarwar of iNDx that PLC's board of directors had approved Plaintiff's *pari passu* $250,000 loan to iNDx. Mohan Uttarwar conveyed the news to Javier Cano.

124.  On January 29, 2015 at 9:30 am PST, in a phone call, Defendant Rieders of NMS welcomed Plaintiff's loan of $250,000 to iNDx at the same *pari passu* terms as PLC and NMS and agreed to enter into the Intercreditor Agreement and fulfill their obligations under this contract, but now denies that they ever intended for PLC and NMS to fulfill those obligations.

125.  On or around March 11, 2016, Defendant Rieders instructed counsel for NMS to send to Plaintiff a draft of an amendment to the Intercreditor Agreement, which, in light of Defendants' denial of the existence of this agreement, must have been meant to continue the subterfuge of deception intended to mislead Plaintiff that NMS recognized that a valid and enforceable Intercreditor Agreements existed between the parties.

126.  On August 21, 2016, Defendant Duer met in Santa Barbara, California, with Javier Cano and Plaintiff's attorney, Patrick Nelson, and admitted that Plaintiff's $250,000 Promissory Note has *pari passu* rights with the PLC and NMS Promissory Notes based on the Intercreditor Agreement and that PLC and NMS would fulfill their obligations under this contract. Defendant Duer now denies that PLC and NMS ever intended to fulfill those obligations.

127.  Defendants Duer and Rieders knowingly and willfully conspired and agreed among themselves to harm Plaintiff by engaging in a pattern of intentional, willful, and malicious misrepresentations to induce Plaintiff to lend $250,000 to iNDx based on the false promise that PLC and NMS would share joint ownership of the Collateral as co-tenants if iNDx defaulted on the notes.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

128.    Defendants never intended to give Plaintiff *pari passu* rights in and to the Collateral as they had promised they would under the terms of the Intercreditor Agreement.

129.    Plaintiff reasonably relied on the representations, omissions, and promises made by Defendants Duer and Rieders at the time that Plaintiff made the $250,000 loan to iNDx.

130.    As set forth above, Defendants Duer and Rieders designed, and intended to design, a scheme and artifice to defraud Plaintiff by making promises, misrepresentations, and misstatements that Defendants knew they had no intention of keeping or knew were false and misleading, or in the alternative, by making such misrepresentations and misstatements with disregard for their truth, veracity, or misleading nature with the desire and intent to defraud Plaintiff.

131.    The misrepresentations, misstatements and omissions were material misrepresentations, misstatements and omissions of past or existing facts, or false promises to do some act in the future on which Defendants intended Plaintiff to rely, or on which Defendants induced Plaintiff to take further actions. Plaintiff relied on the misrepresentations to its detriment and injury.

132.    As a direct, foreseeable and proximate result of Defendants' wrongful acts, Plaintiff has suffered substantial damages, including loss of its joint ownership interest in the Collateral.

133.    The acts directed toward Plaintiff were carried out by Defendants with a conscious disregard for Plaintiff's right to be free from such behavior, such as to constitute oppression, fraud, or malice under Civil Code section 3294, entitling Plaintiff to punitive damages in an amount appropriate to punish and make an example of Defendants in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## Unfair Competition

## Against Reuven Duer, Eric Rieders, PLC and NMS

134.    Plaintiff realleges and incorporates by reference the allegations of each of the other paragraphs set forth in this Complaint.

135.    Defendants, acting individually and in conspiracy with one another, have engaged in unfair competition under California Business and Professions Code section 17200 *et seq.* Defendants have engaged in unlawful, unfair, and/or fraudulent business practices.

136.    Defendants Duer, Rieders, PLC and NMS defrauded Plaintiff in the manner described in the Third Cause of Action, in violation of Civil Code § 1709.

137.    PLC and NMS conducted a sham foreclosure and now make false claims of the parties' respective rights of ownership in the Collateral that create confusion and are misleading, which affects Plaintiff's ability to exploit the Collateral.

138.    PLC is a majority shareholder of iNDx, Defendant Rieders was the Chairman of iNDx's Board, and Defendant Duer was a director on iNDx's Board. As such they owed a fiduciary duty to Plaintiff and iNDx's other minority shareholders to act in a fair, just, and equitable manner. *Interactive Multimedia Artists v. Superior Court,* 62 Cal. App. 4th 1546, 1555 (1998) ("The fiduciary duty of a controlling shareholder or director to a minority shareholder is based on powers in trust. . . . Trust relationships are premised on equitable principles."); *Jones v. H. F. Ahmanson & Co.,* 1 Cal.3d 93, 108 (1969) (holding that majority shareholders have a fiduciary duty to act in a "fair, just, and equitable manner").

139.    PLC and Defendant Duer breached their fiduciary duty to Plaintiff when they misrepresented the state of development of the Collateral's underlying technology and artificially inflated its value to obtain a higher valuation.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

140.    PLC and Defendant Duer breached their fiduciary duty to Plaintiff as a minority shareholder when they blocked iNDx's efforts to obtain debt and equity financing.

141.    In or around May 2016, Defendant Rieders breached his fiduciary duty to Plaintiff as a shareholder when he directed NMS to take possession of iNDx's tangible property and to hire iNDx's employees located at the iNDx office in Los Gatos, California. Defendant Rieders and NMS feigned to negotiate the terms of the Asset Purchase Agreement with iNDx as a stall tactic. Once everything was in place, PLC and NMS moved to foreclose on their notes and denied Plaintiff's *pari passu* rights to the Collateral.

142.    On or around March 18, 2016, Defendant Rieders shipped iNDx equipment to Defendant Duer in Thousand Oaks, California without informing or getting approval from the iNDx Board. Defendant Duer admitted during the April 7, 2016 iNDx board meeting in Los Gatos, California that he had been using this equipment to develop a competing product.

143.    On April 28, 2016, iNDx board member, Piyush Gupta, made the following demand in an email sent to Defendant Duer (and copied Defendant Rieders):

> This email is to put on record my request that you [Defendant Reuven Duer] return any iNDx LifeCare property you have in your possession. This includes, but is not limited to, hardware, software, passwords, confidential material (hardcopy or softcopy). Please note that any IP or technology you have developed using iNDx property is not yours, it belongs to iNDx. The parallel blood development effort you admitted you were working on during the April 7th Board Meeting is illegal and must stop. If you don't, Series A will seek a court injunction to ensure it is stopped, and a law suit to seek return of the property.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

Eric [Rieders], since you abetted the removal of some iNDx property, per your own admission during the April 7th Board Meeting, I urge you to use your good offices with Reuven to secure return of the property.

144.    Plaintiff is informed and believes that PLC and Defendant Duer used iNDx's intellectual property, equipment and former iNDx employees to develop products that would compete with iNDx, in violation of the terms of the JV Agreement and Defendant Duer's employment agreement with iNDx. By doing so, PLC and Defendant Duer violated their fiduciary duty of loyalty to act in the best interest of iNDx's shareholders, including Plaintiff.

145.    In committing the wrongful acts alleged in this Complaint, Defendants pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another in furtherance of their wrongdoing. Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

146.    Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, Defendants breached their fiduciary duties to iNDx.

147.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to:  (a) make iNDx insolvent; (b) wrongfully plunder iNDx's assets; (c) disguise their breaches of fiduciary duties; and (d) disguise and misrepresent NMS' true intent with respect to the Asset Purchase Agreement, which was a ruse to distract iNDx while PLC and NMS carried out their subterfuge.

148.    PLC and NMS plundered the Collateral from iNDx to Plaintiff's detriment by, among other things, conducting a sham foreclosure and bidding an amount far below what PLC had represented to iNDx's shareholders the Collateral to be worth.

149.    The conduct by PLC, NMS and LDIP has undermined the marketability of the Collateral. Because of the dissemination of the false claims of ownership by Defendants, Plaintiff will be unable to license to third parties the technology claimed in the Collateral and this delay and failure in licensing will cause damage and irreparable injury Plaintiff.

150.    Unless enjoined by the Court, the damage and irreparable injury to Plaintiff will continue. Accordingly, Plaintiff is entitled to injunctive relief against all conduct by Defendants alleged above that violates California Business and Professions Code section 17200 *et seq.*

DEMAND FOR JURY TRIAL

*Plaintiff Eurosemillas, S.A. hereby demands trial of this matter by jury.*

**PRAYER FOR RELIEF**

Plaintiff Eurosemillas, S.A. prays for relief and judgment as follows:

**Declaratory Relief Requested**

1.    A Declaration that PLC and NMS and/or LDIP have breached the Intercreditor Agreement.

2.    A Declaration that Plaintiff holds an equitable lien on the Collateral because PLC and NMS did not have the right to foreclose on Plaintiff's *pari passu* pro rata share to the Collateral under the terms of the Intercreditor Agreement. Plaintiff seeks a judicial determination that its equitable lien on the Collateral arises from its *pari passu* rights, title and interest in and to the Collateral

3.    A Declaration that Plaintiff, as a tenant in common, owns full legal and equitable title to the Collateral together with PLC, NMS and/or LDIP.

4.    A Declaration that Defendants are liable to Plaintiff for unfair competition under California Business and Professions Code section 17200 *et seq.*

5.    A Declaration that Plaintiff is entitled to all benefits including, but not limited to, any financial benefits wrongfully and unjustly retained by Defendants as a result of their tortious conduct.

**Injunctive Relief Requested**

6.     An Order unwinding the wrongful foreclosure sales of the Collateral, and return of title to iNDx or, at a minimum, the sale unwound as to Plaintiff's pro rata share of the Collateral.

7.     A temporary restraining order and preliminary injunction enjoining any post-foreclosure proceeding by the Defendants pending the full disposition of this Complaint on the merits including canceling, invalidating and unwinding the foreclosure sale of the Collateral, preventing the Defendants from transferring ownership or title, and for permanent injunctive relief, should Plaintiff prevail on the merits, forever precluding Defendants from denying and recognizing Plaintiff's *pari passu* rights, title and interest in and to the Collateral.

8.     An Order requiring specific performance by PLC, NMS and LDIP to recognize Plaintiff's *pari passu* rights, title and interest in and to the Collateral and to recognize the validity of the Quit Claim Assignment. The Intercreditor Agreement authorizes any signatory to demand specific performance if any signatory fails to comply with any provision of the Intercreditor Agreement. The refusal by PLC, NMS and LDIP to recognize Plaintiff's *pari passu* rights, title and interest in and to the Collateral is a breach of the express terms of the Intercreditor Agreement. Plaintiff gave notice of this breach, and an opportunity to cure, but PLC, NMS and LDIP failed to cure their breach on the Intercreditor Agreement.

9.     An Order directing Defendants to specifically perform their obligations under the Intercreditor Agreement.

10.     An Order enjoining the current invalidity challenges, as well as any future challenge by PLC, NMS and LDIP, either directly or indirectly, to the validity or enforceability of the Intercreditor Agreement before the U.S. Patent and Trademark Office or any other third party.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

11. An Order preliminarily enjoining, and at the time of final judgment, permanently restraining Defendants, their agents, employees, successors, assigns and all persons in active concert or participation with them, including PLC, NMS, LDIP, Reuven Duer and Eric Rieders, from denying Plaintiff's joint ownership interest in the Collateral.

12. An Order preliminarily enjoining, and at the time of final judgment, permanently restraining NMS, their agents, employees, successors, assigns and all persons in active concert or participation with them, from filing any documents with the U.S. Patent Office that interferes with Plaintiff's joint ownership interest in the Collateral.

13. An Order enjoining the current invalidity challenges, as well as any future challenge by PLC, NMS and LDIP, either directly or indirectly, to the validity or enforceability of the Quit Claim Assignment before the U.S. Patent and Trademark Office or any other third party to whom Plaintiff may present the Quit Claim Assignment in connection with any business transaction arising out of or relating to the Collateral.

14. An Order to quiet title to the Collateral under the Intercreditor Agreement, which authorizes Plaintiff to demand specific performance from PLC and NMS if they fail to comply with any provision of the Intercreditor Agreement. Under the terms of the Quit Claim Assignment, iNDx conveyed to Plaintiff all rights that iNDx had in the assigned Collateral, including future rights, following the foreclosure conducted by PLC and NMS on November 4, 2016.

15. An Order directing Defendants to transfer all hardware and/or provide a copy of all software code, descriptions, flow charts and other work product used to design, plan, organize and develop the Collateral, and all supporting documentation, including without limitation user manuals and training materials.

**Monetary Damages Requested**

16.     An Order directing Defendants to indemnify Plaintiff for attorneys' fees incurred as provided under California Code of Civil Procedure section 1021.6. Because of Defendants' fraud and other wrongful conduct, Plaintiff has been required to act to protect its interests by defending against the Defendants' actions taken in the iNDx bankruptcy proceeding and in bringing this Complaint. Plaintiff is without fault in connection with Defendants' wrongful claims that PLC, NMS and/or LDIP own all the interest in and to the Collateral. Plaintiff has been required to defend against these claims and to bring this Complaint solely as a result of the tortious conduct of each of the Defendants as alleged above. Plaintiff has been forced to incur, has in fact incurred, and continues to incur attorneys' fees and costs to protect its joint ownership interest in the Collateral.

17.     A disgorgement of profits in an amount to be proven at trial.

18.     An award of exemplary and punitive damages.

19.     An award of any applicable statutory damages.

20.     An award of prejudgment and post-judgment interest on all damages awarded.

21.     Reasonable attorneys' fees according to all attorney-fee statutes;

22.     Costs of suit incurred.

23.     For such other and further relief as the Court deems just and proper.


Dated:  September 13, 2017          KUMAR LAW

                                    Ruchit Kumar Agrawal
                                    Counsel for Plaintiff Eurosemillas, S.A.

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586

EXHIBIT A

# INDX LIFECARE, INC.

## SECURITY AGREEMENT

This Security Agreement (the "Agreement") is made as of December 27, 2013, by and between iNDx Lifecare, Inc., a Delaware corporation (the "Debtor"), in favor of PLC Diagnostics, Inc., a Delaware corporation (the "Secured Party").

## RECITALS

The Debtor and the Secured Party have entered into that certain Intellectual Property Transfer Agreement dated the date hereof (the "Intellectual Property Transfer Agreement") pursuant to which Secured Party has transferred to the Debtor all of the Secured Party's right, title and interest, on a worldwide basis, in and to the technology described on Exhibit A, attached hereto and all Intellectual Property Rights (as defined below) related thereto.

The Debtor has issued a Secured Convertible Promissory Note of even date to the Secured Party (the "Note") to evidence Debtor's obligations to pay the purchase price for the Property assigned by Secured Party to the Debtor pursuant to the Intellectual Property Transfer Agreement.

The parties intend that the Debtor's obligations to repay the Note be secured by the Collateral (as defined herein).

## AGREEMENT

In consideration of the transfer of the Property and the related Intellectual Property Rights (defined below) by the Secured Party and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Debtor hereby agrees with the Secured Party as follows:

1.   **Grant of Security Interest**.

(a)     To secure the Debtor's full and timely performance of the Obligations, the Debtor hereby grants to the Secured Party a continuing Lien on and security interest (the "Security Interest") in, all of the Debtor's right, title and interest in and to Secured Party's right, title and interest, on a worldwide basis, in and to: (a) the technology described on Exhibit A, attached hereto ("Technology"), (b) all Intellectual Property Rights (as defined below) related to the Technology; and (c) all Proceeds of each of the foregoing and all accessions to, and replacements for, each of the foregoing (collectively, the "Collateral").  The Security Interest shall be a first and prior interest in all of the Collateral.

(b)     The following terms shall have the following meanings for purposes of this Agreement:

**"Intellectual Property Rights"** means all past, present, and future rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights,

# INDX LIFECARE, INC.

## SECURITY AGREEMENT

This Security Agreement (the "Agreement") is made as of December 27, 2013, by and between iNDx Lifecare, Inc., a Delaware corporation (the "Debtor"), in favor of PLC Diagnostics, Inc., a Delaware corporation (the "Secured Party").

## RECITALS

The Debtor and the Secured Party have entered into that certain Intellectual Property Transfer Agreement dated the date hereof (the "Intellectual Property Transfer Agreement") pursuant to which Secured Party has transferred to the Debtor all of the Secured Party's right, title and interest, on a worldwide basis, in and to the technology described on Exhibit A, attached hereto and all Intellectual Property Rights (as defined below) related thereto.

The Debtor has issued a Secured Convertible Promissory Note of even date to the Secured Party (the "Note") to evidence Debtor's obligations to pay the purchase price for the Property assigned by Secured Party to the Debtor pursuant to the Intellectual Property Transfer Agreement.

The parties intend that the Debtor's obligations to repay the Note be secured by the Collateral (as defined herein).

## AGREEMENT

In consideration of the transfer of the Property and the related Intellectual Property Rights (defined below) by the Secured Party and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Debtor hereby agrees with the Secured Party as follows:

1.    **Grant of Security Interest**.

    (a)    To secure the Debtor's full and timely performance of the Obligations, the Debtor hereby grants to the Secured Party a continuing Lien on and security interest (the "Security Interest") in, all of the Debtor's right, title and interest in and to Secured Party's right, title and interest, on a worldwide basis, in and to: (a) the technology described on Exhibit A, attached hereto ("Technology"), (b) all Intellectual Property Rights (as defined below) related to the Technology; and (c) all Proceeds of each of the foregoing and all accessions to, and replacements for, each of the foregoing (collectively, the "Collateral").  The Security Interest shall be a first and prior interest in all of the Collateral.

    (b)    The following terms shall have the following meanings for purposes of this Agreement:

**"Intellectual Property Rights"** means all past, present, and future rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights,

-1-

copyrights, moral rights, and mask work rights; (b) trademark and trade name rights and similar rights (and associated goodwill); (c) trade secret rights; (d) patent and industrial property rights; (e) other proprietary rights in technology and works of authorship of every kind and nature; and (f) rights in or relating to registrations, renewals, extensions, combinations, continuations, divisions, and reissues of, and applications for, any of the rights referred to in clauses (a) through (e) of this sentence.

"**Obligations**" shall mean the liabilities owed by the Debtor to the Secured Party under this Agreement and the Note, including without limitation all interest, fees, charges, expenses, attorneys' fees and accountants' fees chargeable to the Debtor or payable by the Debtor hereunder and thereunder.

"**Permitted Liens**" shall mean (a) Liens for taxes or other governmental charges not at the time delinquent or thereafter payable without penalty or being contested in good faith, provided that adequate reserves for the payment thereof have been established in accordance with generally accepted accounting principals, (b) Liens of carriers, warehousemen, mechanics, materialmen, vendors, and landlords and other similar Liens imposed by law incurred in the ordinary course of business for sums not overdue more than 45 days or being contested in good faith, provided that adequate reserves for the payment thereof have been established in accordance with generally accepted accounting principals, (c) deposits under workers' compensation, unemployment insurance and social security laws or to secure the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or to secure statutory obligations of surety or appeal bonds or to secure indemnity, performance or other similar bonds in the ordinary course of business, (d) zoning restrictions, easements, rights-of-way, title irregularities and other similar encumbrances, which alone or in the aggregate are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of the Debtor, (e) banker's Liens and similar Liens (including set-off rights) in respect of bank deposits, (f) Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties and in connection with the importation of goods in the ordinary course of the Debtor's business, (g) Liens on the property or assets of any subsidiary of the Debtor in favor of the Debtor, and (h) purchase money Liens that will be discharged upon the Debtor's payment of the purchase price for the applicable property, to the extent such Liens relate solely to the property so purchased; provided, however, that in each case, such Lien is not senior or prior to the Security Interest created hereunder.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"**Proceeds**" means "Proceeds," as such term is defined in the UCC.

"**UCC**" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Delaware.

Unless otherwise defined herein, all capitalized terms used herein and defined in the Purchase Agreement shall have the respective meaning given to those terms in the Purchase Agreement, and terms that are defined in the UCC and used herein shall have the meanings given to them in the UCC.

2.     **Representations and Warranties.**   The Debtor hereby represents and warrants to the Secured Party that:

(a)     **Ownership of Collateral.**   Upon the valid and enforceable assignment of the Technology and Intellectual Property Rights related thereto from Secured Party to the Debtor pursuant to the Intellectual Property Transfer Agreement, the Debtor is the legal and beneficial owner of the Collateral.  Except for the Security Interest granted to the Secured Party pursuant to this Agreement, the Debtor has rights in or the power to transfer the Collateral free and clear of any adverse Lien, security interest or encumbrance except as created by this Security Interest, except for Permitted Liens.  To the Debtor's knowledge, no financing statements covering any Collateral or any proceeds thereof are on file in any public office (other than filings listing the Secured Party as the secured party) or otherwise exist.

(b)     **Valid Security Interest.**   The Security Interest granted pursuant to this Agreement will constitute a valid and continuing first priority security interest in favor of the Secured Party in the Collateral for which perfection is governed by the UCC or filing with the United States Copyright Office or United States Patent and Trademark Office.  Such Security Interest will be prior to all other Liens on the Collateral.

(c)     **Organization and Good Standing.**     The Debtor has been duly incorporated, and is validly existing and in good standing, under the laws of the State of Delaware.

(d)     **Location, State of Organization and Name of the Debtor.**     The Debtor's state of organization is Delaware and the Debtor's exact legal name as it appears in the official filings in the State of Purchase Agreement is as set forth in the first paragraph of this Agreement.  The Debtor has only one jurisdiction of organization.

3.     **Covenants.**   The Debtor covenants and agrees with the Secured Party that, from and after the date of this Agreement until the Obligations are paid in full:

(a)     **Other Liens.**   Except for the Security Interest and Permitted Liens, the Debtor has rights in or the power to transfer the Collateral and its title and will be able to do so hereafter free from any adverse Lien, security interest or encumbrance, and the Debtor will defend the Collateral against the claims and demands of all persons at any time claiming the same or any interest therein.

(b)     **Further Documentation.**   At any time and from time to time, upon the written request of the Secured Party, and at the sole expense of the Debtor, the Debtor will promptly and duly authenticate and deliver such further instruments and documents and take such further action as the Secured Party may reasonably request for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted including, without limitation, filing any financing or continuation statements under the UCC in

effect with respect to the Liens created hereby. The Debtor also hereby authorizes the Secured Party to file any such financing, amendment or continuation statement without the authentication of the Debtor to the extent permitted by applicable law. A reproduction of this Agreement shall be sufficient as a financing statement (or as an exhibit to a financing statement on form UCC-1) for filing in any jurisdiction.

(c)     **Compliance with Laws, etc.**  The Debtor (i) will comply with all laws, rules, regulations and orders of any governmental authority applicable to any material portion of the Collateral or to the operation of the Debtor's business, and (ii) shall not use or permit any Collateral to be used in violation of any provision of the Note, any law, rule or obligation or order of any governmental authority, or any policy of insurance covering any material portion of the Collateral.

4.     **Event of Default; the Secured Party's Appointment as Attorney-in-Fact**.

(a)     **Event of Default.**  For purposes of this Agreement, the occurrence of any one of the following events (each, an "Event of Default") shall constitute a default hereunder and under the Note:

(i)     The Debtor's failure to pay or discharge the Obligations in full in accordance with the terms of the Note;

(ii)     A breach of any material representation or warranty made by the Debtor under the Note;

(iii)     The Debtor's failure to observe or perform any other covenant, obligation, condition or agreement contained in this Agreement, the Note or the Intellectual Property Transfer Agreement and such failure shall continue for 30 days after written notice by the Secured Party to the Debtor of such failure;

(iv)     The insolvency of the Debtor, the commission of any act of bankruptcy by the Debtor, the execution by the Debtor of a general assignment for the benefit of creditors, the filing by or against the Debtor of a petition in bankruptcy or any petition for relief under the federal bankruptcy act or the continuation of such petition without dismissal for a period of 90 days or more, or the appointment of a receiver or trustee to take possession of the property or assets of the Debtor; or

(v)     The Debtor's failure to raise at least $1,500,000 from sale of Debtor's equity securities at any time on or prior to March 31, 2014.

(b)     **Powers.**  The Debtor hereby appoints the Secured Party and any officer or agent of the Secured Party, with full power of substitution, as its attorney-in-fact with full irrevocable power and authority in the place of the Debtor and in the name of the Debtor or its own name, from time to time in the Secured Party's discretion so long as an Event of Default has occurred and is continuing, for the purpose of carrying out the terms of this Agreement, to take any appropriate action and to authenticate any instrument which may be necessary or desirable to accomplish the purposes of this Agreement. Without limiting the foregoing, so long as an Event

of Default has occurred and is continuing, the Secured Party shall have the right, without notice to, or the consent of, the Debtor, to do any of the following on the Debtor's behalf:

> (i)     to pay or discharge any taxes or Liens levied or placed on or threatened against the Collateral;

> (ii)     to direct any party liable for any payment under any of the Collateral to make payment of any and all amounts due or to become due thereunder directly to the Secured Party;

> (iii)     to ask for or demand, collect, and receive payment of and receipt for, any payments due or to become due at any time in respect of or arising out of any Collateral;

> (iv)     to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to enforce any right in respect of any Collateral;

> (v)     to defend any suit, action or proceeding brought against the Debtor with respect to any Collateral;

> (vi)     to settle, compromise or adjust any suit, action or proceeding described in subsection (v) above and to give such discharges or releases in connection therewith as the Secured Party may deem appropriate;

> (vii)     to assign any patent right included in the Collateral of the Debtor (along with the goodwill of the business to which any such patent right pertains), throughout the world for such term or terms, on such conditions, and in such manner, as the Secured Party shall in its sole discretion determine; and

> (viii)     generally, to sell, transfer, pledge and make any agreement with respect to or otherwise deal with any of the Collateral and to take, at the Secured Party's option and the Debtor's expense, any actions which the Secured Party deems necessary to protect, preserve or realize upon the Collateral and the Secured Party's Liens on the Collateral and to carry out the intent of this Agreement, in each case to the same extent as if the Secured Party were the absolute owner of the Collateral for all purposes.

The Debtor hereby ratifies whatever actions the Secured Party shall lawfully do or cause to be done in accordance with this Section 4. This power of attorney shall be a power coupled with an interest and shall be irrevocable.

(c)     **No Duty on the Secured Party's Part.**  The powers conferred on the Secured Party by this Section 4 are solely to protect the Secured Party's interests in the Collateral and shall not impose any duty upon it to exercise any such powers. The Secured Party shall be accountable only for amounts that they actually receive as a result of the exercise of such powers, and neither the Secured Party nor any of its officers, directors, employees or agents shall, in the absence of willful misconduct or gross negligence, be responsible to the Debtor for any act or failure to act pursuant to this Section 4.

5.     **Performance by the Secured Party of the Debtor's Obligations.**  If the Debtor fails to perform or comply with any of its agreements or covenants contained in this Agreement and the Secured Party performs or complies, or otherwise causes performance or compliance, with such agreement or covenant in accordance with the terms of this Agreement, then the reasonable expenses of the Secured Party incurred in connection with such performance or compliance shall be payable by the Debtor to the Secured Party on demand and shall constitute Obligations, which shall accrue interest at 5% per annum until paid, secured by this Agreement.

6.     **Remedies.**  If an Event of Default has occurred and is continuing, the Secured Party may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement relating to the Obligations, all rights and remedies of a secured party under the UCC.

7.     **Limitation on Duties Regarding Preservation of Collateral.**  The Secured Party's sole duty with respect to the custody, safekeeping and preservation of the Collateral, under Section 9207 of the UCC or otherwise, shall be to deal with it in the same manner as the Secured Party deals with similar property for its own account.  Neither the Secured Party nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so other than as a result of the gross negligence or willful misconduct of the same or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of the Debtor or otherwise.

8.     **Powers Coupled with an Interest.**  All authorizations and agencies contained in this Agreement with respect to the Collateral are irrevocable and are powers coupled with an interest.

9.     **Termination of Security Interest**.  Upon satisfaction of the Debtor's obligations pursuant to the Note, or conversion of the Note into shares of the Company's equity securities pursuant to the terms of the Note, the security interest granted herein shall terminate and all rights to the Collateral shall revert to the Debtor.  Upon any such termination, the Secured Party shall authenticate and deliver to the Debtor such documents as the Debtor may reasonably request to evidence such termination.

10.     **Miscellaneous**.

(a)     **Amendments and Waivers.**   Any term of this Agreement may be amended with the written consent of the parties or their respective successors and assigns.  Any amendment or waiver effected in accordance with this Section 10 (a) shall be binding upon the Parties and their respective successors and assigns.

(b)     **Transfer; Successors and Assigns**.  The terms and conditions of this Agreement shall be binding upon the Debtor and its successors and assigns, as well as all persons who become bound as a debtor to this Agreement and inure to the benefit of the Secured Party and its successors and assigns.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

(c)    **Governing Law.**  This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the Parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of California, without giving effect to principles of conflicts of law.

(d)    **Resolution of Disputes.**  Any dispute as to the meaning or the application or arising out of the terms of this Agreement, as well as any difference within the Board that the Board cannot resolve by majority vote concerning any material business or management issue arising out of the venture, shall be resolved in the following manner: First, the party or person wishing to raise the existence of such a dispute or unresolved issue shall notify the other persons or parties involved in writing describing the dispute or difference.  Second, the parties or representatives of the parties will thereupon engage in good faith negotiations for the purpose of resolving the dispute or difference.  Third, if the parties or their representatives are unable to resolve the dispute or difference within 30 days of commencing discussions, then a deadlock will be deemed to exist, upon the occurrence of which either party may within 60 days thereafter submit the dispute to binding arbitration pursuant to, and under the administration of, the American Arbitration Association, under its Commercial Rules then in effect, before a single arbitrator to be chosen by the parties or if they cannot agree within 30 days of commencement of the arbitration then by the AAA, with no right to appeal the final award, and with the prevailing party being entitled as a matter of right to the full payment of its reasonable and necessary costs and fees, including attorneys' fees.

(e)    **Counterparts.**  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(f)    **Titles and Subtitles.**  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(g)    **Notices.**  Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient upon receipt, when delivered personally or by courier, overnight delivery service or confirmed facsimile, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, if such notice is addressed to the party to be notified at such party's address or facsimile number as set forth below or as subsequently modified by written notice

(h)    **Severability.**  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each party as close as possible to that under the provision rendered unenforceable.  In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

      (i)    **Entire Agreement.**  This Agreement, and the documents referred to herein constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and any and all other written or oral agreements existing between the parties hereto concerning such subject matter are expressly canceled.

*[Signature Page Follows]*

The Debtor and the Secured Party have caused this Agreement to be duly executed and delivered as of the date first above written.

**DEBTOR:**

**INDX LIFECARE, INC.**

By: _____

Name: Mohan Uttarwar
Title: Chief Executive Officer

Address:
20380 Town Center Lane, Suite 218
Cupertino, CA 95014
Facsimile Number:_____

**SECURED PARTY:**

**PLC DIAGNOSTICS, INC.**

By:_____

Name: Abraham D. Sofaer
Title: Chairman

Address:
9568 Topanga Canyon Blvd.
Chatsworth, CA 91311
Facsimile Number:_____

A copy of all Notices should be sent to:
Abraham D. Sofaer,
1200 Bryant St.
Palo Alto, CA 94301

The Debtor and the Secured Party have caused this Agreement to be duly executed and delivered as of the date first above written.

**DEBTOR:**

**INDX LIFECARE, INC.**

By: _____

Name: Mohan Uttarwar
Title: Chief Executive Officer

Address:
20380 Town Center Lane, Suite 218
Cupertino, CA 95014
Facsimile Number: _____

**SECURED PARTY:**

**PLC DIAGNOSTICS, INC.**

By: _____

Name: Abraham D. Sofaer
Title: Chairman

Address:
9568 Topanga Canyon Blvd.
Chatsworth, CA 91311
Facsimile Number: _____

A copy of all Notices should be sent to:
Abraham D. Sofaer,
1200 Bryant St.
Palo Alto, CA 94301

# EXHIBIT A

## TECHNOLOGY

The Property shall include all of the Transferor's intellectual property including all of its software code embodying any of the foregoing in any software language, all versions of any of the foregoing, all descriptions, flow charts and other work product used to design, plan, organize and develop any of the foregoing, and all documentation, including without limitation user manuals and training materials, relating to any of the foregoing, and shall include, without limitation:

**LIST OF PATENT AND PATENT APPLICATIONS TO BE TRANSFERRED**

US Patents:
1. US7,951,583 – Optical Scanning System
2. US8,187,866 – Optical Scanning System
3. US8,288,157 – Waveguide-Based Optical Scanning System

US Pending Patent Applications:
1. US20070211985A1 – Optical Scanning System
2. US20090068668A1 – Waveguide-Based Optical Scanning System
3. US20100302544A1 – Waveguide-Based Detection System with Scanning Light Source
4. US20090312188A1 – System and Method for Nucleic Acids Sequencing by Phased Synthesis
5. US20110249260A1 – Optical Scanning System
6. US20130071850A1 – Waveguide-Based Optical Scanning System
7. US20130215425A9 – Waveguide-Based Detection System with Scanning Light Source

GB Patent:
1. GB2461026 - System and Method for Nucleic Acids Sequencing by Phased Synthesis

Ex-US Patent Applications:
Waveguide-Based Detection System with Scanning Light Source
1. AU2010241641– Australia
2. CA2,759,396 – Canada
3. CN201080028057.2 – China
4. EP10716716.5 – Europe
5. HK10716716.5 – Hong Kong
6. IL215898 – Israel
7. IN8694/CHENP/2011 – India
8. JP2012-508642 – Japan
9. KR10-2011-7028448 – South Korea

System and Method for Nucleic Acids Sequencing by Phased Synthesis
1. AU2009260321 – Australia
2. CA2,727,158 – Canada
3. CN200980131813.1 – China
4. EP09767491.5 – Europe
5. HK09767491.5 – Hong-Kong
6. IL209813 – Israel
7. IN8758/DELNP/2010 – India
8. KR10-2011-7001046 – South Korea
9. MX/A/2010/013911 – MEXICO

EXHIBIT  B

From: Forte, Barbara
Sent: Friday, March 11, 2016 11:25 AM
To: Javier Cano (javier@eurosemillas.com<mailto:javier@eurosemillas.com>)
Cc: Coopersmith, Douglas; Eric.Rieders@nmslabs.com
<mailto:Eric.Rieders@nmslabs.com>; Munoz, Peter S.
(PMunoz@ReedSmith.com<mailto:PMunoz@reedsmith.com>); Forte, Barbara
(barbara.forte@bipc.com<mailto:barbara.forte@bipc.com>)
Subject: Workshare Compare Document Distribution

At the request of Eric Rieders at NMS Labs and Doug Coopersmith at Buchanan
Ingersoll & Rooney PC, for your review, please find attached an Amended and Restated
Intercreditor Agreement among NMS Labs, PLC Diagnostics, Inc. and Eurosemillas, S.A.
with respect to the obligations due from INDX Lifecare, Inc. For your reference, the
attached has been blacklined against the existing form of Intercreditor Agreement among
the three parties.


Please let us know if you have any comments and/or questions regarding the attached.
Barbara


Barbara Forte
Shareholder

Two Liberty Place
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102-2555
215 665 3959 (o)
215 495 2376 (c)
barbara.forte@bipc.com<mailto:barbara.forte@bipc.com>

vCard<http://www.bipc.com/load.vcf?type=atty&id=061C18C6-4E1A-47B0-9EA9-
138671BE8483> | Bio<http://www.bipc.com/Barbara-A-Forte> |
BIPC.com<http://www.bipc.com/> | Twitter<https://twitter.com/buchannannews> |
LinkedIn<http://www.linkedin.com/company/buchanan-ingersoll-&-rooney-pc>

Buchanan Ingersoll & Rooney PC

KNOW GREATER PARTNERSHIP

CONFIDENTIAL/PRIVILEGED INFORMATION: This e-mail message (including any attachments) is a
private communication sent by a law firm and may contain confidential, legally privileged or protected
information meant solely for the intended recipient. If you are not the intended recipient, you are hereby
notified that any use, dissemination, distribution or copying of this communication is prohibited and may be
unlawful. Please notify the sender immediately by replying to this message, then delete the e-mail and any
attachments from your system.

## AMENDED AND RESTATED INTERCREDITOR AGREEMENT

THIS AMENDED AND RESTATED INTERCREDITOR AGREEMENT, dated as of ~~January~~March __, ~~2015~~2016 (this **"Agreement"**) is by and among EUROSEMILLAS, S.A., a Spanish corporation ("**SpanCo**"), PLC DIAGNOSTICS, INC., a Delaware corporation (**"PLC"**), NMS LABS, a Pennsylvania corporation (**"NMS"** and together with SpanCo, the **"Creditors"** and each a **"Creditor"**), and INDX LIFECARE, INC., a Delaware corporation (**"iNDx"**).

### R E C I T A L S :

WHEREAS, iNDx is indebted to PLC pursuant to a Secured Convertible Promissory Note dated December 27, 2013, in the principal amount of $3,100,000.00 (as the same may modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, the **"PLC Note"**);

WHEREAS, iNDx's obligations under the PLC Note and related documents are secured by a pledge of certain assets (the **"Collateral"**) pursuant to a Security Agreement from iNDx to PLC dated as of December 27, 2013 (as the same may modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, the **"PLC Security Agreement"**);

WHEREAS, iNDx is indebted to NMS pursuant to (i) a ~~Secured~~secured Convertible ~~Promissory~~ Note, dated ~~November 15~~October 29, 2014, (the **"First NMS Loan"**) in the principal amount of $~~1,000,000, evidenced by iNDx's Convertible Note of even dated therewith (the "NMS Note") and~~1,000,000 (the **"First NMS Loan"**); (ii) a ~~Secured~~secured Convertible Promissory Note, dated ~~May 27,~~June 2, 2015 (the **"Second NMS Loan"** ~~and with~~) in the principal amount of $500,000 (the "**Second NMS Note**"); (iii) a secured Convertible Promissory Note, dated December 10, 2015 (the "**Third NMS Loan**") in the principal amount of $150,000 (the "**Third NMS Note**"); and (iv) a secured Convertible Promissory Note, dated as of <mark>January __, 2016</mark> (the "**Fourth NMS Loan**" and together with the First NMS Loan, the Second NMS Loan and the Third NMS Loan, collectively, the "**NMS Loans**") in the principal amount of $~~500,000, evidenced by iNDx' Convertible Note of even date thereof (the "Second NMS Note" and with the NMS Note, the "NMS Notes");~~ 150,000 (the "**Fourth NMS Note**" and together with the First NMS Note, the Second NMS Note and the Third NMS Note, collectively, as the same may in each case be modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, the "**NMS Notes**") and together with the First NMS Note, the Second NMS Note, the Third NMS Note and the Fourth NMS Note, collectively, as the same may in each case be modified, amendment, supplement, replaced or restated, from time to time, subject to the terms of this Agreement, collectively, the "**NMS Notes**");

WHEREAS, iNDx's obligation under the NMS Notes and related documents are secured by a pledge of the same Collateral as is pledged with PLC pursuant to a Security Agreement from iNDx to NMS, dated on or about ~~October 28,~~August 1, 2014 (the "**Original NMS Security Agreement**"), as amended by ~~the~~that certain First Amendment to ~~the~~ Security Agreement, dated as of June 2, 2015 (the "**First Amendment to the Original NMS Security ~~NMS Agreement" and with the NMS Security Agreement, the "NMS Security Agreements").~~ Agreement**"), as

further amended by that certain Second Amendment to Security Agreement, dated as of March __, 2016 (the "**Second Amendment to the Original NMS Security Agreement**", and together with the Original NMS Security Agreement and the First Amendment to the Original NMS Security Agreement, as the same may further modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, collectively, the "**NMS Security Agreement**");

WHEREAS, iNDx, PLC and NMS signed ~~an original intercreditor agreement dated on or about October 28, 2014 (the "Original~~that certain Intercreditor Agreement~~")~~, dated as of October 28, 2014, as amended by the First Amendment to the Intercreditor Agreement, dated on or about ~~May 27, 2015 (the "First Amendment to the Original Intercreditor Agreement" and with the Original Intercreditor Agreement, the "Intercreditor Agreements")~~June 2, 2015, collectively, the "**Original Intercreditor Agreement**");

WHEREAS, SpanCo ~~has~~ extended credit to iNDx in the amount of $250,000 (the "**SpanCo Loan**") evidenced by iNDx's Convertible Note ~~of even dated herewith~~ (dated as of January __, 2015 (as the same may modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, the "**SpanCo Note**"); and

WHEREAS, as a condition to making the SpanCo Loan, SpanCo ~~has~~ required that iNDx's obligations under the SpanCo Note and related documents be secured by a pledge of the Collateral pursuant to a Security Agreement ~~of even date herewith~~dated as of January __, 2015 from iNDx to NMS (as the same may amended, modified, amended, supplemented, replaced or restated, from time to time, subject to the terms of this Agreement, the "**SpanCo Security Agreement**"); and

WHEREAS, as a further condition to making the SpanCo Loan, SpanCo ~~has~~ required that SpanCo's lien on the Collateral be of equal priority to the liens of PLC and NMS on the Collateral; and

WHEREAS, iNDx, PLC, NMS and SpanCo entered into that certain Intercreditor Agreement, dated January __, 2015 (the "**Existing Intercreditor Agreement**"), which such Existing Intercreditor Agreement superseded the Original Intercreditor Agreement; and

WHEREAS, as a condition of NMS making the Fourth NMS Loan, NMS required that iNDx's obligations under the Third NMS Note, the Fourth NMS Note and any other loans made to iNDx by NMS as evidenced by a promissory note or otherwise be secured the Collateral pursuant to the NMS Security Agreement; and

WHEREAS, as a further condition to the making of the Fourth NMS Loan, NMS required that the parties hereto enter into this Agreement; and

WHEREAS, the parties intend that this Agreement ~~supercede~~supersede the Existing Intercreditor ~~Agreements~~Agreement.

2

NOW THEREFORE in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the undersigned agree as follows:

1.      *Lien Priority*. The parties hereto hereby agree that any and all liens, rights and security interests owned, claimed or held, or to be owned, claimed or held by PLC ~~or NMS (collective~~(the "**PLC Liens**"), NMS (the "**NMS Liens**") or SpanCo (the "**SpanCo Liens**", together with the PLC Liens and the NMS Liens, collectively, the  "**Liens**") as security for any present or future indebtedness, obligation or liability owed to PLC ~~or NMS~~(the "**PLC Debt**"), NMS (the "**NMS Debt**") and SpanCo (the "**SpanCo Debt**", together with the PLC Debt and the NMS Debt, collectively, the "**Debt**") by iNDx or its affiliates ~~(collectively, the **"Debt"**)~~, in connection with any loans made or to be made in compliance with this Section 1 by PLC, NMS or SpanCo to iNDx, and each case evidenced by a promissory note, are and shall be in all things *pari passu* to each other, and of the same priority ~~as, any and all liens, rights and security interests owned, claimed or held, or to be owned, claimed or held by SpanCo (collectively, the **"SpanCo Liens"**) as security for any present or future indebtedness, obligation or liability owed to SpanCo by iNDx or its affiliates (collectively, the **"SpanCo Debt"**)~~.

      (a)      Each Creditor hereto agrees not to make any additional loans to iNDx or otherwise hereafter accept any additional promissory notes from iNDx without the written consent of the Required Creditors (as hereinafter defined) and the terms of any such additional loans shall be subject to the approval of the Required Creditors.

      (b)      If any Creditor shall hereinafter make any additional loans to iNDx or otherwise accept any additional promissory notes from iNDx without the written consent of the Required Creditors, iNDx shall remain obligated with respect to such additional indebtedness extended by such Creditor (such debt shall be referred to herein as the "**Unsecured Debt**"); provided however, such Unsecured Debt (i) shall not be included within the PLC Debt, the NMS Debt or the SpanCo Debt, as the case may be, or included within the definition of "Debt" as used herein, (ii) shall in no event be secured by the Collateral and (iii) shall be subordinate in all respects to the payment of any principal or interest of the Debt.  In accordance with the foregoing, any reference in this Agreement to "Debt" shall exclude any Unsecured Debt.

      (c)      As used in this Agreement, "**Required Creditors**" means (a) if there are one or two Creditors, all Creditors; and (b) if there are three or more Creditors, Creditors who have in the aggregate at least sixty six and two thirds percent (66.67%) of either (i) the aggregate commitments of the Creditors with respect to the Debt secured by the Collateral, or (ii) in the event that there are no unfunded commitments of the Creditors with respect to the Debt secured by the Collateral, the aggregate outstanding balance of the Debt secured by the Collateral.

2.      *Treatment of Payments*.  Subject to **Section 3** below, prior to the occurrence of an event of default under (a) the SpanCo Note, the SpanCo Security Agreement or any of the documents executed in connection therewith (collectively, the "**SpanCo Documents**"), or (b) the PLC Note, the PLC Security Agreement~~, or any of the documents executed in connection therewith (collectively, the "PLC Documents") or (c)~~ the NMS ~~Note~~Notes, the NMS Security Agreement or any of the documents executed in connection therewith (collectively, the "**NMS Documents**",

and together with the SpanCo Documents and the PLC Documents, collectively, the **"Documents"**), NMS, PLC, and SpanCo respectively, shall each be entitled to receive and retain for its own account any and all regularly scheduled interest payments made when due (but not those coming due by acceleration or demand other than pursuant to a demand note) under the SpanCo Documents and, the PLC Documents or NMS Documents, respectively, or under any other documents evidencing Debt of the Creditors secured by the Collateral. To the extent that NMS, PLC or SpanCo receives any payments of principal on their respective Debt such Creditor shall notify the other Creditors in writing of such receipt and may retain their Pro Rata portion of the payments and shall hold the remainder IN TRUST for the other Creditors. Any such amounts received by any Creditor and being held IN TRUST shall be paid over upon demand to the other Creditors based on their respective Pro Rata portion of such amount.

3. *Certain Distributions*. (a) In the event of: (i) any insolvency, bankruptcy, receivership, custodianship, liquidation, reorganization, readjustment of debt, arrangement, composition, assignment for the benefit of creditors, or other similar proceeding relative to iNDx or its property, or (ii) any proceeding for voluntary liquidation, dissolution or other winding up or bankruptcy proceedings (a **"Proceeding"**), then and in any such event: (A) any and all payments or distributions of any character, whether in cash, securities, obligations or other property, whether received by SpanCo, PLC or NMS, shall be shared by the Creditors Pro Rata (as defined below); (B) any payment or distribution of any character, which would otherwise (but for the terms hereof) be payable or deliverable in respect of the debt owed to a Creditor in excess of the amount to which it would be entitled to under clause (A) above, shall be paid or delivered directly to the other Creditors, or their representative, and each Creditor or any other holder of its debt irrevocably authorizes, empowers and directs all receivers, custodians, trustees, liquidators, conservators and others having authority in the premises to effect all such payments and deliveries; and (C) each Creditor shall retain the right to file a proof of claim, to vote and to otherwise act in any Proceeding (including, without limitation, the right to vote to accept or reject any plan of partial or complete liquidation, reorganization, readjustment, arrangement, composition or extension proposed in any Proceeding) provided, that no Creditor shall vote with respect to any such plan or take any other action to contest the validity, enforceability or priority of the liens held by the other Creditors, or the enforceability of any agreements between the iNDx and any of the Creditors or this Agreement.

(b) iNDx agrees with each Creditor that, except for the payment when due of regularly scheduled principal payments coming due other than by acceleration or demand, iNDx will not make any partial or total payment of principal to any of the Creditors (including without limitation principal coming due by acceleration or demand other than in the case of a demand note) without simultaneously making a payment to the other Creditors in an amount equal to its Pro Rata share of the aggregate payments.

(c) After the occurrence of an event of default under the SpanCo Documents, the NMS Documents, or the PLC Documents or all, any and all payments and proceeds of Collateral received by any of the Creditors shall be applied by such Creditor first against costs of collection reasonably incurred and then shared with the other Creditors on a Pro Rata basis for application by each of the other Creditors, first against accrued but unpaid interests and then against principal.

4

(d)     In the event that, notwithstanding subsection (a), (b) or (c) hereof, any Creditor receives payment of principal, other than regularly scheduled principal payments, in excess of the amounts which it was entitled pursuant to subsection (a), (b) or (c), such Creditor shall hold such excess IN TRUST for and immediately remit such excess to, the other Creditors.

(e)     As used in this Agreement, the term **"Pro Rata"** means the formula for sharing payments between the Creditors whereby each Creditor's share of a payment shall equal such payment times a fraction, the numerator of which shall be the ~~amount of~~ principal amount of the Debt owed by iNDx to such Creditor immediately prior to the sharing of said payment, and the denominator of which shall be the aggregate principal amount of the Debt owed by iNDx to the Creditors immediately prior to the sharing of said payment.

4.     *No Impairment*. The provisions of this Agreement are intended ~~solely~~primarily for the purpose of defining the relative rights of the Creditors, and nothing contained in this Agreement is intended to, or shall, impair, as between iNDx, other creditors, and any of the Creditors, all amounts due and payable to such Creditor,  or to affect the relative rights between any of the Creditors and other creditors of iNDx (other than the Creditors), nor shall anything herein or therein prevent any of the Creditors from exercising all remedies against iNDx otherwise permitted by applicable law, subject to the rights of the other Creditors under the provisions of this Agreement. ~~Nothing contained~~Except as expressly provided in this Agreement, this Agreement is not intended to limit the exercise of any rights or remedies of SpanCo under the SpanCo Documents, NMS under the NMS Documents, PLC under the PLC Documents, or as may be available to any of the Creditors in law or in equity.

(a)     Notwithstanding anything to the contrary in this Agreement, no Creditor shall take any action to foreclose upon any item of Collateral except with the written consent of the Required Creditors.  If the Required Creditors cannot mutually agree on a method to foreclose upon all or part of the Collateral, they may obtain the appointment of a receiver to foreclose upon and liquidate the Collateral.  All expenses of such receiver and the fees and costs (including attorneys' fees) incurred in the appointment of the receiver or incurred by the receiver shall be paid or reimbursed out of the proceeds of the Collateral and any shortfall shall be borne by the Creditor seeking the appointment of the receiver.

(b)     Any receiver shall hold the all Collateral and all net proceeds therefrom IN TRUST for the Creditors following payment as set forth in Section 4(b).

5.     *Modification to SpanCo Documents, PLC Documents or NMS Documents*. ~~Each~~Subject to the restrictions on the rights of Creditors explicitly set forth in this Agreement, each Creditor may, at any time and from time to time, without the consent of or notice to any person, without incurring any responsibility to any person, and without impairing or releasing the obligations of iNDx or the other Creditors hereunder (a) extend, modify or amend any agreement or any SpanCo Documents, PLC Documents or NMS Documents, as the case may be; (b) sell, exchange, release or otherwise deal with any property by whomsoever at any time pledged or mortgaged to secure or howsoever securing, the SpanCo Debt, PLC Debt or NMS Debt as the case may be; (c) release anyone liable in any manner for the payment or collection of the SpanCo

Debt, PLC Debt or NMS Debt as the case may be; (d) exercise or refrain from exercising any rights against iNDx or the SpanCo Liens, the PLC Liens or the NMS Liens, as the case may be; or (e) take or refrain from taking any other action whatsoever, *provided, however that* in each such case, no Creditor shall (i) with respect to any existing Debt, agree to any amendment which changes the maturity date or any payment date or amount of scheduled principal or interest payments due on such payment date without the written consent of the Required Creditors, or (ii) take any or attach any voluntary or involuntary liens or pledges or security interests in any asset not included in "Collateral" on the date hereof, unless a *pari passu* lien, pledge or security interest in such asset is simultaneously granted to or obtained or has previously been granted to or obtained by the other Creditors. At such time as the lien is granted or attached, the assets subject to such lien or attachment shall be deemed to be included within the term "Collateral" under this Agreement.

6. *Supercedure of the Intercreditor AgreementsAgreement*. This Agreement supercedes the amends and restates and supersedes the Existing Intercreditor AgreementsAgreement in its entirety.

7. *Specific Performance*. Each Creditor is hereby authorized to demand specific performance of this Agreement at any time when any other party shall have failed to comply with any of the provisions of this Agreement applicable to it. Subject to any Creditor's right to seek appointment of a Receiver, iNDx and each Creditor hereby irrevocably waive any defense based upon the adequacy of a remedy at law which might be asserted as a bar to such remedy of specific performance and waive any requirement of the posting of any bond which might otherwise be required before such remedy of specific performance is granted.

8. *Deed in Lieu of Foreclosure*. As to any Collateral, any of the Creditorsno Creditor may at any time after the occurrence and during the continuance of a default accept a full or partial deed in lieu of foreclosure or assignment in lieu of foreclosure in its own name or in the name of its designee or nominee or otherwise, provided that prior to the delivery of such deed or assignment, such Creditor has notified the other Creditors in writing of its intention to accept such deed or assignment, and the other Creditors have not within ten (10) days after such notice requested in writing that title be registered in the name of all of the Creditors as tenants in common (on a Pro Rata basis), or in the name of their respective nomineeswithout the prior written consent of the Required Creditors. In the event of approval by the Required Creditors, the Creditors agree to cooperate in determining how such Collateral will be titled and registered among the Creditors, as tenants in common or otherwise and, if as tenants in common, the Creditors will cooperate in entering into a tenant in common agreement, in form and substance reasonably acceptable to all of the Creditors.

9. *Participations*. The Creditors and iNDx agree that payments made by iNDx to a Creditor but shared by the Creditors pursuant to the terms hereof, shall reduce the obligations owed by iNDx to the Creditors based upon application under this Agreement and not based upon which Creditor to which iNDx makes its payment, to the extent recognized by law. To the extent not recognized by law, a payment shared by a Creditor (the **"Purchasing Creditor"**) with the other Creditors (the **"Selling Creditors"**) pursuant to the terms of this Agreement shall constitute a purchase by the Purchasing Creditor of a non-voting participation interest in the obligations of iNDx owed to the Selling Creditors.

10.   *Perfection*. Each Creditor shall take all steps to perfect and maintain perfection of its security interest in the Collateral, provided that failure to do so shall (a) make **Section 1** hereof inoperative unless and until the defaulting Creditor re-establishes perfection and provides evidence to the other Creditors that there have been no intervening liens, and (b) not affect any other provision of this Agreement, including without limitation, **Section 3** hereof, provided that the non-defaulting Creditors shall retain any other right of action against the defaulting Creditor available at law.

11.   *Miscellaneous*.

(a)   This Agreement may not be amended, waived, terminated or otherwise modified except in writing executed by the Creditors.

(b)   Any delay in the exercise of or any failure to exercise any right or remedy of ~~either Creditor~~ any Creditor under this Agreement, the respective documents evidencing the Debt owed to such Creditor, at law or in equity or otherwise shall not be deemed a waiver of any such right or remedy of any Creditor.

(c)   Each reference to this Agreement to a Creditor shall include any assignee or transferee of such Creditor.

(d)   If any term or provision of this Agreement shall be determined to be illegal or unenforceable, all other terms and provisions hereof shall nevertheless remain effective and shall be enforced to the fullest extent permitted by law.

(e)   All notices, requests, consents, demands and other communications required or permitted under this Agreement shall be in writing and, unless otherwise specifically provided in this Agreement, shall be deemed sufficiently given or furnished if delivered by personal delivery, by telegram or telex, by expedited delivery service with proof of delivery, or by registered or certified U.S. mail, postage prepaid, at the address as specified below (unless changed by similar notice in writing given by such particular party whose address is to be change). Any such notice or communication shall be deemed to have been given either at the time of personal service, or, in the case of delivery service or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of telegram or telex upon receipt.

iNDx's address:
~~20380 Town Center Lane, Suite 218~~
104 Cooper Court [Confirm address]
~~Cupertino, CA  95014~~ Los Gatos, CA  95032

SpanCo's address
Paseo de la Victoria, 311A
Cordoba, 14004, Spain

NMS's address:
3701 Welsh Road
Willow Grove, PA  19090

7

PLC's address:
~~9568 Topanga Canyon Blvd.~~
~~Chatsworth, CA  91311~~
192 Odebolt Dr.
Thousand Oaks, CA 91360

(f)    This Agreement may be signed in any number of counterparts, each of which when so executed shall be deemed to constitute one and the same agreement.

(g)    This Agreement shall be governed by and construed in accordance with the laws of the ~~State~~Commonwealth of ~~California~~Pennsylvania.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**iNDx LIFECARE, INC.**

By: _____
       Name: ~~Mohan Uttarwar~~
       Title: ~~Chief Executive Officer~~

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**PLC DIAGNOSTICS, INC.**

By: _____
      Name: Reuven Duer
      Title:  President

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.


**EUROSEMILLAS, S.A.**

By: _____
        Name: Javier Lopez
        Title: Manager

IN WITNESS WHEREOF, this Agreement is executed as of the date first above written.

**NMS LABS**

By: _____
       Name: Pierre Cassigneul
       Title:  Chief Executive Officer

EXHIBIT C

415.956.6457 (f)

202.777.8950 (t)
202.347.8429 (f)
www.rjo.com

Embarcadero Dollar Building
311 California Street, 10th Flr.
San Francisco CA 94104

The Bowen Building
875 15th Street NW, Suite 725
Washington DC 20005

# ROGERS JOSEPH O'DONNELL

October 31, 2016

**<u>Via E-mail & U.S. Mail</u>**
mlitvak@pszjlaw.com

Maxim B. Litvak
**PACHULSKI STANG ZIEHL & JONES LLP**
150 California Street, 15th Floor
San Francisco, CA 94111

Re:     Amended Notice of Disposition of Collateral
By Public Foreclosure Sale

Dear Mr. Litvak:

I am writing to you now as you are counsel of record for PLC Diagnostics, Inc. (PLC), and NMS Labs (NMS). This firm represents Eurosemillas S.A. (Eurosemillas or SpanCo) in connection with the actions of PLC and NMS to foreclose upon the Collateral identified in the SpanCo, PLC and NMS Intercreditor Agreement dated October 22, 2014 (Intercreditor Agreement). Specifically, pursuant to an Amended Notice of Disposition of Collateral By Public Foreclosure Sale (Amended Notice) mailed to Eurosemillas on or about October 21, 2016, NMS and PLC are purporting to sell on November 4, 2016, "all of the Debtor's [iNDx Lifecare, Inc.] right, title and interest, on a worldwide basis, in and to Collateral" expressly covered by the Intercreditor Agreement. Further, as more fully set forth below, NMS and PLC, by its actions, conduct and statements both inside and outside of iNDx Lifecare bankruptcy, have breached the Intercreditor Agreement and in bad faith have denied the existence and enforceability of the Intercreditor Agreement.

While Eurosemillas hopes that upon further reflection, NMS and PLC will respect Eurosemillas' rights, and that the parties can resolve this matter without recourse to the courts, please be advised that Eurosemillas objects to and does not consent to NMS and PLC's Disposition of Collateral By Public Foreclosure Sale. Eurosemillas specifically demands that NMS and PLC cancel the November 4, 2016 purported public foreclosure sale of all right, title and interest in the Collateral. Contrary to their Amended Notice, NMS and PLC do not have the right to foreclose on all of Debtor iNDx Lifecare's right, title and interest in the Collateral. Eurosemillas further expressly reserves any and all rights, claims and defenses under the Intercreditor Agreement and which exist in law and equity.

382673.2

A Professional Law Corporation

**ROGERS JOSEPH O'DONNELL**

Maxim B. Litvak
October 31, 2016
Page 2


<u>The Intercreditor Agreement</u>

       The Intercreditor Agreement expressly recognizes that Eurosemillas loaned iNDx Lifecare $250,000 on the condition that iNDx Lifecare's Obligations as defined in the SpanCo Security Agreement "be secured by a pledge of the Collateral pursuant to the Security Agreement from iNDx Lifecare to NMS,"[1] and that Eurosemillas' "lien on the Collateral be of equal priority to the lien of PLS and NMS on the Collateral."  (Intercreditor Agreement, Recitals). Consequently, the parties agreed that

> any and all liens, rights and security interests owned, claimed or held by PLC or NMS (collective, the "PLC Liens") as security for any present or future indebtedness, obligation or liability owed to PLC or NMS by iNDx or its affiliates (collectively, the "PLC Debt") are and shall be in all things pari passu to, and of the same priority as, any and all liens, rights and security interests owned, claimed or held, or to be owned, claimed or held by SpanCo (collectively, the "SpanCo Liens") as security for any present or future indebtedness, obligation or liability owed to SpanCo by iNDx or its affiliates (collectively, the "SpanCo Debt").  (Intercreditor Agreement, section 1.)

       Numerous other provisions recognize Eurosemillas' pari passu rights.  For instance, upon the occurrence of any default by iNDx Lifecare relative to its obligations to Eurosemillas, NMS or PLC, any and all payments and proceeds of Collateral are to be "shared with the other Creditor on a Pro Rata basis".  (*Id.*, section 3(c)). Perhaps most importantly, the Intercreditor Agreement addresses the foreclosure on Collateral.  Section 7 ("Deed in Lieu of Foreclosure") of the Intercreditor Agreement allows any Creditor to accept a full or partial deed in lieu of foreclosure, but expressly provides that the other Creditors are entitled to have title registered in all Creditors' name "as tenants in common (on a Pro Rata basis)."  Eurosemillas does not consent to NMS and PLC foreclosing on the Collateral; however, to the extent NMS and PLC purport to purchase all rights, title and interest in the Collateral, Eurosemillas asserts that by operation of law and the terms of the Intercreditor Agreement, a tenancy in common with Eurosemillas on a Pro Rata basis will be created.

---

[1] The Collateral is defined in the Intercreditor Agreement to include all Technology and Intellectual Property Rights related to the listed patents and patent applications. The "Obligations" are defined in the SpanCo Security Agreement to mean "the liabilities owed by the Debtor to the Secured Party under this Agreement, the Strategic Agreement and the Note, including without limitation all interest, fees, charges, expenses, attorneys' fees and accountants' fees chargeable to the Debtor or payable by the Debtor hereunder and thereunder."

A Professional Law Corporation

**ROGERS JOSEPH O'DONNELL**

Maxim B. Litvak
October 31, 2016
Page 3

By asserting that they are entitled to foreclose on all of iNDx Lifecare's right, title and interest in the Collateral, NMS and PLC have anticipatorily breached the Intercreditor Agreement. Certainly, if they actually move to foreclose on the Collateral on November 4, your clients' breach will be certain. But NMS and PLC have already breached the Intercreditor Agreement in many respects. For instance, the Intercreditor Agreement provides that in the event of any insolvency or bankruptcy, readjustment of debt, arrangement "or other similar proceeding relative to iNDx or its property," or "any proceeding for voluntarily liquidation, dissolution or other winding up…any and all payments or distributions of any character, whether in cash, securities, obligations or other property, whether received by SpanCo, PLC or NMS, shall be shared by the Creditors Pro Rata…" (*Id.*, section 3 (a) (ii) (C)). Each Creditor retained the right to file a proof of claim or act in any proceeding, "<u>provided</u>, that no Creditor shall …take any …action to contest the validity, enforceability or priority" of another Creditor's liens, or "of the enforceability of any agreements between the iNDx and any of the Creditors or this Agreement." (*Id.*, emphasis in original.) NMS and PLC breached the Intercreditor Agreement by taking action to contest the validity and enforceability of the Intercreditor Agreement.

Indeed, Reuven Duer, in support of both NMS and PLC, submitted a declaration in the bankruptcy court disputing the existence and enforceability of the Intercreditor Agreement *despite the fact that he, on PLC's behalf, personally executed the Intercreditor Agreement and in a meeting with Eurosemillas acknowledged the Intercreditor Agreement was a valid, binding contract.* Yet, Reuven Duer states in his declaration that "Eurosemillas S.A. ("SpanCo") *purportedly* loaned $250,000 to the Debtor and…has taken the position that its liens and claims under the SpanCo Note are pari passu with the PLC Note and the NMS Notes pursuant to an intercreditor agreement." (*See* Docket 15-1 (Declaration of Reuven Duer, ¶ 13.) The basis for NMS and PLC's attack on the enforceability of Eurosemillas' pari passu status with NMS and PLC is that "SpanCo, however, has been unable to provide a fully-executed copy of such intercreditor agreement." (*Id.*)

You have been provided a copy of the Intercreditor Agreement executed by iNDx Lifecare, Eurosemillas and PLC. The only thing missing from the copy of the Intercreditor Agreement currently in Eurosemillas' possession is the countersignature page on behalf of NMS. Notably, Mr. Rieders did not submit a declaration in the bankruptcy court stating that NMS never signed the Intercreditor Agreement or stating that NMS denies entering into the Intercreditor Agreement.

Please advise whether NMS will produce its counterpart signature to the Intercreditor Agreement and if not, whether it is NMS's position that it did not agree to the Intercreditor Agreement *(i.e.,* the agreement is not a valid, binding contract because NMS

A Professional Law Corporation

**ROGERS JOSEPH O'DONNELL**                                        www.rjo.com

Maxim B. Litvak
October 31, 2016
Page 4

never signed the document.)  As I am sure you are privy to the parties' course of conduct,
including numerous emails from both Mr. Rieders and NMS counsel to Eurosemillas,
Mr. Rieders and NMS consistently acknowledged the binding nature of the Intercreditor
Agreement, and knowingly accepted the benefits of Eurosemillas' loan made in reliance
upon NMS' agreement to the Intercreditor Agreement.

          We are hopeful that contrary to the suggested implications of Mr. Duer's
declaration and NMS and PLC's motion papers, NMS and PLC do not genuinely dispute
Eurosemillas' rights under the Intercreditor Agreement.  In all events, we expect NMS and
PLC realize they would be estopped from denying its existence and enforceability, in light of
the parties' subsequent communications, course of dealing and NMS and PLC's knowing
acceptance of the benefits from Eurosemillas.

NMS and PLC's Improper and Commercially Unreasonable Pending "Public Foreclosure
Sale"

          The Amended Notice of Public Foreclosure, issued on October 21, 2016, states
that on November 4, 2016, PLC and NMS, "the 'Secured Party'", will sell the Collateral to
the highest or otherwise best qualified bidder at a public auction to be conducted in your law
offices. The Amended Notice states the Collateral being sold by NMS and PLC "consists of
**all** of the Debtor's right, title and interest, on a worldwide basis, in and to the Collateral"
(emphasis added), *i.e.*, all Technology (pertaining to the identified US Patents and US
Pending Patent Applications) and all related Intellectual Property Rights. The Collateral
identified in the Amended Notice is identical to the Collateral covered by the Intercreditor
Agreement.

          NMS and PLC's proposed public auction is not commercially reasonable.
Indeed, in several material respects, the Amended Notice and auction procedures are
designed to dissuade potentially interested parties from participating in the auction.  The
Amended Notice is facially invalid because it misrepresents that NMS and PLC have the
authority to sell **all** of the right, title and interest in the Collateral when they have no right to
sell Eurosemillas' undivided pari passu pro rata interest in the Collateral. The Intercreditor
Agreement does not empower anyone else to sell under Eurosemillas' lien, and under UCC
§ 9617(a)(2) and (3) and (c), the sale only discharges the "security interest under which the
sale is made" and "any subordinate security interest." Therefore, Eurosemillas' equal priority
lien survives (as does the Debtor's related interest underlying your lien.)

          Any potential buyer of the Intellectual Property Rights NMS and PLC purport
to sell would likely need more time than your clients' have afforded to conduct due diligence
and to arrange financing or investments.  Perhaps more importantly, NMS and PLC's

A Professional Law Corporation

# ROGERS JOSEPH O'DONNELL

Maxim B. Litvak
October 31, 2016
Page 5

extensive reservation of rights set forth in the Amended Notice would dissuade prospective
bidders from undertaking due diligence under any circumstances: NMS and PLC reserve the
right to (a) adjourn or cancel the Sale without notice; (b) alter the terms of payment; (c)
abandon or elect not to dispose of certain Collateral; (d) submit a credit bid for the Collateral;
and/or (d) reject all bids for the Collateral.

NMS and PLC additionally warn any otherwise potentially interested bidders
that "[a]dditional terms of Sale may be announced at the time of the Sale."  The Amended
Notice further advises any potential bidders:

> EXCEPT AS THE SECURED PARTY OTHERWISE AGREES, THE
> COLLATERAL IS BEING OFFERED AS A SINGLE LOT ON AN
> "AS IS/WHERE IS" BASIS WITH ALL FAULTS, WITHOUT
> RECOURSE TO THE SECURED PARTY OR ANY OF ITS
> AGENTS OR REPRESENTATIVES, AND WITH NO
> REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED,
> RELATING TO TITLE, POSSESSION, QUIET ENJOYMENT,
> MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE
> OR THE LIKE.

Eurosemillas asserts that the limited distribution of notice, limited time to
evaluate the Collateral being offered, facially false statement regarding the totality of the
rights and interests to the Collateral being auctioned, and sweeping reservation of rights and
disclaimers, individually and collectively, demonstrate that NMS and PLC's proposed
disposition of the Collateral is not being conducted in a commercially reasonable manner in
compliance with the UCC, including but not limited to, UCC § 9-627.

NMS and PLC's bold representation to the bankruptcy court that "[a]side from
Movants [NMS and PLC] no party has expressed any interest in submitting a bid on the
Debtor's assets at the foreclosure sale" further evinces that the proposed foreclosure sale is
not commercially reasonable.(Docket no. 15, 7:3.)  Indeed, the stated failure of any
expressed interest in bidding does not reflect a lack in value or interest in the IP Collateral,
but rather reveals the success of NMS and PLC's efforts to thwart the process and deter any
party from even considering bidding against their announced intent to credit bid on the
Collateral.

Viewed objectively, NMS and PLC's proposed public foreclosure sale was
and is designed to generate little or no interest in the Collateral to thereby enable them to
ostensibly purchase the Collateral to later exploit for their own benefit. Certainly, one must
ask what individual or entity would expend the time and energy to undertake the appropriate

A Professional Law Corporation

ROGERS JOSEPH O'DONNELL                                        www.rjo.com

Maxim B. Litvak
October 31, 2016
Page 6

due diligence to consider purchasing the Collateral at issue here – IP and Technology related to medical diagnostic devices – when NMS and PLC have told any potentially interested buyers that they can (and will) submit a credit bid and that if the auction does not go their way, they reserve the right to adjourn or cancel the Sale without notice; alter the terms of payment; abandon or elect not to dispose of certain Collateral; and/or reject all bids for the Collateral. Simply stated, the supposed public foreclosure auction is a sham.

In sum, Eurosemillas asserts that NMS and PLC have breached the Intercreditor Agreement, have issued an improper and misleading Amended Notice of Disposition of Collateral By Public Foreclosure Sale, and seek to engage in a purported public foreclosure sale that is not commercially reasonable and is in violation of the UCC. Eurosemillas would welcome the opportunity to discuss the matter further with you. However, please understand that our client is committed to protecting its interests and rights by whatever means necessary, and at a minimum, must insist that NMS and PLC immediately cancel their scheduled November 4, 2016 purported public foreclosure sale in your offices.

Due to the imminence of the impending sale, your prompt attention to this letter would be greatly appreciated. In the meantime, Eurosemillas hereby reserves all its rights, claims and defenses, including but not limited to its right to specific performance, quiet title, equitable subordination, injunctive or other equitable relief under the Intercreditor Agreement, as well as all other rights, claims, defenses and remedies available in law or equity.

Sincerely yours,

Gayle M. Athanacio

GMA:sci

cc:     Andrew Moher, Esq. (iNDx Lifecare, Inc. counsel amoher@moherlaw.com)
        G. Larry Engel, Esq.

382673.2

A Professional Law Corporation

EXHIBIT  D

# QUITCLAIM ASSIGNMENT

This QUITCLAIM ASSIGNMENT is by iNDx LIFECARE, INC., a Delaware corporation having offices at 20380 Town Center Lane, Suite 218, Cupertino, California 95014 (**"iNDx"**), with respect to certain patents, identified in the attached <u>Exhibit A</u> (**"iNDx Patents"**) and related "Intellectual Property Rights."[1]

## R E C I T A L S

A.  iNDx was indebted to PLC DIAGNOSTICS, INC., a Delaware corporation (**"PLC"**) under a Secured Convertible Promissory Note dated December 27, 2013, in the principal amount of $3,100,000.00 (**"PLC Note"**). iNDx's obligations under the PLC Note and related documents were secured by the iNDx Patents and Intellectual Property Rights (collectively, the **"Collateral"**) identified in a Security Agreement from iNDx to PLC, dated December 27, 2013.

B.  iNDx was indebted to NMS LABS, a Pennsylvania corporation (**"NMS"**) under a Secured Convertible Note, dated October 29, 2014, in the principal amount of $1,000,000.00 and a Secured Convertible Note, dated May 27, 2015, in the principal amount of $500,000.00 (collectively, **"NMS Notes"**).

---

[1]  "Intellectual Property Rights" means all past, present, and future rights of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights, copyrights, moral rights, and mask work rights; (b) trademark and trade name rights and similar rights (and associated goodwill); (c) trade secret rights; (d) patent and industrial property rights; (e) other proprietary rights in technology and works of authorship of every kind and nature; and (f) rights in or relating to registrations, renewals, extensions, combinations, continuations, divisions and reissues of, and applications for, any of the rights referred to in clauses (a) through (e) of this sentence.

C.      iNDx's obligations under the NMS Notes and related documents were secured by a pledge of the same Collateral as is pledged with PLC under a Security Agreement from iNDx to NMS, dated October 2014.

D.      iNDx is indebted to EUROSEMILLAS, S.A., a Spanish corporation ("*__SpanCo__*") under a Secured Convertible Promissory Note, dated January 28, 2015, in the principal amount of $250,000.00 ("*__SpanCo Note__*"). iNDx's obligations under the SpanCo Note and related documents are secured by a pledge of the same Collateral as is pledged with PLC and NMS under a Security Agreement from iNDx to SpanCo, dated October 24, 2014.

E.      As a further condition to making the loan represented by the SpanCo Note, SpanCo required that SpanCo's lien on the Collateral be of equal priority to the liens of PLC and NMS on the Collateral. Accordingly, iNDx, PLC, NMS and SpanCo entered into that certain Intercreditor Agreement, dated October 28, 2014 ("*__Intercreditor Agreement__*").

F.      Section 1 of the Intercreditor Agreement provides that "any and all liens, rights and security interests owned, claimed or held, or to be owned, claimed or held by PLC or NMS (collective, the "PLC Liens") as security for any present or future indebtedness, obligation or liability owed to PLC or NMS by iNDx or its affiliates (collectively, the "PLC Debt") are and shall be in all things *pari passu* to, and of the same priority as, any and all liens, rights and security interests owned, claimed or held, or to be owned, claimed or held by SpanCo (collectively, the "SpanCo Liens") as security for any present or future indebtedness, obligation or liability owed to SpanCo by iNDx or its affiliates (collectively, the "SpanCo Debt")."

G.      iNDx is in default of its obligations under the PLC Note, NMS Notes and SpanCo Note. Section 7 of the Intercreditor Agreement provides that PLC, NMS and SpanCo "may at any time after the occurrence and during the continuance of a default accept a full or partial deed in lieu of foreclosure or assignment in lieu of foreclosure in its own name."

H.     On November 4, 2016, PLC and NMS purported to conduct a public foreclosure sale of all of iNDx's right, title and interest in and to the Collateral over SpanCo's objections.

I.     A dispute currently exists between PLC and NMS on the one hand, and SpanCo on the other, with regard to, among other things, the enforceability of the Intercreditor Agreement, the validity of the purported foreclosure sale, and whether iNDx currently retains any right, title and interest in the Collateral. NMS and PLC dispute SpanCo's assertion that the Intercreditor Agreement is enforceable. iNDx does not contest the validity of the Intercreditor Agreement.

J.     To avoid becoming involved in SpanCo's dispute with PLC and NMS, iNDx offered to quitclaim, assign, transfer and convey to PLC, NMS and/or SpanCo, as tenants in common, whatever right, title, and interest to the Collateral, if any, iNDx had prior to, and/or may have retained following, the purported public foreclosure sale. SpanCo accepted iNDx's offer.

NOW THEREFORE in consideration of the promises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound:

1.     iNDx hereby quitclaims, assigns, transfers and conveys to SpanCo any right, title, and interest that iNDx may have to the Collateral, and all divisions, renewals and continuations of the iNDx Patents and all Letters Patent of the United States that may be granted thereon and all reissues and extensions thereof, and all rights of priority under International Conventions and applications for Letters Patent which may later be filed from the Patent Applications in any country or countries foreign to the United States, and all Letters Patent that may be granted for the Patent Applications in any country or countries foreign to the United States and all extensions, renewals and reissues thereof.

2.     iNDx hereby authorizes and requests, to the extent of any right iNDx may have to do so, the Commissioner of Patents of the United States, and any Official of any country or countries foreign to the United States, whose duty it is to issue patents on applications, to issue all Letters Patent

for the Patent Applications to SpanCo, its successors, legal representatives and assigns, in accordance with the terms of this instrument.

3.    iNDx hereby sells, assigns, transfers, and conveys to SpanCo, its successors, legal representatives, and assigns any claims for damages and all remedies arising out of any violation of the rights assigned hereby that iNDx may have that may have accrued prior to the date of assignment to SpanCo, or may later accrue, including, but not limited to, the right to sue for, collect, and retain damages for past infringements of the Letters Patent before or after issuance.

4.    As part of this Quitclaim Assignment, iNDx makes no representations or warranties, express or implied, as to the adequacy or sufficiency of Patent Applications, their freedom from defects of any kind, including freedom from any claim of patent or trade secret infringement and may result from the use of iNDx's Patents. This Quitclaim Assignment provides no warranties, including warranties of title.

IN WITNESS WHEREOF, the undersigned has caused this Quitclaim Assignment to be executed.

Dated:  December 24, 2016          **iNDx LIFECARE, INC.**

By: _____

          Piyush Gupta
          Managing Consultant

# EXHIBIT A

## LIST OF PATENT AND PATENT APPLICATIONS

US Patents:

      1.      US7,951,583 – Optical Scanning System

      2.      US8,187,866 – Optical Scanning System

      3.      US8,288,157 – Waveguide-Based Optical Scanning System

US Pending Patent Applications:

      1.      US20070211985A1 – Optical Scanning System

      2.      US20090068668A1 – Waveguide-Based Optical Scanning System

      3.      US20100302544A1 – Waveguide-Based Detection System with Scanning Light Source

      4.      US20090312188A1 – System and Method for Nucleic Acids Sequencing by Phased Synthesis

      5.      US20110249260A1 – Optical Scanning System

      6.      US20130071850A1 – Waveguide-Based Optical Scanning System

      7.      US20130215425A9 – Waveguide-Based Detection System with Scanning Light Source

      GB Patent:

      1.      GB2461026 - System and Method for Nucleic Acids Sequencing by Phased Synthesis

<u>Ex-US Patent Applications:</u>

Waveguide-Based Detection System with Scanning Light Source

1.     AU2010241641– Australia

2.     CA2,759,396 – Canada

3.     CN201080028057.2 – China

4.     EP10716716.5 – Europe

5.     HK10716716.5 – Hong Kong

6.     IL215898  – Israel

7.     IN8694/CHENP/2011 – India

8.     JP2012-508642 – Japan

9.     KR10-2011-7028448 – South Korea

System and Method for Nucleic Acids Sequencing by Phased Synthesis

1.     AU2009260321 – Australia

2.     CA2,727,158 – Canada

3.     CN200980131813.1 – China

4.     EP09767491.5 – Europe

5.     HK09767491.5 – Hong-Kong

6.     IL209813 – Israel

7.     IN8758/DELNP/2010 – India

8.     KR10-2011-7001046 – South Korea

9.     MX/A/2010/013911 – MEXICO

# CERTIFICATE OF SERVICE

I hereby certify that the above document was filed electronically with the Clerk of the United States District Court for the Northern District of California, and was served via hyperlink generated by the court's CM/ECF system, which was sent electronically to:

Maxim B. Litvak
Harry D. Hochman
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
T: 415.263.7000
F: 415.263.7010
*mlitvak@pszjlaw.com*
*hhochman@pszjlaw.com*

I declare under penalty of perjury, under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated: September 13, 2017

Ruchit Kumar Agrawal

KUMARLAW
6525 Crown Blvd. #20072
San Jose, California 95160
(408) 601-0586