1
2
3
4
5

Sherrett O. Walker (SBN 286595)
ATTORNEY AT LAW
P.O. Box 1543
Pacifica, California 94044-6543
(415) 305-6546
*rett@walkercalawyer.com*

6
7

Counsel for Eurosemillas, S.A.,
Mohan Uttarwar and Piyush Gupta

8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11   EUROSEMILLAS, S.A.,

12          Plaintiff,

13      v.

14   PLC DIAGNOSTICS, INC.;
     NATIONAL MEDICAL SERVICES,
15   INC.; LDIP, LLC; REUVEN DUER;
     ERIC RIEDERS; and Does 1 – 10,
16

17          Defendants.

18   PLC DIAGNOSTICS, INC.;
19   NATIONAL MEDICAL SERVICES,
     INC.; LDIP, LLC; REUVEN DUER;
20   ERIC RIEDERS,
21          Third Party Plaintiffs,

22      v.

23   MOHAN UTTARWAR,
24   PIYUSH GUPTA,

25          Third Party Defendants.

26

27   AND RELATED COUNTERCLAIMS

28

Case No. 17-cv-3159-MEJ

REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF THIRD PARTY
DEFENDANTS' MOTION TO DISMISS
THE THIRD PARTY COMPLAINT

Date:   January 18, 2018
Time:   10:00 a.m.
Place:  450 Golden Gate Ave.
        Courtroom B – 15th Floor
        San Francisco, CA

Judge:  Maria-Elena James

Judicial notice may properly be taken of matters of public record outside the pleadings, including proceedings from other cases.[1]  A court may appropriately take judicial notice of such facts on a motion to dismiss. [2]

Accordingly, Third Party Defendants Mohan Uttarwar and Piyush Gupta request  judicial notice of the following public records filed in this Court in the case of *National Medical Services, Inc. v. iNDx Lifecare, Inc.,* Case No. 5:16-cv-04425-EJD:

Exhibit A     Verified Complaint for Multiple Breaches of Contract and Money
                           Had and Received, dated August 5, 2016.

Exhibit B     Report and Recommendation to Grant Default Judgment, and
                           Request for Reassignment, dated June 17, 2017.

Exhibit C     Order and Judgment, dated July 10, 2017.

Dated:  December 19, 2017          Respectfully submitted,

_Sherrett Walker_

Sherrett O. Walker
Counsel for Eurosemillas S.A.,
Mohan Uttarwar and Piyush Gupta

---

[1]  *See Reyn's Pasta Bella, LLC v. Visa USA,* Inc., 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (taking judicial notice, as a matter of public record, of "pleadings, memoranda, expert reports, etc., from [earlier] litigation [,]" which were thus "readily verifiable," in order to determine what issues were actually litigated in an earlier case); *Bennett v. Medtronic, Inc.,* 285 F.3d 801, 803 n. 2 (9th Cir. 2002) (taking judicial notice, as a matter of public record, of various filings in state court because a court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue"); *Sullivan v. Kelly Servs., Inc.,* No. C07-2784 CW, 2008 WL 4891051, *2 (N.D. Cal. Nov. 12, 2008) (granting request for judicial notice of public court records).

[2]  *See Pineda v. Washington Mut. Bank, FA,* No. C 10-0294, 2011 WL 249486, *2 (N.D. Cal. 2011) (taking judicial notice of matters of public record for purposes of deciding a 12(b)(6) motion).

SHERRETT O. WALKER
P.O. Box 1543
Pacifica, California 94044-6543
(415) 305-6546

**CERTIFICATE OF SERVICE**

I hereby certify that the above document was filed electronically with the Clerk of the United States District Court for the Northern District of California, and was served via hyperlink generated by the court's CM/ECF system, which was sent electronically to:

Steven J. Kahn
Harry D. Hochman
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, California 94111-4500
T:  415.263.7000
F:  415.263.7010
*skahn@pszjlaw.com*
*hhochman@pszjlaw.com*

I declare under penalty of perjury, under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated:  December 19, 2018

*Sherrett Walker*

Sherrett O. Walker

SHERRETT O. WALKER
P.O. Box 1543
Pacifica, California 94044-6543
(415) 305-6546

EXHIBIT  A

CHRISTOPHER D. SULLIVAN (148083)
csullivan@diamondmccarthy.com
MATTHEW S. SEPUYA (287947)
msepuya@diamondmccarthy.com
**DIAMOND McCARTHY LLP**
150 California Street, Suite 2200
San Francisco, California 94111
Tel: (415) 692-5200

Attorneys for Plaintiff NATIONAL
MEDICAL SERVICES, INC. dba NMS
LABS

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

|  |  |
|---|---|
| NATIONAL MEDICAL SERVICES, INC. dba NMS LABS, a Pennsylvania Corporation.<br><br>          Plaintiff,<br><br>     vs.<br><br>iNDX LIFECARE, INC., a Delaware Corporation,<br><br>          Defendants. | Case No.<br><br>**VERIFIED COMPLAINT FOR MULTIPLE BREACHES OF CONTRACT AND MONEY HAD AND RECEIVED** |

Plaintiff National Medical Services, Inc. dba NMS Labs ("Plaintiff" or "NMS"), hereby alleges and complains against Defendant iNDx LifeCare, Inc. as follows:

## **PARTIES**

1.     Plaintiff NMS is a Pennsylvania Corporation with its principal place of business in Pennsylvania.  Plaintiff transacts business in California and in the city of Los Gatos, Santa Clara County.

-1-

2.     Defendant iNDx LifeCare, Inc. ("iNDx"), is a Delaware Corporation. Defendant held a business office in the city of Los Gatos, Santa Clara County.

**JURISDICTION**

3.     Plaintiff brings its complaint under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

4.     This Court has personal jurisdiction over this matter in that Defendant is located in, and have sufficient minimum contacts in, the State of California.  More specifically, Defendant iNDx maintained an office, conducted business, and has had agents or employees in Santa Clara County.

**VENUE**

5.     Venue is proper in this Court pursuant to 28 U.S. C. § 1391(b) (2) because the obligations to be performed by iNDx arose in this County.  Specifically, the underlying events that give rise to the contracts and promissory notes, as further described below, occurred in Santa Clara County. Further, venue is proper pursuant to 28 U.S.C § 1391(b)(1), because Defendant maintained offices, transacts business and has agents in Santa Clara County and, as such, is considered a resident of the State of California.

6.     Venue also is appropriate in the County of Santa Clara because the written contracts, described further below, provided that any action or proceeding arising out of or related to the agreements shall be in the County of Santa Clara.

**BACKGROUND**

7.     NMS and iNDx entered into a Product Development Agreement ("PDA") on August 1, 2014, a true and correct copy of which is attached as Exhibit 1.  Pursuant to the PDA, NMS agreed to provide, and did provide, a loan of substantially more than a million dollars to iNDx and to use its expertise in certain technology to collaborate with iNDx in the joint development of certain small molecule testing and assay products.  iNDx promised to use its expertise to jointly develop the products and to develop specific prototype devices according to an agreed upon schedule, as outlined in detail in the PDA

Complaint

and its exhibits, and to comply with a number of material reporting provisions as also outlined in the PDA and its exhibits.

8.   NMS fully complied with its obligations under the PDA as the project began and at all other times.

9.   NMS provided $1 million in financing to iNDx in October of 2014, pursuant to a secured promissory note.  NMS subsequently provided another $500,000 in loan financing to iNDx pursuant to a second secured promissory note and an Addendum to the Product Development Agreement, entered into as of October 2, 2014 ("PDA Addendum"), a true and correct copy of which is attached hereto as Exhibit 2.

10.   iNDx has failed to repay the two secured loans, but NMS is not seeking in this action remedies based on the failure of iNDX to repay the secured loans.

11.   In December of 2015 NMS made an unsecured loan of $150,000 to iNDx, which iNDx agreed to repay according to the terms outlined in the Promissory Note attached as Exhibit 3.  Exhibit 3 is a true and correct copy of a Promissory Note reflecting the $150,000 loan from NMS to iNDx.

12.   NMS made all of the required payments due under the PDA and PDA Addendum.  These payments totaled $1,160,000.

13.   NMS subsequently made additional loans of $250,000, through a wire transfer of $150,000 made on January 22, 2016 and a wire transfer of $100,000 made on February 25, 2016.

14.   iNDx failed to honor its obligations to properly document or repay the additional loans outlined in paragraph 13 above.

15.   Despite the substantial support of NMS, the financial condition of iNDx deteriorated dramatically in 2015 and worsened even more in 2016.

16.   iNDx defaulted on its obligations to NMS under the secured promissory notes and is in default under the terms of the Promissory Note attached as Exhibit 3, as also further described below.

17.   iNDx also materially defaulted on numerous obligations outlined in the PDA

-3-

Complaint

and defaulted on the obligations it owed under the PDA Addendum, as also outlined further below.

18.   iNDx failed to repay the additional loans (the "Unsecured Loans") outlined in Paragraph 12 above and to abide by the obligations it undertook at the time that it borrowed money through the Unsecured Loans with NMS.

19.   NMS is now forced to file this action to recover for its substantial losses as a result of the many material failures of iNDx to honor its promises and comply with its contractual and other obligations.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT (PROMISSORY NOTE)

20.   On or about December 10, 2015, Plaintiff NMS and Defendant iNDx entered into a written contract as evidenced by the Promissory Note.  A copy of the contract, marked "Exhibit 3," is attached to this complaint and incorporated by reference.

21.   Plaintiff NMS has performed all the conditions, covenants, promises, and agreements required of it under the terms of the contract.

22.   Defendant iNDx has failed, and continues to fail, to perform its part of the contract or to tender such performance.  In particular, iNDx has not met its obligation to pay the principal amount, and all interest owing on the principal amount, despite the obligation of iNDx to pay the principal amount owed since there have been a number of additional events of default under the Promissory Note, as specified in paragraph 4 of the Promissory Note.  For example, and not by way of limitation, iNDx is in default of its obligations under the secured promissory notes outlined above in paragraph 9; iNDx is in default of its obligations under the PDA; and is in default of its obligations under the PDA Addendum.

23.   NMS hereby makes a demand that iNDx pay the entire principal and accrued interest owed under the Promissory Note.

24.   Defendant iNDx is obligated to pay the expenses of Plaintiff NMS in enforcing the Promissory Note, including its attorney's fees.

Complaint

25.  Because of Defendant's failure to perform its obligations under the contract, Plaintiff has been damaged in the sum of $150,000, plus the unpaid interest, no part of which has been paid.

## SECOND CAUSE OF ACTION

## BREACH OF CONTRACT (ADDITIONAL LOANS)

26.  As outlined in paragraph 13 above, Plaintiff NMS made additional Unsecured Loans to Defendant iNDx in the total amount of $250,000.

27.  In consideration for the receipt of these loans, Defendant iNDx was to, among other things, repay the additional Unsecured Loans on the same terms as agreed to in the Promissory Note.

28.  Plaintiff NMS has performed all the conditions, covenants, promises, and agreements required of it under the terms of the contract.

29.  Defendant iNDx has failed, and continues to fail, to perform its obligations pursuant to the additional loan contracts regarding the Unsecured Loans or to tender such performance as is required per the loan agreements.  In particular, iNDx has not met its obligations to repay the principal amounts of the Unsecured Loans, and all interest owing on the principal amounts, despite the obligation of iNDx to pay the principal amounts owed since there have been a number of events of default under the terms of the loan agreements.

30.  NMS hereby makes a demand that iNDx pay the entire principal and accrued interest of the Unsecured Loans owed under the additional loan agreements.

31.  Because of Defendant's failure to perform its obligations under the contract, Plaintiff has been damaged in the sum of $250,000, plus the unpaid interest, no part of which has been paid.

## THIRD CAUSE OF ACTION

## BREACH OF CONTRACT (PDA  AND PDA ADDENDUM)

32.  On or about August 1, 2014, Plaintiff NMS and Defendant iNDx entered into a written contract as evidenced by the PDA.  A copy of the contract, marked "Exhibit 1," is

Complaint

attached to this complaint and incorporated by reference.

33. On or about October 22, 2014, Plaintiff NMS and Defendant iNDx entered into a written addendum to the PDA contract as evidenced by the PDA Addendum. A copy of the Addendum, marked "Exhibit 2," is attached to this complaint and incorporated by reference.

34. Plaintiff NMS has performed all the conditions, covenants, promises, and agreements required of it under the terms of the PDA and the PDA Addendum, including paying all the amounts called for under the PDA and PDA Addendum.

35. Defendant iNDx has breached numerous material obligations that it promised to perform in the PDA and the PDA Addendum.

36. For example, and not by way of limitation, iNDx commited the following material breaches of the PDA:

A. iNDx neglected to properly undertake its agreed-upon development activities regarding the development of assays required under the PDA.

B. iNDx improperly spent time and used NMS funds to secure investment monies for use other than the development of Products (as defined specifically in the PDA) for use in the Field (also as defined specifically in the PDA)..

C. iNDx repeatedly spent NMS provided funds on uses not related to development of Products for use in the Field.

D. iNDx failed on many occasions to provide reports regarding uses of funds and other reports required by the PDA.

E. iNDx failed to produce form models as required by the Development Plan and as outlined in the PDA.

F. iNDx failed to deliver fully functional Initial Devices or cartridges as required by Section 3.4.2(ii) of the PDA.

G. iNDx failed to create assay development set up and engage in proper assay testing.

H. iNDx improperly evaluated the sampling devices and was negligent in design evaluation.

I. iNDx failed to create professional designs for the assay cartridge and reader.

Complaint

J.   iNDx allowed its financial condition to so deteriorate that it could not meet its business obligations and NMS was required to pay obligations owed by iNDx in order to prevent further damage to the product development efforts.

37.   iNDx breached its obligations under the PDA Addendum by, among other issues, the failure of iNDx to deliver a functional New Device as outlined in the PDA Addendum.

38.   iNDx has been notified of material defaults under the PDA and the PDA Addendum and has failed to cure its defaults.

39.   Because of Defendant's failure to perform its obligations under the PDA and PDA Addendum, Plaintiff NMS has been damaged and suffered substantial losses, including the losses from all amounts paid under the PDA.  In addition, for example only and not by way of limitation, NMS has been forced to spend management time and effort trying to mitigate the problems to the joint development efforts caused by the failures of iNDx and has been forced to spend significant amounts to pay obligations owed by iNDx. For example only, and not by way of limitation, NMS had to loan $79,000 to iNDx to pay wages and taxes owed by iNDx, which iNDx has not repaid, and NMS paid substantial amounts outstanding to iNDx vendors.

## **FOURTH CAUSE OF ACTION**
## **COMMON COUNT – MONEY HAD AND RECEIVED**

40.   As outlined in paragraph 13 above, Plaintiff NMS made two loans totaling $250,000 through two wire transfers to Defendant iNDx in 2016.

41.    iNDx received the money from NMS that was intended as a loan and iNDx indicated was intended to be repaid to NMS.

42.   As outlined above, Defendant iNDx has not repaid any of the money loaned to Plaintiff NMS and not paid any interest for the use of the money.

43.   Plaintiff NMS has been damaged in the amount of $250,000, plus the amount of unpaid interest.

Complaint

# **PRAYER FOR JUDGMENT**

WHERFORE, Plaintiff prays for judgment against iNDx as follows:

1.    On the First Cause of Action for Breach of Contract an award of damages in the amount of $150,000, plus unpaid interest.

2.    On the Second Cause of Action for Breach of Contract an award of damages in the amount of $250,000, plus unpaid interest.

3.    On the Third Cause of Action for Breach of Contract an award of damages in the amount of at least $79,000, and such additional amounts as further established at trial.

4.    On the Fourth Cause of Action for Money Had and Received an award of damages in the amount of $250,000, plus unpaid interest.

5.    For attorneys' fees and costs.

6.    For pre- and post-judgment interest in the maximum amount owed by law.

7.    For such other relief as the Court may deem proper.


Dated: August 5, 2016                    DIAMOND MCCARTHY LLP


By: */s/ Christopher D. Sullivan*
     Christopher D. Sullivan
     Attorneys for Plaintiff NATIONAL
     MEDICAL SERVICES, INC. dba NMS
     LABS.

-8-                                                      Complaint

1

**VERIFICATION**

National Medical Services, Inc. dba NMS Labs, a Pennsylvania Corporation v. INDX Lifecare,

Inc., a Delaware Corporation

I, Pierre Cassigneul, declare:

I am the President and CEO of National Medical Services, Inc., in the above-entitled matter and am authorized to make this verification on its behalf.

I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 5th, 2016 at Willow Grove PA. 19090

_Pierre Cassigneul_ (signature)

Name

Complaint

EXECUTION VERSION

## PRODUCT DEVELOPMENT AGREEMENT

This PRODUCT DEVELOPMENT AGREEMENT (this "Agreement") is made and entered into as of August 1, 2014 ("Effective Date") by and between NMS Labs, a Pennsylvania corporation, having its principal office at 3701 Welsh Road, Willow Grove, PA 19090 ("NMS"), and iNDx Lifecare, Inc., a Delaware corporation, having its principal office at 9568 Topanga Canyon Blvd., Chatsworth, CA 91311 ("iNDx").

1. **BACKGROUND**

   1.1. NMS has expertise in the development, marketing, distribution, and sales of products and services related to commercially viable forensic applications and certain technology relating to detection of small molecules typical of drugs of abuse or alcohol, including know-how pertaining to such technology;

   1.2. iNDx has expertise in the development of the Q-SENS Platform relating to immune assays , including certain patents and proprietary technology useful in product development; and

   1.3. NMS and iNDx desire to collaborate in the development of small molecule assay Product(s) based upon their respective technologies and expertise with the intent that a range of such products shall be developed and commercially marketed, in part by NMS and in part by iNDx.

2. **DEFINITIONS**

   Certain terms are used in this Agreement as specifically defined herein. In addition, the following terms shall have the meanings set forth in this Section

   "Affiliate" of a party means any entity that directly or indirectly controls, is controlled by or is under common control with such party. "Control"  (and, with correlative meanings, the terms "controlled by" and "under common control with") means, in the case of a corporation, the ownership of fifty percent (50%) or more of the outstanding voting securities thereof or, in the case of any other type of entity, an interest that results in the ability to direct or cause the direction of the management and policies of such party or the power to appoint fifty percent (50%) or more of the members of the governing body of the party, or if not meeting the preceding requirement, any company owned or controlled by or owning or controlling a party at the maximum control or ownership right permitted in the country where such party exists.

   "Alternate Field" shall mean the application of the Device or Product(s) for use for (i) pain management or (ii) therapeutic drug monitoring in the areas of forensic applications, or (iii) for application in other specific areas to be mutually agreed to between the Parties from time to time.

"Commercialize" or "Commercialization" means obtaining all regulatory and other approvals required for the lawful sales of any Product for use in the Field in any one or more governmental subdivisions of any country.

"Development Period" means the period beginning on the Effective Date and ending on that date that is twenty-four months thereafter, subject to extension as provided in Section 13.1.1 of this Agreement.

"Development Plan" means the written summary of the development activities conducted by the Parties in accordance with the Development Program (as defined in Section 3.1.1 hereof) in order to develop and commercialize Product(s). The Development Plan shall be annexed hereto as Exhibit A, and the same may be modified only by the Planning Committee as set forth in Section 3.

"Device" means the Q-SEN device as an instrument platform as used in a roadside or criminal laboratory setting or in other forensic and clinical applications and having certain nanotechnology related to biochip-based fluorescent immunoassay detection of small molecules.

"Effective Date" means the date as set forth in the first paragraph of this Agreement.

"Field" means the use of the Device or Product(s) solely to (i) measure or determine the presence of any drugs of abuse or alcohol in humans or (ii) identify one or more particular drugs of abuse, in either case on handheld or desktop instruments for use in non-clinical locations or non-clinical laboratories. The Device or Product(s) may be used, for the aforementioned purposes, on/with oral or other bodily fluids, tissues, other biological solids or fluids, or non-biological solid or liquid dosage forms, powders or other forensic evidence and paraphernalia. The Field shall not include human applications of the Device or Product(s) solely to measure or determine the presence of any drugs of abuse or alcohol on desktop and large contracted instrument platforms for use in clinical laboratories, subject to FDA and CLIA regulations by qualified laboratory technicians.

"iCore Technology" means the inventions owned by iNDx Technology, Inc. and licensed to iNDx pursuant to the Service and Licensing Agreement between iNDx Technology Inc. and iNDx dated April 1, 2014 which license permits iNDx to use the iCore Technology to provide reporting functionality in the Products for use in the Field or Alternate Field.

"Initial Device" means a Device meeting the specifications set forth in the Development Plan.

"Know-How" means any proprietary information including, without limitation, any trade secret, useful in any aspect of the development, use, manufacture or sale of Product(s) and is not publicly known, disclosed or published.

"Inventions" means a Party's Patents and all inventions (patentable or otherwise), developments, designs, copyright, design right, database rights, trademark, service mark, devices, computer data, software, hardware, improvements, formulae, concepts, ideas, know-

2

how, methods or processes, discoveries and techniques necessary or desirable for the development, manufacture, sale or distribution of or otherwise relating to Product(s), applications to register any of the aforementioned rights,, whether owned as of the date hereof or hereafter acquired or licensed pursuant to the Development Program or otherwise.

"Marketing Essential Characteristic" means the set of properties, characteristics, and functional requirements that must be incorporated in or displayed by Product(s) or the Device to make them acceptable to NMS and commercially acceptable, in NMS's reasonable opinion, in the market in which they are intended to be sold (e.g. the Field or Alternate Field).

"Material Breach" means a failure of a Party to perform an express covenant or obligation under this Agreement or a breach of a representation or warranty of a Party which failure or breach has had or would reasonably be expected to have a material adverse financial consequence to the non-failing or non-breaching Party or a material adverse effect on the likelihood of success hereunder.

"Net Sales" means the gross revenues actually collected by NMS or any of its Affiliates during a given period from the sale of Product(s) less the following amounts: (i) discounts, including cash discounts, or rebates actually allowed or granted, in the ordinary course of business (ii) credits or allowances actually granted upon claims or returns regardless of the party requesting the return, in the ordinary course of business, (iii) freight paid for delivery and related travel and insurance charges and (iv) sales, use, value added and excise taxes, import and customs duties, tariffs, and any other similar taxes, duties or tariffs payable in the ordinary course of business and as required under applicable laws and regulations.

"Patents" means (i) the U.S. and foreign patent applications and patents owned or licensed by either or both Parties that are directly related to or have application in the Field or Alternate Field, and (ii) all divisions, continuations, continuations-in-part, and substitutions thereof; and all extensions, reissues and re-examinations of any of the foregoing; in each case, wherein such patents or applications contain claims that would, but for the licenses granted hereunder, be infringed by the other Party's activities in the Field or Alternate Field.

"Planning Committee" or "PC" means the committee having representatives from both Parties to provide oversight and advice for the conduct of the Development Program as described in Section 3.2.

"Product(s)" means any and all products, and modifications, enhancements and new versions thereof, where one or both of the Parties have interest in pursuing, including without limitation reagents, test cartridges, consumable products and disposable items, all or some of which may be incorporated or utilized in a Q-SEN Device as an instrument platform. While a Product may include the Q-SEN Device, the ownership of the Q-SEN Device will be retained exclusively by iNDx, subject to the License Agreement.

"Regulatory Approval" means any approval by a governmental entity to commence commercial sale in any country and any other approvals, clearances, registrations, or permits

3

that may be required to manufacture, market, and sell Product(s) or any related components of such Product(s).

"Regulatory Authority" means all governmental agencies regulating the development, manufacture or sale of Product(s) in any country or groups of countries.

"Third Party" means any person or entity other than iNDx, NMS or their respective Affiliates.

3.    **DEVELOPMENT PROGRAM**

   3.1.    Development Program.

      3.1.1.    NMS and iNDx intend to develop, in accordance with the terms and conditions hereof, commercially viable forensic applications of immunoassays using small molecules typical in the identification of drugs of abuse or alcohol (collectively, "Applications"), and incorporate such applications into Product(s) (the "Development Program"). During the term of this Agreement, the Parties shall use commercially reasonable efforts to conduct the activities for which it is responsible under the Development Plan and the provisions of this Agreement, in each case, within the time schedule set forth therein and herein. The Parties will conduct the Development Program in a prudent, commercially reasonable manner in all material respects in accordance with the Development Plan then in effect and provided in Exhibit A as amended, and in accordance with all applicable Federal, state and local laws, rules, regulations and other applicable requirements (including, without limitation, applicable cGMP, QSR, ISO and the regulations of other non-US Regulatory Authorities). The initial goal of the Parties is to develop, manufacture and market Product(s) intended for use in the Field for roadside, laboratory or other forensic settings.

      3.1.2.    Contemporaneous with the execution and delivery of this Agreement, the Parties shall execute and deliver a License Agreement in the form attached hereto as Exhibit B (the "License Agreement"). Pursuant to the License Agreement, NMS shall have the exclusive license, right and title to sell, market and distribute in any and all territories in the world (other than in India) Product(s) for use in the Field, along with a non-exclusive license, right and title to sell, market and distribute in any and all territories in the world (other than in India) Product(s) for use in the Alternate Field. The License Agreement shall be non-cancellable until such time that NMS is in material breach of this Agreement. Notwithstanding anything to the contrary herein, the License Agreement shall not be effective until NMS has made the $800,000 investment specified in Section 5.1 below. The License Agreement shall also provide, among other things, that (i) each of NMS and iNDx

4

shall have the right and license to use the Inventions and other intellectual property of the other Party, including without limitation the iCore Technology, in order to perform their respective obligations under the Development Plan, (ii) a material breach shall include NMS' failure to pay royalties when due, (iii) NMS shall have the right to use the iCore Technology, Jointly Owned Inventions (hereafter defined) and iNDx Owned Inventions (hereafter defined) and to develop and use improvements, enhancements and other modifications thereto, including, without limitation, software applications for mobile devices providing the means to measure or determine the presence of drugs of abuse or alcohol, to manufacture or have manufactured Product(s) or any component thereof or new software applications or other products part of or separate from the Device, exclusively in the Field and non-exclusively in the Alternate Field (to the extent NMS chooses to develop Product(s) for use in an Alternate Field) and (iv) NMS shall have the right to develop and use improvements, enhancements and other modifications of the Product(s) or any component thereof, including without limitation the iCore Technology or new software applications or other products part of or separate from the Device solely for use in the Field and Alternate Field (to the extent NMS chooses to develop Product(s) for use in an Alternate Field)). The License Agreement will also provide that INDx shall, at the cost and expense of NMS (only to the extent the services of any third party is required to effect such knowledge transfer), complete the transfer of the know-how on assay development and reagent manufacturing to NMS solely and, upon request of NMS, shall also transfer the assembly know-how of the Device, along with the software, cartridge and all other information needed to manufacture Product(s) for use in the Field.

(i)     Net Sales of Product(s) for use in an Alternate Field by NMS shall be aggregated with Net Sales of Product(s) in the Field for purposes of Section 6.2.

(ii)    Subject to the provisions of Section 7.1.2(b) below, NMS shall grant to iNDx a right and license to use the NMS Owned Inventions in connection with the development and commercialization of Product(s) for use in an Alternate Field should iNDx develop and commercialize such a Product(s) as permitted in this Section 3.1.3. iNDx shall grant to NMS a right and license to use the iNDx Owned Inventions in connection with the development and commercialization of Product(s) for use in the Field and an Alternate Field should NMS develop and commercialize such a Product(s) as permitted in this Section 3.1.2.

3.2. <u>Development Program Management</u>.

3.2.1. Within thirty (30) days after the date hereof the Parties shall form the Planning Committee ("PC") in accordance with the provisions set forth herein.

3.2.2. The PC shall be composed of not less than 3 representatives, a majority of whom shall be representatives of NMS. NMS shall appoint a senior business representative to be Chairperson of the PC. The PC shall have at least one representative from iNDx. Each party may substitute one or more of its representatives, from time to time in its sole discretion, effective upon notice to the other Party of such change.

3.2.3. The purpose of the PC is to provide oversight and guidance as to the conduct of the Development Program hereunder and to supervise and coordinate duties to be performed by both Parties. As part of its responsibilities, the PC will:

(i)     review activities and progress of all parties under the Development Plan,

(ii)    as necessary, consider and adopt modifications to the Development Plan,

(iii)   develop and approve plans for sample collection and reagent cartridges, and software suited for the forensic applications as defined by NMS user requirements,

(iv)    review and evaluate data and conclusions from results in Product(s) development,

(v)     establish protocols, coordinate and approve all plans for the development, validation , manufacture, and release to market of Product(s),

(vi)    review necessary Regulatory Approval to offer Product(s) for forensic use,

(vii)   carry out such other oversight activities as the Parties may from time to time agree;

(viii)  review and approve terms for any third party licenses needed in the development of the Product(s); and

(ix)    to address newly discovered desirable features or requirements during the development process.

3.2.4. Unless otherwise agreed, the PC shall meet no less frequently than quarterly. Each Party is responsible for its own costs incurred in connection with such meetings and performance of services by its nominees to the PC.

3.2.5. The PC will prepare and deliver to the Parties within thirty (30) calendar days after the date of such meeting a summary of the matters reviewed and any actions taken and decisions made at such meetings.

3.3. Responsibilities of NMS.

3.3.1. NMS shall manage and oversee the development of Product(s) for use in the Field through the Planning Committee as described more fully in Section 3.2. In addition, NMS shall diligently perform all tasks and responsibilities for which it is responsible under the Development Plan and Section 3.3.2 below. NMS shall be allowed to utilize its commercially reasonable judgment and expertise in conducting the day-to-day activities for which it is responsible under the Development Plan and Section 3.3.2 below but NMS recognizes that iNDx wishes to be informed of all key decisions in advance of their execution and be afforded the opportunity to influence the same.

3.3.2. NMS will at its cost and expense during the Development Period (i) provide user requirements for software, sample collection and reagent cartridges; (ii) provide raw material for reagent components required for the immunoassays in the forensic applications such as conjugated targets and antibodies for assay development; (iii) validate the forensic applications and obtain all necessary documentation in order to offer the test for forensic use, (iv) seek any Regulatory Approval necessary to sell and market the Product(s) for use in the Field, and (v) develop assays and an oral fluid collection system in accordance with NMS requirements.

3.4. Responsibilities of iNDx.

3.4.1. iNDx shall use commercially reasonable efforts to diligently perform all tasks and responsibilities for which it is responsible under the Development Plan and Section 3.4.2 below. iNDx shall be allowed to utilize its commercially reasonable judgment and expertise in conducting the day-to-day activities for which it is responsible under the Development Plan and Section 3.4.2 below but recognizes NMS's management and oversight as described in Section 3.3.1 above and further that the PC is responsible for all key decisions which are to be discussed with and are subject to the approval of the PC in advance of their execution.

7

3.4.2. iNDx will at its cost and expense during the Development Period:

(i) (a) provide technical expertise for the development of the immunoassays by NMS required in the forensic applications including, but not limited to, implementing and testing assays on device setup for product development as needed to identify and solve cross-reactivity and interference issues; (b) provide technical expertise, consulting and training throughout the entire project to NMS, for the associated sample and reagent cartridge accessories; (c) implement assays on the prototype Device platform in accordance with a timeline in Exhibit A; (d) modify the instrument software and provide technical expertise in connection with the development of the oral fluid collection system for check-point testing in accordance to the timeline shown in Exhibit A; (e) provide readers and cartridges and participate in check-point testing in accordance to the timeline shown in Exhibit A; (f) transfer the know-hows for assay development and manufacturing of updated assay content to NMS; and (g) be responsible for assay porting/migration to, and optimization in its platform.

(ii) to, in addition to its obligation to timely complete the Milestones on Exhibit E, deliver twenty (20) fully functional and completed Initial Devices and between 1000 and 2000 cartridges to be used as components thereof within 18 months from the June 1, 2014, at a price equal to iNDx cost therefor (without inclusion of any overhead charges)

## 3.5. Joint Responsibilities

As part of each Party's duties, the Parties will jointly during the Development Period (i) establish protocols and coordinate plans for development, validation, and release of Product(s) for use in the Field and (ii) develop sample collection means and reagent cartridges, and software suited for the forensic applications as per NMS user requirements. Each Party shall use commercially reasonable efforts during the Development Period to cooperate fully with the other Party to comply with and obtain the approval of the Regulatory Authorities and all other approvals necessary for the Parties to market, sell and distribute Product(s) for use in the Field as set forth in the Development Plan. In furtherance, and not in limitation of the foregoing, each Party agrees to provide the other Party (and any appropriate Regulatory Authority) access to its data, records, facilities, employees and consultants to the extent needed to assist in the approval process, subject to appropriate protections of Confidential Information.

8

3.6. <u>Funding Obligations</u>.

 3.6.1. Subject to the right of early termination in Section 13.1.2 of this Agreement, NMS shall pay to iNDx the sum of $40,000 per month for the next successive twelve months, payable on or prior to the first business day of each respective month. iNDx acknowledges receipt of the first and second of such twelve $40,000 payments prior to the Effective Date. All such funds shall be non-refundable and used by iNDx to fund its development obligations hereunder including both direct and indirect expenses associated with the development of the Applications as follows: (i) cost of FTEs, training and supervising, directly related to its obligations hereunder and (ii) expenses/reimbursements including instruments, chips, surface prep, antibodies, printing services and consumables. At the end of such 12 month period, and also subject to the right of early termination in Section 13.1.2 of this Agreement NMS shall fund iNDx for an additional 6 months at $30,000 per month and such funds will be used solely as described above and in in accordance with the Development Plan, as may be amended by mutual agreement between the parties.

 3.6.2. NMS may, at its discretion, fund the costs for check-point testing which shall be determined at a later date and will be based on the number of cartridges and instruments required.

 3.6.3. In all other respects, each Party shall be responsible for funding of its own activities and responsibilities under the Development Plan.

3.7. <u>Reports and Exchange of Information</u>.

 3.7.1. The Parties shall report the status of their work in the Development Program and all results to the PC at such intervals, as the PC shall reasonably agree but no less frequently than in a written report every calendar quarter and provided to members of the PC no less than one week prior to their scheduled meetings. Each such quarterly written report shall summarize the progress and results during the previous quarter in implementing the Development Plan and achieving its goals and shall provide such other related information as NMS shall reasonably request.

 3.7.2. The Parties shall report the status of the commercialization of the Product(s) in a manner and at such intervals, as the PC shall reasonably agree but no less frequently than in a written report every calendar quarter and provided to members of the PC no less than one week prior to their scheduled meetings. Each such quarterly written report shall summarize the progress of the Parties' development efforts during the

previous quarter in achieving its goals and shall provide such other related information as each Party shall reasonably request.

3.7.3.  Each Party agrees to permit personnel of the other Party to visit the facilities that are utilized in connection with the production, quality assurance, research and development of Product(s), at mutually agreed upon times, during normal business hours to observe the activities being conducted.

3.7.4.  iNDx shall provide NMS with written monthly report regarding the expenditure of funds paid by NMS under Section 3.6.1 and contributed to NMS under Section 5.1.  This report shall be in sufficient detail to indicate the use of such funds in accordance with the terms of this Agreement, including, without limitation, amounts expended for salary and other compensation, supplies and all vendor and third party costs.

3.7.5.  Each Party shall have the right, upon reasonable notice to the other and during regular business hours, to inspect and audit the books and records of such Party to assure compliance with the provisions of this Agreement.  The Parties acknowledge that the provisions of this section granting certain audit rights shall in no way relieve either Party of any of its obligations under this Agreement, nor shall such provisions require either Party to conduct any such audits.

4.    **PRE-COMMERCIALIZATION ACTIVITIES.**

4.1.  <u>Marketing Essential Characteristics</u>.  NMS shall, in consultation with iNDx, define the Marketing Essential Characteristics for the Product(s), including its Device, components and materials, and apprise iNDx of any changes therein.  In the event of disagreement regarding Marketing Essential Characteristic definitions, the PC shall decide the matter and such decision shall be final.

4.2.  <u>Regulatory Approval Submissions.</u>  The Parties will have joint responsibility for submissions in connection with Regulatory Approvals for any Product(s) within the Field or Alternate Field (should NMS elect to develop Product(s) in the Alternate Field) in countries where regulatory filing for such Product(s) should be submitted to a Regulatory Authority. Prior to any submission to any Regulatory Authority, NMS shall consult with iNDx.  NMS shall have the final decision making authority with respect to all regulatory filings.

4.3.  <u>Ownership of Approvals</u>.  All documents filed with Regulatory Authorities within the Field shall be submitted in the name of NMS and NMS shall own all such Regulatory Approvals in the Field, unless otherwise required by applicable law for the Field.  Regulatory Approvals of tests solely for use in an Alternate Field shall be jointly owned by the Parties, unless otherwise required by law.  To the extent approvals include specific use of the Device, iNDx shall

10

own all such rights but NMS shall have a license to use the Device and related Inventions as provided for in the License Agreement.

4.4. <u>NMS Manufacturing Obligations</u>. NMS shall manufacture and supply iNDx with iNDx's requirements of reagents for the Product(s) in order for iNDx to develop a finished initial Device. NMS warrants that any reagents provided to iNDx or any customer hereunder shall comply in all material respects with the specifications, as the case may be, therefor and shall be free from defects in design, material and workmanship. NMS represents and warrants that it shall comply with all present and future statutes, laws, ordinances and regulations relating to the manufacture and supply of reagents being provided hereunder, including, without limitation, those enforced by the United States Food and Drug Administration (including compliance with good manufacturing practices) and all applicable international standards.

4.5. <u>iNDx Manufacturing Obligations</u>. iNDx shall manufacture and supply NMS with NMS's requirements for final Devices in order for NMS to develop finished Product(s), including use by NMS in validation at its finishing and packaging facilities, marketing activities, and appropriate regulatory filings. iNDx warrants that any Devices or other components provided to NMS or any customer hereunder shall comply in all material respects with the specifications, as the case may be, therefor and shall be free from defects in design, material and workmanship. iNDx represents and warrants that it shall comply with all present and future statutes, laws, ordinances and regulations relating to the manufacture and supply of Devices and components being provided hereunder, including, without limitation, those enforced by the United States Food and Drug Administration (including compliance with good manufacturing practices) and all applicable international standards. Without prejudice to any other remedy which NMS may have, iNDx shall replace at its own cost and expense, including reimbursement of freight and disposition costs incurred by NMS, any Device that fails to comply with the Device specifications. iNDx shall notify NMS of the existence and nature of any non-compliance or defect and iNDx shall have a reasonable opportunity, not to exceed ten (10) days from receipt of notification, to inspect such defective Device and provide NMS with detailed written instructions to return or dispose of such defective Device. If iNDx fails to so inspect and instruct NMS as to the disposition of such defective Device, NMS may dispose of such defective Device as it sees fit and iNDx shall promptly (1) reimburse NMS for all direct, out-of-pocket costs incurred by NMS in such disposition, and (2) replace such defective Device at its own cost and expense.

5. **INVESTMENT**

5.1. <u>Investment</u>. If the PC determines that the development of a Product for use in the Field or Alternate Field is commercially viable (a "Proof of Concept" as determined in accordance with Exhibit C) , NMS shall, within 5 business days

of (a) completion of Milestone 0, as described in Exhibit E, make a $800,000 investment in iNDx and (b) completion of Milestones 1, 2, 3, 4 and 5, as described in Exhibit E, make a $200,000 investment in iNDx, both pursuant to a convertible promissory note in the form attached hereto as Exhibit D (the "Note"). The Note shall accrue interest at a rate of 5% per annum and the principal and accrued interest thereon shall be automatically convertible into equity securities of iNDx upon the closing of iNDx's next round of equity financing that provides gross proceeds to iNDx of not less than $5.0M (the "Financing Round") and shall have the other right, privileges, terms and conditions of the securities issued in the Financing Round provided that the conversion price of the Note shall be subject to a 10% discount. If the Financing Round does not close prior to December 31, 2015, the principal and accrued interest under the Note shall be due upon demand of the holder thereof, unless iNDx demonstrates it has adequate funds at such time to continue operations and perform its development obligations hereunder for at least 12 months, in which event the deadline for closing of the Financing Round shall be extended until December 31, 2016. The net proceeds from sale of the Note shall be used solely by iNDx to fund its obligations hereunder as described in Section 3.4 hereof. iNDx agrees that until such time that the Note either converts to equity securities or is satisfied by payment, no third party shall be permitted to lend money (except on a pari passu basis with NMS) to iNDx without the consent of NMS, and that the Note shall be on a pari passu basis (with respect to all material provisions including, without limitation, payment, interest, conversion price, and lien priority) with that certain $3.1M Secured Convertible Promissory Note (the "PLC Note") dated December 27, 2013 issued by iNDx to PLC Diagnostics ("PLC"). Prior to the payment of any portion of the investment described in this Section 5.1, PLC shall execute such intercreditor documentation, including assignment of a pari passu portion of its security interest in the collateral servicing the PLC Note, as is reasonably required by NMS.

6. **COMMERCIAL ACTIVITIES.**

6.1. <u>Commercialization</u>. The Parties will discuss the joint manufacturing, forecasting, ordering and delivery of Product(s) and Devices for use in the Field (and any components thereof). In the event the parties are unable to reach a mutually acceptable agreement for such activities, NMS shall be free to manufacture, directly or indirectly through third parties, sell and distribute Product(s) for use solely in the Field or Alternate Field. NMS may not nor allow others to manufacture, sell or allow distribution for use outside the Field or Alternate Field. Notwithstanding anything to the contrary herein, NMS shall use commercially reasonable efforts to Commercialize the Product(s) worldwide (except India) within five years of the Effective Date (the "Commercialization Period"). If NMS fails to Commercialize the Product in any one or more governmental subdivisions of a country within the Commercialization Period, the same shall not be considered a breach by NMS,

but NMS shall lose its exclusivity in the Field in those countries in which Commercialization has not occurred in any one or more governmental subdivisions thereof.

6.2    Royalties.

6.2.1.    Within thirty (30) days after the end of each calendar quarter commencing with the first commercial sale of Product(s) by NMS for use in the Field or Alternate Field, NMS will pay to iNDx royalties from Net Sales received by NMS world-wide on the sale of Product(s) as follows:

(a)    20% of the first $5,000,000 of Net Sales ($5,000,000 cumulative), provided however if iNDx does not timely deliver Devices and cartridges as described in Section 3.4.2(ii) above until the period beginning after (i) 18 months after the Effective Date and ending before the end of the initial two year Term of this Agreement, the royalty payable in this Section 6.1(a) shall be 15% or (ii) 24 months after the Effective Date, the royalty payable in this Section 6.1(a) shall be 10%;

(b)    15% of the second $5,000,000 of Net Sales ($10,000,000 cumulative);

(c)    10% of the third $5,000,000 of Net Sales ($15,000,000); and

(d)    5% of Net Sales in excess of $15,000,000.

(e)    Notwithstanding anything to the contrary in the foregoing, the royalties payable by NMS to iNDx hereunder shall not in any case be less than $50,000 per quarter for the first 12 months beginning with the first quarter during which NMS begins commercial sales of Product(s),  $100,000 per quarter for each quarter for the second 12 months and $125,000 per quarter for the third 12 months and $156,250 per quarter thereafter, and ending at such time that NMS ceases sales of Product(s).  All payments of such minimum royalties, whether or not the result of actual Net Sales, shall be a credit toward the tiers described in (a)-(d) above.

6.2.2.    Within thirty (30) days after the end of each calendar quarter commencing with the first commercial sale of Product(s) by iNDx for use in the Field or Alternate Field, iNDx will pay to NMS royalties from Net Sales received by iNDx on the sale of Product(s) as follows:

(a)    iNDx shall pay to NMS a royalty from sales of Products (i) in the Field or Alternate Field in India or (ii) outside the Field in

13

applications measuring or determining the presence of any drugs of abuse or alcohol, on the same terms as those provided for in Section 6.2.1, excepting there shall be no minimum royalty payment obligation.

(b) iNDx shall pay to NMS a royalty from worldwide sales of Products outside the Field or Alternate Field using NMS Owned Inventions, not involving applications measuring or determining the presence of any drugs of abuse or alcohol, as provided in Section 7.1.2(b).

7. **INTELLECTUAL PROPERTY**

7.1. <u>Ownership of Inventions.</u>

7.1.1. Except as set forth in Section 7.1.2 hereof, (a) all right, title, and interest in any Inventions existing as of January 6, 2014, will be retained by the current holder and (b) any Inventions (i) created after January 6, 2014 or (ii) created prior to or after January 6, 2014 directly related to the Product(s) in the Field and/or their design in furtherance of a feasibility study beginning July 19, 2013 shall be jointly owned.

7.1.2. All right, title, and interest in Inventions made by employees or contractors of NMS or iNDx, as the case may be shall be owned as follows:

(a) Inventions related to software (except as provided in Section 7.1.2(b) below) and the reader index contained in or used in connection with the Product(s) (the "iNDx Owned Inventions") shall be owned by iNDx;

(b) Inventions made by NMS related to software applications for use in the Field or Alternate Field, the oral fluid collection and sample applying system contained in the Product(s) and the developed reagents and assays (the "NMS Owned Inventions") shall be owned by NMS, with iNDx having the non-exclusive license to the NMS Owned Inventions for all areas other than the Field. Such license shall require the payment to NMS of a royalty equal to 2% of net sales of Product(s) utilizing the oral fluid collection system or any system substantially similar, shall prohibit the sublicense of such NMS Owned Inventions and shall otherwise be in the form attached as Exhibit B;

(c) all other Inventions made by the Parties described in Section 7.1.1(b) related to the Product(s) or pursuant to the Development Plan (the "Jointly Owned Inventions") shall be

14

jointly owned by NMS and iNDx, provided that any cartridge designs (part of the "iNDx Owned Inventions") shall at all times be owned by iNDx, with NMS having the license to the iNDx Owned Inventions solely for the Field. Each party shall, and does hereby, assign and convey to the other all rights, titles and interests necessary to give full effect to such joint ownership of the Jointly Owned Inventions.

Notwithstanding the foregoing, use of any such Inventions shall be determined in accordance with the terms and conditions of this Agreement and the License Agreement.

7.2. Third Party Licenses.

7.2.1. NMS shall be required to pay for any and all costs, fees, royalties, or other payments associated with obtaining any license or other rights from a Third Party that are required to commercialize Product(s), provided that iNDx shall obtain prior written approval from NMS for any costs and expense greater than $2,000 in the aggregate.

7.2.2. iNDx shall be required to pay for any and all costs, fees, royalties, or other payments associated with obtaining any license or other rights from a Third Party that are required to develop Product(s).

## 8. PATENTS

8.1. Reporting; Jointly Owned Inventions. Each Party shall promptly report to the other all Inventions whether or not such Inventions are patentable during the term of this Agreement. NMS and iNDx shall jointly select whether or not they wish to file for Patents or perfect other intellectual property rights for any Jointly Owned Inventions and they shall select the countries where they wish to file Patents or have Patents maintained. Upon selection, NMS shall, using patent counsel of its choice, reasonably acceptable to iNDx, take all necessary steps to file, prosecute and maintain, the requested patent protection on such joint Inventions. Each Party shall provide to the other copies of all Patents covering Jointly Owned Inventions, all prior art searches relating to such Patents, and all correspondence to and from the United States Patent and Trademark Office and, upon request, with other patent offices.

8.2. NMS Owned Inventions. NMS may, in its discretion, decide to obtain a patent or patents for NMS Owned Inventions in the Field or Alternate Field. NMS shall promptly inform iNDx of all Patents filed on NMS Owned Inventions and shall provide to iNDx copies of all such Patents, all prior art searches relating to such Patents, and all correspondence to and from the United States Patent and Trademark Office relating to the same. Upon the request of iNDx, NMS shall make available to iNDx related correspondence with other patent offices.

8.3.  <u>iNDx Owned Inventions</u>.  iNDx may, in its discretion, decide to obtain a patent or patents for iNDx Owned Inventions in the Field.  iNDx shall promptly inform NMS of all Patents filed on iNDx Owned Inventions in the Field and shall provide to NMS copies of all such Patents, all prior art searches relating to such Patents, and all correspondence to and from the United States Patent and Trademark Office relating to the same.  Upon the request of NMS, iNDx shall make available to NMS related correspondence with other patent offices.

8.4.  <u>Costs</u>.  All patent attorney fees and all patent registration, patent filing, patent translation and patent maintenance fees, costs and expenses with respect to the Patents and the Inventions in the Field or Alternate Field by a Party shall be borne (a) in the case of Jointly Owned Inventions, equally by NMS and iNDx, (b) in the case of NMS Owned Inventions, by NMS and (c) in the case of iNDx Owned Inventions by iNDx.

8.5.  <u>Discontinuing Prosecution</u>.  In the event that either Party elects not to pursue Patent prosecution, discontinues or abandon prosecutions of any Patent or any joint or solely-owned Invention useful in the Field, or elects to cease paying maintenance fees of any resulting joint or solely-owned Patent useful in the Field, the Party electing not to pursue, discontinuing or abandoning shall promptly inform the other Party.  Such other Party shall then be entitled to prosecute or continue the prosecution of any such application, pay any expense or cost, and take any other action necessary to prosecute or continue the prosecution of such Patent or keep any resulting Patents in force on behalf of the Parties.  If a Party elects to prosecute, continue with prosecution expenses or payment of maintenance fees after the other Party elects to discontinue or abandon any jointly or solely-owned Patent or Invention, all right, title, and interest to the Patent or Invention shall transfer to the Party that assumes the costs.

9.  **THIRD PARTY INFRINGEMENT**

9.1.  <u>Enforcement by NMS</u>.  If either Party becomes aware that any of the Patents or Inventions in the Field or Alternate Field are being or have been infringed by any Third Party, such Party shall promptly notify the other Party hereto in writing describing the facts relating thereto in reasonable detail.  For Jointly-Owned Inventions or NMS Owned Inventions, NMS shall have the initial right, but not the obligation, to institute, prosecute and control any action, suit or proceeding (an "Action") with respect to such infringement relating to the Field or Alternate Field, including any declaratory judgment action, at its expense, using counsel of its choice.  iNDx shall cooperate with NMS and provide such assistance as NMS may reasonably request in connection with any such Action.  Any recovery of damages by NMS for any suit related to Jointly Owned Inventions and NMS Owned Inventions, as applicable to the Field or Alternate Field, shall be applied first in satisfaction of any costs

incurred by NMS relating to the Action (including attorneys' and expert fees) and the balance remaining from any recovery shall belong to NMS.

9.2. <u>Joint Enforcement</u>. In the event that NMS institutes an Action pursuant to Section 9.1 above related to a Jointly Owned Invention, iNDx shall have the right, but not the obligation, to intervene in such Action and NMS shall not oppose such intervention, provided that (i) iNDx notifies the court of its intention to intervene within one hundred twenty (120) days of the commencement of such Action, and (ii) iNDx shares equally with NMS the total costs incurred by NMS (including, without limitation, attorneys' and expert fees) of conducting such Action. The Parties shall cooperate and provide each other such assistance as either may reasonably request in connection with any such Action, provided, NMS shall retain the control of the conduct and settlement of any such Action. Any recovery of damages for any such suit shall be applied first in satisfaction of any actual out-of-pocket costs and expenses incurred by either of the Parties relating to the Action (including, without limitation, attorneys' and expert fees), the balance remaining from any recovery shall be divided equally between the Parties.

9.3. <u>Enforcement by iNDx</u>. In the event that NMS fails to initiate or defend any Action involving Jointly Owned Inventions in the Field or Alternate Field or if any Action involves iNDx Owned Inventions, iNDx may, at its option, initiate and control such an Action (including Actions for past infringements), and NMS shall cooperate with iNDx and provide such non-monetary assistance as iNDx may reasonably request in connection with any such Action. Any recovery of damages by iNDx for any such suit shall be applied first in satisfaction of any costs incurred by iNDx relating to the Action (including attorneys' and expert fees), the balance remaining from any recovery shall be shall belong to iNDx. In the event that iNDx fails to initiate or defend (or continue to prosecute or defend) any Action involving iNDx Owned Inventions and NMS, in its sole discretion, determines the technology to be critical in its commercialization of Product(s), NMS may, at its option and costs, initiate and control such an Action. In any such Action where NMS assumes the costs of litigation, iNDx shall assign all right, title, and interest to NMS of any damages recovered.

10. **THIRD PARTY CLAIM OF INFRINGEMENT**

10.1. <u>Infringement Notice</u>. If a claim of patent infringement or misappropriation or wrongful use of a trade secret or other proprietary right is threatened or brought against a Party hereto in any country by reason of any act conducted in the furtherance of this Agreement, or if a Party becomes aware of its, or the other Party's patent or invention potentially infringing on a patent or other proprietary right owned by a Third Party in any country, such Party shall promptly give notice thereof to the other Party and provide them with all information in its possession regarding such claim or potential infringement.

17

10.2. <u>Indemnification</u>. Each Party shall indemnify, defend and hold harmless the other Party against any damages, costs, expenses and liabilities (including attorneys' fees and expenses) arising out of a claim of patent infringement or misappropriation or wrongful use of a trade secret or other proprietary right based on the manufacture, use, or anticipated sale of any Product(s) that embodies the indemnifying Party's Invention. The indemnifying Party shall conduct the defense of any such suit for infringement, misappropriation, or misuse at its expense. The indemnified Party may participate in such defense, at its option and expense, and shall furnish to the indemnifying Party such assistance as it may reasonably need and request from time to time for the conduct of the defense of such suit. Neither Party shall dispose of or settle any such claim in any manner which may compromise or affect the validity of any of the other Party's Inventions, without that Party's prior written consent, which shall not be unreasonably withheld.

10.3. <u>Costs</u>. Each Party shall pay and contribute 50% of any damages, costs, expenses and liabilities (including attorneys' fees and expenses) arising out of a claim against the other party of patent infringement or misappropriation or wrongful use of a trade secret or other proprietary right based on the manufacture, use, or anticipated sale of any Product(s) that embodies Jointly Owned Inventions, other than a claim of a party's gross negligence or willful misconduct. In the case of gross negligence or willful misconduct, the party whose acts or omissions caused such claim shall indemnify, defend and hold harmless the other party pursuant to the same terms as provided in Section 10.2 above. Each Party shall furnish to the other Party such assistance as it may reasonably need and request from time to time for the conduct of the defense of such suit. Neither Party shall dispose of or settle any such claim in any manner without the other Party's prior written consent, which shall not be unreasonably withheld.

## 11. **PATENT MARKING**

The Parties will mark Product(s) for the Field with appropriate patent numbers or indicia as determined by the Planning Committee, given packaging, printing schedules and other factors, in those countries where such markings have notice value as against infringing persons.

## 12. **CONFIDENTIALITY AND PUBLICATION**

12.1. <u>Confidential Information</u>. All Confidential Information disclosed by one Party to the other either before or after the Effective Date shall not be used by the receiving Party except in connection with the activities contemplated by this Agreement, shall be maintained in confidence by the receiving Party, and shall not be disclosed by the receiving Party to any other person, firm or agency, governmental or private, without the prior written consent of the disclosing Party, except to the extent Confidential Information is:

18

(a)  known by or in possession of the receiving Party at the time of its receipt as documented in competent written records;

(b)  independently developed outside the scope of this Agreement by employees of the receiving Party having no access to or knowledge of the Confidential Information disclosed hereunder as documented in competent written records;

(c)  in the public domain at the time of its receipt or thereafter becomes part of the public domain through no fault of the receiving Party;

(d)  received without an obligation of confidentiality from a Third Party having the right to disclose such information;

(e)  required to be disclosed to governmental agencies in order to gain approval to sell Product(s), or disclosure is otherwise required by law, regulation or governmental or court order (so long as the receiving Party provides notice of such disclosure and allows the disclosing Party to seek protective orders or other available confidentiality treatment);

(f)  released from the restrictions of this Section 12.1 by the express written consent of the disclosing Party; or

(g)  disclosed to agents, consultants, assignees, sublicensees or subcontractors of NMS or iNDx which have a need to know such information in connection with the performance of this Agreement, provided that such persons are or agree to be subject to the provisions of this Section 12.1 or substantially similar provisions.

12.2.  <u>Publication</u>.  Prior to public disclosure or submission for publication of a manuscript or other work describing the result of any aspect of the Development Program or other scientific or clinical activity or collaboration between NMS and iNDx relating to any Invention or activity under the terms of this Agreement, the Party disclosing or submitting such a manuscript ("Disclosing Party") shall send the other party ("Responding Party") a copy of the manuscript to be submitted and shall allow the Responding Party to determine whether the manuscript contains subject matter for which patent protection should be sought, whether the manuscript contains Confidential Information belonging to the Responding Party, or whether the manuscript contains information that should not yet be revealed for other business reasons. If the Responding Party believes the subject matter of the manuscript contains Confidential Information or a patentable invention of commercial value, then the Responding Party shall notify the Disclosing Party in writing.  Upon

19

receipt, the Disclosing Party shall delay public disclosure of such information to permit preparation and filing of a patent application on the disclosed subject matter or, if Confidential Information of the Responding Party, obtain prior written consent of the Responding Party.

13.  **TERM, TERMINATION, AND REMEDIES FOR CERTAIN BREACHES**

    13.1.  Term.

        13.1.1. Unless earlier terminated in accordance with this Section 13, this Agreement shall remain in effect for two (2) years following the Effective Date hereof. Notwithstanding the foregoing, iNDx, if it is not then in breach of any of its obligations in this Agreement, shall have the right, by a written notice to NMS provided not less than 60 days before the end of the second anniversary of the Effective Date, to extend the Term for a period of 6 months (the "Extended Term").

        13.1.2. Notwithstanding anything contained hereto to the contrary, during the Term, NMS may terminate this Agreement, if it reasonably determines that any of the development milestones attached as Exhibit E have not been successfully and timely completed. NMS shall provide written notice of this determination to the other party and this Agreement shall automatically terminate upon receipt of such notice.

    13.2.  Termination by Mutual Agreement. This Agreement may be terminated at any time upon the mutual agreement of the parties in writing.

    13.3.  Termination for Breach. In the event of a Material Breach by either Party, then the other Party may terminate this Agreement by giving such Party notice of such Material Breach. The Party receiving such notice shall have thirty (30) days from the date of receipt thereof to cure such Material Breach. If such Material Breach is not cured within such thirty (30) day period, then the non-breaching Party shall have the right to terminate this Agreement effective as of the end of such period. In the event such Material Breach is cured during such period, such notice shall be of no force or effect and this Agreement shall not be terminated.

    13.4.  Effect of Termination.

        13.4.1. In the event of termination of this Agreement pursuant to Section 13.1.1, if the Product(s) designed for use in the Field are not yet ready for commercial sale, NMS shall have the rights described in Section 13.4.3 below and if such Product(s) are subsequently sold commercially by NMS, iNDx shall be entitled to receive a royalty from NMS in accordance with Section 6.1 hereof except that the royalty payable in Section 6.1(a) shall be reduced to 10%.

13.4.2. Termination of this Agreement for any reason shall not release any Party hereto from any liability for breach or otherwise (or obligation assumed and substantially undertaken but not yet accrued) which, at the time of such termination, has already accrued to the other Party or which is attributable to a period prior to such termination, nor preclude either Party from pursuing any rights and remedies it may have hereunder at law or in equity which accrued or are based upon any event occurring prior to such termination, subject to any limitations on damages expressly set forth herein.

13.4.3. Upon termination of this Agreement other than as of a result of (i) NMS exercising its right to terminate under Section 13.1.2, or (ii) a Material Breach by NMS, iNDx shall provide NMS with all knowledge transfer, manufacturing information and know-how and such other assistance as is reasonably necessary to enable NMS to manufacture such Product(s) and NMS shall have the right to continue to develop or manufacture Product(s) or cause a Third Party to manufacture any Product(s), or any component thereof.

14.  **GOVERNING LAW; VENUE.**

14.1.  <u>Governing Law</u>. This Agreement, including all exhibits and schedules and all documents or instruments delivered in connection herewith, and all disputes among the parties under this Agreement will be governed by, and construed and enforced in accordance with and decided pursuant to, the laws of the State of California (and in accordance with federal law where applicable), without regard to any jurisdiction's conflicts or choice of law provisions.

14.2.  <u>Venue</u>.  Except as otherwise provided in this Agreement, any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby shall be brought in the state or federal courts located in the State of California, County of Santa Clara and each of the parties hereto irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of such action or proceeding shall be heard and determined only in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any other court.  The parties agree that any party may file a copy of this Section with any court as written evidence of the knowing, voluntary and bargained agreement among the parties irrevocably to waive any objections to venue or to convenience of forum.  THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE

PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

## 15. **REPRESENTATIONS, INDEMNIFICATION, NON-COMPETITION COVENANTS**

15.1. <u>Representations of iNDx.</u> iNDx represents and warrants to NMS that:

15.1.1. The execution, delivery and performance of this Agreement by iNDx and any other agreement to which iNDx is a party, the execution and delivery of which is contemplated hereby will not, with or without notice, the passage of time or both, result in any violation of, be in conflict with, or constitute a default under any organization documents (hereafter defined) contract, obligation or commitment to which iNDx is a party or by which it is bound, or to iNDx's knowledge, any statute, rule or governmental regulation applicable to iNDx.

15.1.2. iNDx has all requisite legal and corporate power and authority to enter into this Agreement and any other agreement to which iNDx is a party, the execution and delivery of which is contemplated hereby and to carry out and perform its obligations under the terms of this Agreement. All corporate action on the part of iNDx and its officers, directors and stockholders necessary for the performance of iNDx's obligations hereunder and any other agreement to which iNDx is a party, the execution and delivery of which is contemplated hereby has been taken. This Agreement and any other agreement to which iNDx is a party, the execution and delivery of which is contemplated hereby constitutes a valid and binding obligation of iNDx, enforceable in accordance with its terms.

15.1.3. All employees of iNDx who are expected to participate in the Development Program have signed agreements regarding proprietary information and inventions, confidentiality and non-use of information with iNDx in a form reasonably considered by iNDx and its counsel to assure iNDx's title to any Inventions or Confidential Information that may arise or be developed by such employees hereunder. Such agreements are legal, valid and binding obligations of iNDx and its employees and are enforceable in accordance with their terms, except as limited by applicable bankruptcy laws and other similar laws affecting

22

the creditors' rights and remedies generally and except insofar as the availability of equitable remedies may be limited.

15.1.4. To the knowledge of iNDx, as of the Effective Date of this Agreement, Product(s) and related instrumentation and materials in development and contemplated development on the date hereof, can be manufactured, produced, used, sold and distributed for the purposes contemplated by this Agreement without infringing the patents or other proprietary rights of any other party.

15.1.5. iNDx has obtained rights relating to Product(s) for the purposes contemplated by this Agreement and related instrumentation and materials that may have been affected by collaborations between iNDx and Third Parties wherein such rights are necessary for the performance hereunder by NMS and iNDx.

15.1.6. iNDx is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware and is duly qualified and is authorized to transact business and is in good standing as a foreign corporation in each jurisdiction in which the conduct of iNDx's business or the nature of the property owned by it requires such qualification.

15.1.7. Attached hereto as Schedule 15.1.7 are true and correct copies of iNDx's Certificate of Incorporation, Bylaws, Shareholders Agreement and Joint Venture Agreement (collectively, the "Organizational Documents"), all as amended and in effect as of the date hereof.

15.1.8. Schedule 15.1.8 sets forth a list of all of the material written or oral contracts, agreements, indentures, notes, bonds, loans, mortgages, licenses, instruments, leases, commitments or other arrangements or agreements (collectively, "Contracts") to which iNDx is a party or by which it is bound. iNDx has delivered to NMS true, correct and complete copies of all of the Contracts. Except as described on Schedule 15.1.8, all of the Contracts are in full force and effect. Neither iNDx nor, to the knowledge of iNDx, any other party to any Contract is in default thereunder or has otherwise failed to comply in all material respects with its obligations thereunder. No Contract has been modified or amended except as described on Schedule 15.1.8 of this Agreement. iNDx has not received any notice or communication from any party to a Contract or other material client or supplier (whether or not a party to a Contract) relating to such party's intent to modify, terminate or fail to renew the arrangements and relationships set forth therein.

15.1.9. As of the date hereof, the authorized, issued and outstanding capital stock of iNDx is as set forth on Schedule 15.1.9. There are no outstanding options, warrants or convertible securities of any character whatsoever relating to, or securities, rights or obligations convertible into or exchangeable for, or giving any person or entity any right to subscribe for or acquire, any capital stock of iNDx, or contracts, commitments, understandings or arrangements by which iNDx is or may become bound to issue additional capital stock or other securities. No stock plan, stock purchase, stock option or other agreement or understanding between iNDx and any holder of securities of iNDx provides for acceleration or other changes in the vesting provisions or other terms of such agreement or understanding as the result of the occurrence of any event.

15.1.10. Except as set forth on Schedule 15.1.10 to this Agreement, iNDx has not loaned or borrowed any amounts from, or has outstanding any indebtedness or other similar obligations to or owing from, any affiliate of iNDx. Except as set forth on Schedule 15.1.10, neither iNDx nor any affiliate of iNDx nor any officer or employee of any of them: (i) owns any direct or indirect interest of any kind in, or controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, any person which is (A) a competitor, supplier, client, landlord, tenant, creditor or debtor of iNDx, (B) engaged in a business related to the business of iNDx, or (C) a participant in any transaction to which iNDx is a party; or (ii) is a party to any contract with iNDx except oral employment contracts. iNDx does not have any contract or understanding with any officer, director or manager of iNDx, or any affiliate of any such person, with respect to the subject matter of this Agreement, the consideration payable hereunder or any other material matter except as previously disclosed in writing to NMS.

15.1.11. iNDx has delivered to NMS copies of iNDx's unaudited balance sheet and income statement as of the period ending August 31, 2014 (the "Financial Statements") attached as Schedule 15.1.11. The Financial Statements are true, complete and correct in all material respects, are in accordance with the books and records of iNDx, and present fairly the financial position of iNDx as of and at the dates indicated and the results of their operations for the periods specified. Except as set forth in the Financial Statements, iNDx does not have any liabilities (whether accrued, absolute, unlimited, contingent or otherwise, whether due or to become due, and regardless of when asserted) other than immaterial liabilities and obligations, that have arisen after the date of the Financial Statements in the ordinary course of business (none of which is a liability resulting from breach of contract, breach of warranty, infringement, claim or lawsuit).

15.2.    <u>Representations of NMS</u>.  NMS represents and warrants to iNDx that:

15.2.1. Its execution, delivery and performance of this Agreement will not, with or without notice, the passage of time or both, result in any violation of, be in conflict with, or constitute a default under any contract, obligation or commitment to which it is a party or by which it is bound, or to its knowledge, any statute, rule or governmental regulation applicable to it.

15.2.2. NMS has all requisite legal and corporate power and authority to enter into this Agreement and to carry out and perform its obligations under the terms of this Agreement.  All corporate action on the part of NMS and its officers and directors necessary for the performance of its obligations hereunder has been taken.  This Agreement constitutes a valid and binding obligation of each such party, enforceable in accordance with its terms.

15.2.3. All employees of NMS who are expected to participate in the Development Program have signed agreements regarding proprietary information and inventions, confidentiality and non-use of information with NMS in a form reasonably considered by NMS and its counsel to assure NMS's title to any Inventions or Confidential Information that may arise or be developed by such employees hereunder.  Such agreements are legal, valid and binding obligations of NMS and its employees and are enforceable in accordance with their terms, except as limited by applicable bankruptcy laws and other similar laws affecting the creditors' rights and remedies generally and except insofar as the availability of equitable remedies may be limited.

15.2.4. NMS, as of the Effective Date, is not a party to any material contract (other than this Agreement) with a Third Party with respect to the Field or Alternate Field

15.2.5. NMS shall not, in its commercialization activities for Product(s), manufacture, produce, use, sell or distribute any Product(s) in a manner which infringes the patents or other proprietary rights of any Third Party.

15.3.    <u>Indemnification by iNDx</u>.    In addition to, and not in limitation of, indemnification for third-party infringement claims, which are provided for in Section 10 of this Agreement, iNDx shall at all times, during the term of this Agreement and thereafter, indemnify and hold harmless NMS and its Affiliates, stockholders, directors, officers, agents and employees from any claim, proceeding, loss, expense, and liability of any kind whatsoever (including but not limited to those resulting from death, personal injury, illness or property damage and including legal expenses and reasonable attorneys'

25

fees) (collectively, "Damages") arising out of or resulting from (a) the misrepresentations of any representation or the breach of any warranty, covenant or agreement made by iNDx in this Agreement and (b) the negligence or willful misconduct of iNDx or any of its Affiliates or any of their respective subagents in connection with the activities undertaken pursuant to this Agreement; provided, however that there shall be apportionment in accordance with responsibility when such indemnity obligation derives in part from acts of iNDx and in part from acts of NMS.

15.4.  Indemnification by NMS.  In addition to, and not in limitation of, indemnification for third-party infringement claims, which are provided for in Section 10 of this Agreement, NMS shall at all times, during the term of this Agreement and thereafter, indemnify and hold harmless iNDx and its Affiliates, stockholders, directors, officers, agents and employees from any claim, proceeding, loss, expense, and liability of any kind whatsoever (including but not limited to those resulting from death, personal injury, illness or property damage and including legal expenses and reasonable attorneys' fees) arising out of or resulting from (a) the misrepresentation of any representation or the breach of any warranty, covenant or agreement made by NMS in this Agreement and (b) the negligence or willful misconduct of NMS or any of its employees or agents in connection with the activities undertaken by NMS pursuant to this Agreement; provided, however, that there shall be apportionment in accordance with responsibility when such indemnity obligation derives in part from acts of iNDx and in part from acts of NMS.

15.5.  Product Liability and Personal Injury Claims.  The parties hereby each separately agree to be responsible for any damages, costs, expenses and liabilities (including attorneys' fees and expenses) arising from any third party product liability or personal injury claims arising from such party's sale, use or distribution of any Product(s) and to indemnify, defend and hold harmless the other party against any product liability claim arising from the selling party's Product(s).

15.6.  Claims.  In any claim for indemnification (an "Indemnity Claim"), the indemnified Party agrees to give the indemnifying Party prompt written notice of any matter upon which such indemnified Party intends to base such a claim under this Agreement.  The indemnifying Party shall have the right to participate jointly with the indemnified Party in the indemnified Party's defense, settlement or other disposition of any Indemnity Claim.  With respect to any Indemnity Claim relating solely to the payment of money damages and which could not result in the indemnified Party's becoming subject to injunctive or other equitable relief or otherwise adversely affect the business of the indemnified Party in any manner, and as to which the indemnifying Party shall have acknowledged in writing the obligation to indemnify the indemnified Party hereunder, the indemnifying Party shall have the sole right to defend, settle or otherwise dispose of such Indemnity Claim, on such terms as

the indemnifying Party, in its sole discretion, shall deem appropriate; provided that the indemnifying Party shall provide reasonable evidence of its ability to pay any damages claimed and with respect to any such settlement shall obtain the written release of the indemnified Party from the Indemnity Claim. The indemnifying Party shall obtain the written consent of the indemnified Party prior to ceasing to defend, settling or otherwise disposing of any Indemnity Claim if as a result thereof the indemnified Party would become subject to injunctive or other equitable relief or the business of the indemnified Party would be adversely affected in any manner. In the event that any such indemnity obligation shall be apportioned between the Parties, NMS shall have the right to control the Indemnity Claim, subject to the participation and involvement of iNDx.

15.7.   <u>Insurance</u>. Each Party agrees to procure and maintain in full force and effect during the term of this Agreement valid and collectible insurance policies in connection with its activities as contemplated hereby which policies shall provide for the types of and amounts of coverage according to the following and defined in Exhibit F. Each policy shall provide for 30 days written notice of cancellation or material change and upon request, each Party shall provide to the other Party a certificate of coverage or other written evidence reasonably satisfactory to such other Party of such insurance coverage.

15.8.   <u>Non-Competition Covenant</u>. The License Agreement shall provide that during the License Term (as defined in the License Agreement), iNDx shall not directly or indirectly, compete with NMS in the sale or license of Product(s) in the Field and NMS shall not, directly or indirectly, compete with iNDx in the sale or license of Product(s) being developed or commercially marketed by iNDx outside the Field, excepting the Alternate Field.

15.9.   <u>Mohan Uttarwar Covenants</u>.

15.9.1. iNDx covenants it shall cause Mohan Uttarwar to agree not to compete, directly or indirectly, with iNDx or NMS (to the extent of NMS' licensed activities as described in the License Agreement), while he is an employee, consultant or equity holder (directly or beneficially) of iNDx and for a period of two years thereafter, unless he is terminated by iNDx without cause, all as described in the amendments to the Consulting Agreements between iNDx and Avam LLC dated January 1, 2014, and the Services and License Agreement by and between iNDx and iNDx Technology, Inc. dated April 1, 2014, true and correct copies of which have been provided to NMS.

15.9.2. iNDx covenants that Mohan Uttarwar shall not resign as a consultant to iNDx, providing services to the same extent as provided on the date of this Agreement, prior to the end of the Development Period.

27

16. **MISCELLANEOUS**

16.1. <u>Notices</u>.  Any notice to be given hereunder by NMS to iNDx or by iNDx to NMS shall be in writing and delivered personally, or sent by national overnight delivery service or postage pre-paid registered or certified U.S. mail, and shall be deemed given: when delivered, if by personal delivery or overnight delivery service; or upon if so sent by U.S. mail, three business days after deposit in the mail, and shall be addressed:

If to NMS, to;

> Pierre G. Cassigneul
> President and CEO
> NMS Labs
> 3701 Welsh Road
> Willow Grove, PA  19090

If to iNDx to

> 20380 Town Center Lane, Suite 218
> Cupertino, CA 95014
> Attention: Mohan Uttarwar, Chief Executive Officer

or to such other address as any party shall hereafter designate by notice given in accordance with this Section.

16.2. <u>Payment of Expenses</u>.  Except as expressly set forth herein, all costs and expenses related to this Agreement and the related transactions, including the fees and expenses of legal counsel, accountants, brokers and other representatives and consultants, shall be borne by the Party incurring such costs and expenses, whether or not such transactions are consummated.

16.3. <u>Assignment</u>.

16.3.1. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by either Party without the prior written consent of the other Party which consent shall not be unreasonably withheld; except that (a) NMS may, without such consent, assign this Agreement or any or all of such rights, interests and obligations to (i) any Affiliate thereof or (ii) a Third Party to whom substantially all of NMS's business or assets is transferred, subject to iNDx's rights set forth in the Agreement; and (b) iNDx may, without such consent, assign this Agreement to (i) an Affiliate or (ii) a Third Party to whom substantially all of iNDx's business or assets (including, without limitation, Inventions) have been assigned, subject to NMS's rights set forth in the Agreement. Notwithstanding the foregoing, no permitted

28

assignment hereunder shall have the effect of relieving the assigning Party of its duties and obligations hereunder.

16.3.2. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, and no other person shall have any right, benefit or obligation under this Agreement as a third party beneficiary or otherwise.  Any assignment in contravention of this Section 16.3 is void.

16.4.  <u>Public Statements and Press Releases</u>.  The Parties hereto covenant and agree that, except as provided for herein, each will not from and after the date hereof make, issue or release any public announcement, press release, statement or acknowledgment of the existence of, or reveal publicly the terms, conditions and status of, the transactions contemplated herein, without the prior written consent of the other Party as to the content and time of release of and the media in which such statement or announcement is to be made.  No Party shall use the name or proprietary marks of the other Party or any of its Affiliates for advertising or promotional or any other purposes without the prior written consent of such other Party, excluding disclosure to prospective investors, customers and business partners and in such case, only upon the prior review and approval of the other Party.

16.5.  <u>Modifications and Amendments</u>.  This Agreement shall not be modified or otherwise amended except pursuant to an instrument in writing executed and delivered by each of the Parties hereto.

16.6.  <u>Waiver</u>.  The failure of any Party to require the performance of any term of this Agreement, or the waiver of any Party of any breach of this Agreement, shall not prevent a subsequent exercise or enforcement of such terms or be deemed a waiver of any subsequent breach of the same or any other term of this Agreement.

16.7.  <u>Board Appointment</u>.  NMS may nominate one individual as director to the Business Advisory Board of iNDx Lifecare, Inc. and, upon execution of this Agreement, iNDx shall appoint the nominee as a Non-Executive Director to the Business Advisory Board of iNDx Lifecare, Inc. for the term of this Agreement.

16.8.  <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

16.9.  <u>Invalidity</u>.  In the event that any one or more of the provisions (or any part thereof) contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in

any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

16.10.  <u>Construction and Incorporation of Exhibits</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.  The Exhibits identified in this Agreement are incorporated herein by reference and made a part hereof.  In the event of any conflict between the terms or provisions of any Exhibit and those of the basic Agreement, the terms or provisions of the basic Agreement shall govern.

16.11.  <u>Entire Agreement</u>.  It is the desire and intent of the Parties to provide certainty as to their future rights and remedies against each other by defining the extent of their undertakings herein.  This Agreement constitutes and sets forth the entire agreement and understanding between the parties with respect to the subject matter hereof and is intended to define the full extent of the legally enforceable undertakings of the Parties hereto, and no promise, agreement or representation, written or oral, which is not set forth explicitly in this Agreement is intended by either Party to be legally binding.  Each Party acknowledges that in deciding to enter into this Agreement and to consummate the transactions contemplated hereby it has not relied upon any statements, promises or representations, written or oral, express or implied, other than those explicitly set forth in this Agreement.  This Agreement supersedes all previous understandings, agreements and representations between the Parties, written or oral, with respect to the subject matter hereof.

16.12.  <u>Survival of Certain Provisions</u>.  To the extent applicable the following Sections shall survive termination of this Agreement along with any remedies for the breach thereof:  3.1.2, 4.2, 4.3, 4.4, 4.5, 6.1, 6.2, 7.1, 7.2, 8, 9, 10, 11, 12, 13, 14, 15 and 16.

16.13.  <u>No Agency</u>.  Nothing in this Agreement shall be construed to make the relationship of the Parties herein a joint venture, an association, a partnership, or make the Parties agents of one another. The Parties are not authorized to act as agents of one another as to any matter or to make any representations to any Third Parties indicating or implying the existence of any such agency relationship and the relationship between the Parties shall be that of independent contractors.

16.14.  <u>Rights Upon Insolvency</u>.  All rights and licenses to Inventions granted under or pursuant to this Agreement by one Party ("Licensor") to the other Party ("Licensee") are, for all purposes of Section 365(n) of Title 11 of the U.S.

Code ("Title 11"), licenses of rights to intellectual property as defined in Title 11. Each Party agrees during the term of this Agreement to create and maintain current copies or, if not amenable to copying, detailed descriptions or other appropriate embodiments, of all such Inventions. If a case is commenced by or against any Party hereto under Title 11, then, unless and until this Agreement is rejected as provided in Title 11, such Party (in any capacity, including debtor-in-possession) and its successors and assigns (including, without limitation, a Title 11 trustee) shall provide to the other Party all such intellectual property (including all embodiments thereof) held by such Party and such successors and assigns, as the other Party may elect in a written request, immediately upon such request. If a Title 11 case is commenced by or against a Party, this Agreement is rejected as provided in Title 11 and the other Party elects to retain its rights hereunder as provided in Title 11, then such Party (in any capacity, including debtor-in-possession) and its successors and assigns (including, without limitation, a Title 11 trustee) shall provide to the other Party all such intellectual property (including all embodiments thereof) held by such Party and such successors and assigns immediately upon the other Party's written request therefor. All rights, powers and remedies of any Party, as a Licensee hereunder, provided herein are in addition to and not in substitution for any and all other rights, powers and remedies now or hereafter existing at law or in equity (including, without limitation, Title 11) in the event of the commencement of a Title 11 case by or against the other Party. Licensee, in addition to the rights, powers and remedies expressly provided herein, shall be entitled to exercise all other such rights and powers and resort to all other such remedies as may now or hereafter exist at law or in equity (including Title 11) in such event.

*[Signatures continued on next page]*

IN WITNESS WHEREOF, the Parties hereto intending legally to be bound hereby, have each caused this Agreement to be duly executed as of the date first above written.

NMS Labs

By_____
Name: Pierre G. Cassigneul
Title:   President and CEO

iNDx Lifecare, Inc.

By _____
Name: Mohan Uttarwar
Title:   CEO

IN WITNESS WHEREOF, the Parties hereto intending legally to be bound hereby, have each caused this Agreement to be duly executed as of the date first above written.

NMS Labs

By _Pierre G Cassigneul_

Name: Pierre G. Cassigneul
Title:   President and CEO


iNDx Lifecare, Inc.


By_____

Name: Mohan Uttarwar
Title:   CEO

## EXHIBIT A

DEVELOPMENT PLAN

**Project Development Plan (Oct 7 Tue, 2014)**

| Task Name | Start | Finish | Duration |
|---|---|---|---|
| **Kopi Project** | **Thu 5/1/14** | **Mon 10/19/15** | **383 days** |
| Six weeks feasibility plan | Thu 5/1/14 | Fri 6/13/14 | 6.4 wks |
| Development project launch | Mon 11/3/14 | Mon 11/3/14 | 0 days |
| **Assay development (M1,M4)** | **Mon 11/3/14** | **Mon 6/29/15** | **171 days** |
| **Group I - three assay development (M1)** | **Mon 11/3/14** | **Fri 12/19/14** | **35 days** |
| Develop and titrate three individual assays | Mon 11/3/14 | Fri 11/21/14 | 3 wks |
| Integrate all three assays on a single chip | Mon 11/24/14 | Fri 12/5/14 | 2 wks |
| Validate with spiked and real samples | Mon 12/8/14 | Fri 12/19/14 | 2 wks |
| **Group II - three assay development (M1)** | **Mon 12/22/14** | **Fri 2/6/15** | **35 days** |
| **Group III - three assay development (M1)** | **Mon 2/9/15** | **Fri 3/27/15** | **35 days** |
| **Group IV - last two assay development (M1)** | **Mon 3/30/15** | **Fri 5/8/15** | **30 days** |
| **Integrate assays on cartridge (M4)** | **Tue 5/5/15** | **Mon 6/29/15** | **40 days** |
| Port all assays on cartridge | Tue 5/5/15 | Mon 6/1/15 | 4 wks |
| Test and validate | Tue 6/2/15 | Mon 6/29/15 | 4 wks |
| Assay validation (Stability, Interferences, carry over) | Tue 6/30/15 | Mon 7/27/15 | 4 wks |
| **NMS LABS to acquire assay development setup (M6)** | Tue 7/28/15 | Mon 8/24/15 | 4 wks |
| **Hardware and Software Development** | **Tue 7/15/14** | **Mon 6/1/15** | **230 days** |
| Product definition | Tue 7/15/14 | Mon 12/29/14 | 6 mons |
| **Chip modification (M3)** | **Tue 11/4/14** | **Mon 3/16/15** | **95 days** |
| Design the 4X8 chip and run optical simulations | Tue 11/4/14 | Mon 11/17/14 | 2 wks |
| Order lithographic masks | Tue 11/18/14 | Mon 11/24/14 | 1 wk |
| First wafer manufacturing batch | Tue 11/25/14 | Mon 12/22/14 | 4 wks |
| Testing of new design | Tue 12/23/14 | Mon 1/12/15 | 3 wks |
| Design modifications | Tue 1/13/15 | Mon 1/19/15 | 1 wk |
| Order lithographic masks | Tue 1/20/15 | Mon 1/26/15 | 1 wk |
| Second wafer manufacturing batch | Tue 1/27/15 | Mon 2/23/15 | 4 wks |
| Testing of new design | Tue 2/24/15 | Mon 3/16/15 | 3 wks |
| **Reader & Software development (M5, M7, M8)** | **Tue 11/4/14** | **Mon 6/1/15** | **150 days** |
| **Electronic Board (M5)** | **Tue 11/4/14** | **Mon 3/2/15** | **85 days** |
| Specifications | Tue 11/4/14 | Mon 11/10/14 | 1 wk |
| Board design and parts selection | Tue 11/11/14 | Mon 12/8/14 | 4 wks |
| Parts procurement | Tue 12/9/14 | Mon 1/5/15 | 4 wks |
| Integration and testing | Tue 1/6/15 | Mon 2/2/15 | 4 wks |

| | | | |
|---|---|---|---|
| Modifications + integration + testing | Tue 2/3/15 | Mon 3/2/15 | 4 wks |
| **Optical head (M5)** | **Tue 12/9/14** | **Mon 2/23/15** | **55 days** |
| Specifications | Tue 12/9/14 | Mon 12/15/14 | 1 wk |
| Optical design | Tue 12/16/14 | Mon 12/29/14 | 2 wks |
| Parts procurements | Tue 12/30/14 | Mon 1/26/15 | 4 wks |
| Integration and testing | Tue 1/27/15 | Mon 2/23/15 | 4 wks |
| **Software (M7)** | **Tue 12/30/14** | **Mon 4/27/15** | **85 days** |
| **Embedded SW** | **Tue 12/30/14** | **Mon 3/9/15** | **50 days** |
| Specifications | Tue 12/30/14 | Mon 1/5/15 | 1 wk |
| Coding | Tue 1/6/15 | Mon 2/2/15 | 4 wks |
| Integration with HW & testing | Tue 2/3/15 | Mon 2/16/15 | 2 wks |
| Modifications + coding + testing | Tue 2/17/15 | Mon 3/9/15 | 3 wks |
| **User interface** | **Tue 2/17/15** | **Mon 4/27/15** | **50 days** |
| Specifications | Tue 2/17/15 | Mon 2/23/15 | 1 wk |
| Coding | Tue 2/24/15 | Mon 3/16/15 | 3 wks |
| Integration with HW & testing | Tue 3/17/15 | Mon 4/6/15 | 3 wks |
| Modifications + coding + testing | Tue 4/7/15 | Mon 4/27/15 | 3 wks |
| **Mechanics (M5)** | **Tue 12/30/14** | **Mon 4/6/15** | **70 days** |
| Specifications | Tue 12/30/14 | Mon 1/5/15 | 1 wk |
| Design | Tue 1/6/15 | Mon 1/19/15 | 2 wks |
| Parts manufacturing | Tue 1/20/15 | Mon 3/2/15 | 6 wks |
| Integration and testing | Tue 3/3/15 | Mon 4/6/15 | 5 wks |
| **Enclosure (M8)** | **Tue 1/20/15** | **Mon 3/2/15** | **30 days** |
| Industrial design | Tue 1/20/15 | Mon 2/2/15 | 2 wks |
| Manufacturing | Tue 2/3/15 | Mon 2/23/15 | 3 wks |
| Integration | Tue 2/24/15 | Mon 3/2/15 | 1 wk |
| **Product integration and testing (M8)** | **Tue 4/7/15** | **Mon 6/1/15** | **40 days** |
| First iteration | Tue 4/7/15 | Mon 5/4/15 | 4 wks |
| Second iteration | Tue 5/5/15 | Mon 6/1/15 | 4 wks |
| **Cartridge development (M2,M3,M4)** | **Tue 11/4/14** | **Mon 5/11/15** | **135 days** |
| Cartridge definition | Tue 11/4/14 | Mon 12/1/14 | 4 wks |
| Caridge design | Tue 12/2/14 | Mon 1/12/15 | 6 wks |
| Machine cartridge | Tue 1/13/15 | Mon 1/26/15 | 2 wks |
| Cartridge testing | Tue 1/27/15 | Mon 2/9/15 | 2 wks |
| Design modification + machining + testing | Tue 2/10/15 | Mon 3/2/15 | 3 wks |
| Mold design + manufacture | Tue 3/3/15 | Mon 4/6/15 | 5 wks |
| Parts molding | Tue 4/7/15 | Mon 4/13/15 | 1 wk |
| Cartridge testing | Tue 4/14/15 | Mon 5/11/15 | 4 wks |
| Integration of assays cartridge and reader (M5,M8) | Tue 6/30/15 | Mon 7/27/15 | 20 days |
| NMS Product validation & field testing (M9) | Tue 7/28/15 | Mon 10/19/15 | 3 mons |

# EXHIBIT B

LICENSE AGREEMENT –MUTUAL

See attached.

# License Agreement

THIS LICENSE AGREEMENT is made and entered into this ___ day of _____, 2014 by and between NMS Labs, a Pennsylvania corporation, having its principal office at 3701 Welsh Road, Willow Grove, PA 19090 ("NMS"), and iNDx Lifecare, Inc., a Delaware corporation, having its principal office at 9568 Topanga Canyon Blvd., Chatsworth, CA 91311 ("iNDx") and iNDx Technology, Inc., solely for the purposes of guaranteeing the license grants of iNDx to NMS hereunder with respect to the iCore Technology. Each of NMS and iNDx are sometimes referred to as a "Party" and NMS and iNDx are sometimes referred hereinafter as "the Parties".

RECITALS

WHEREAS, iNDx and NMS entered into that certain Product Development Agreement as of the above date ("Product Development Agreement") pursuant to which NMS and iNDx are collaborating in the development of small molecule assay Product(s) based upon their respective technologies and expertise with the intent that a range of such products shall be developed and commercially marketed, in part by NMS and in part by iNDx.

WHEREAS, capitalized terms used in this Agreement and not otherwise defined in this Agreement shall have the meanings ascribed to them in the Product Development Agreement; and

WHEREAS, the Parties desire to enter into this agreement to effectuate the collaboration pursuant to the Product Development Agreement, including by licensing the Jointly Owned Inventions, Know-How, NMS Owned Inventions (as applicable), iNDx Owned Inventions (as applicable) and the iCore Technology (as applicable) for the development, manufacturing and distribution purposes more fully set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants of this Agreement, the Parties hereto agree as follows:

## I. LICENSES; NON-COMPETITION

A. MUTUAL LICENSE. NMS, for the Term of the Product Development Agreement, hereby grants to iNDx, a non-exclusive, non-assignable (except pursuant to Section XIII.D. hereunder), right and license to use the Jointly Owned Inventions, NMS Owned Inventions and NMS Know-How to perform iNDx's obligations under the Product Development Agreement, including the specifically agreed upon obligations under the Development Plan. iNDx, for the Term of the Product Development Agreement, hereby grants to NMS, a non-exclusive, non-assignable, right and license to use the iCore Technology, Jointly Owned Inventions, iNDx Owned Inventions and iNDx Know-How to perform NMS's obligations under the Product Development Agreement, including the specifically agreed upon obligations under the Development Plan. The Licenses granted herein shall not be effective until NMS has made the $800,000 investment specified in Section 5.1 of the Product Development Agreement.

B. LICENSES TO NMS. iNDx hereby grants to NMS a perpetual, sole and exclusive (except as otherwise noted below, and subject to modification as set forth in Section 6.1 of the Product Development Agreement), non-assignable (except pursuant to Section XIII.D. hereunder), sublicenseable right and license to: (i) use the iCore Technology, Jointly Owned Inventions, iNDx Owned Inventions and iNDx Know-How to manufacture or have manufactured the Product(s) or any component thereof or new software applications or other products part of or separate from the Device solely for exclusive use in the Field and non-exclusive use in the Alternate Field (to the extent NMS chooses to develop Product(s) for use in an Alternate Field); (ii) make improvements, enhancements, derivative works and other modifications of the Product(s) or any component thereof (including without limitation software applications for mobile devices providing the means to measure or determine the presence of drugs or abuse of alcohol) solely for exclusive use in the Field and non-exclusive use in the Alternate Field (to the extent NMS chooses to develop Product(s) for use in an Alternate Field); (iii) develop and use improvements, enhancements and other modifications of the Product(s) or any component thereof, including without limitation the iCore Technology or new software applications or other products part of or separate from the Device solely for use in the Field and Alternate Field (to the extent NMS chooses to develop Product(s) for use in an Alternate Field) and (iv) sell, market and distribute (through multiple tiers) in any and all territories in the world (other than in India) the Product(s) (using any NMS trademark as determined by NMS) for use in the Field. iNDx hereby grants to NMS a perpetual, non-exclusive, non-assignable (except pursuant to Section XIII.D. hereunder), sublicenseable right and license to sell, market and distribute (through multiple tiers) in any and all territories in the world (other than in India) the Product(s) (using any NMS trademark as determined by NMS) for use in the Alternate Field.

C. LICENSES TO iNDx. NMX hereby grants to NMS a perpetual, non-exclusive, non-assignable and non-sublicensable right and license to: (i) use the NMS Owned Inventions in connection with the development and Commercialization of Product(s) for use in an Alternate Field should iNDx develop and Commercialize such a Product(s) as permitted in Section 3.1.2 of the Product Development Agreement; (ii) use the NMS Owned Inventions in Products utilizing the oral fluid collection system or any system substantially similar ("iNDx Oral Fluid Collection Products") in all areas other than the Field; (iii) sell, market and distribute (through multiple tiers) in any and all territories in the world the iNDx Oral Fluid Collection Product(s) (using any NMS trademark as determined by NMS) for use in all areas other than the Field.

D. KNOWLEDGE TRANSFER. iNDx shall, upon request and at the cost and expense of NMS (only to the extent the services of any third party is required to effect such knowledge transfer), complete the transfer of the know-how on assay development and reagent manufacturing to NMS solely and, upon request of NMS, shall also transfer the assembly Know-How of the Device, along with the chip, cartridge and all other information needed to manufacture Product(s) for use in the Field or Alternate Field. NMS shall, upon request and at the cost and expense of iNDx (only to the extent the services of any third party is required to effect such knowledge transfer), complete the transfer of the know-how on developed assays and reagents to iNDx along with all other information needed to sell, market or distribute the iNDx Oral Fluid Collection Products for use in all areas other than the Field.

E. NON-COMPETITION COVENANT. During the License Term (as defined below), iNDx shall not, as an owner, contractor, consultant, investor or in any other capacity whatsoever, directly or indirectly, compete with NMS in the sale or license of Product(s) in the Field and NMS shall not, as an owner, contractor, consultant, investor or in any other capacity whatsoever, directly or indirectly, compete with iNDx in the sale or license of Product(s) being developed or commercially marketed by iNDx outside the Field (excluding the Alternate Field wherein each of NMS and iNDx have non-exclusive rights hereunder). Each party acknowledges that a breach of the foregoing covenants by the other party may cause irreparable harm to the non-breaching party. Each party agrees therefore, that without limiting any other rights and remedies, including collection of monetary damages, in the event of a breach by the other party, the non-breaching party shall be entitled to seek immediate injunctive relief without posting of a bond,

## II. TERM

This Agreement shall be effective as of the date of execution by both parties and shall extend until terminated as provided pursuant to Section XI herein (the "License Term"); provided further that the termination of the Product Development Agreement, in and of itself, shall not operate to cause the termination of this Agreement.

## III. ROYALTY

In consideration for the licenses granted in this Agreement, the only royalty payable from NMS to iNDx shall be the royalties set forth in Section 6.2 of the Product Development Agreement. In consideration for the licenses granted in this Agreement, the only royalties payable from iNDx to NMS shall be: (a) the royalties set forth in Section 6.2 of the Product Development Agreement (from sales of Products in India on the same terms as those provided for in such Section 6.2, except that there shall be no minimum royalty payment obligation); and (b) the royalties set forth in Section 7.1.2(b) of the Product Development Agreement (from sales of iNDx Oral Fluid Collection Products for all areas other than the Field as set forth in such Section 7.1.2(b)).

## IV. RECORD INSPECTION; AUDITS

A. RECORD INSPECTION; AUDITS. During the License Term, each Party shall have the visitation and inspection/audit rights as set forth in Section 3.7.3 and 3.7.4 of the Product Development Agreement with respect to the activities under this Agreement.

## V. INDX'S OBLIGATIONS

A. iNDx OWNED INVENTIONS AND iNDx KNOW-HOW. Beginning upon the effective date of this Agreement, iNDx shall meet with and provide NMS with such information and materials as are necessary and related to the operation and use of the iCore Technology, iNDx Owned Inventions and iNDx Know-How which NMS believes NMS may require in order to utilize the licenses granted herein.

B. TECHNICAL EXPERTISE. iNDx shall also provide NMS, at its place of business, such technical and other qualified experts for developing, Commercializing, manufacturing and selling the Products, including without limitation to facilitate all technical expertise and know-how transfer specified in Section 3.4.2 of the Product Development Agreement, and for assisting

NMS on any problems or matters which require on-the-spot assistance in accordance with the Product Development Agreement subsequent Commercializing, manufacturing and selling activities contemplated thereunder.

C. AUTHORIZATION. iNDx represents and warrants that it has the right and power to enter into, perform and be bound by this Agreement, and that there are no other agreements with any other party in conflict with any of the foregoing.

D. CONFIDENTIALITY.  During and after the License Term, iNDx shall comply with the confidentiality obligations set forth in Section 12 of the Development Agreement with respect to its activities under this Agreement.

## VI. NMS'S OBLIGATIONS

A. NMS OWNED INVENTIONS AND NMS KNOW-HOW. Beginning upon the effective date of this Agreement, NMS shall meet with and provide iNDx with such information and materials as are necessary and related to the operation and use of the NMS Owned Inventions NMS Know-How which iNDx believes iNDx may require in order to utilize the license granted herein.

B. TECHNICAL EXPERTISE. NMS shall also provide iNDx, at its place of business, such technical and other qualified experts for developing the Products and for assisting iNDx on any problems or matters which require on-the-spot assistance in accordance with the Product Development Agreement and the activities thereunder.

C. AUTHORIZATION. NMS represents and warrants that it has the right and power to enter into, perform and be bound by this Agreement, and that there are no other agreements with any other party in conflict with any of the foregoing.

D. CONFIDENTIALITY.  During and after the License Term, NMS shall comply with the confidentiality obligations set forth in Section 12 of the Development Agreement with respect to its activities under this Agreement.

## VII. OWNERSHIP OF IMPROVEMENTS

During the License Term, the ownership of Inventions shall be as set forth in Section 7 of the Product Development Agreement with respect to the activities under this Agreement; provided that NMS's improvements, enhancements, derivative works and other modifications of the Product(s) or any component thereof for use in the Field and Alternate Field (to the extent NMS chooses to develop Product(s) for use in an Alternate Field) pursuant to Section I.B.(ii) above shall be owned by NMS.

## VIII. THIRD PARTY INFRINGEMENT AND INDEMNIFICATION

A. THIRD PARTY INFRINGEMENT. During the License Term, each Party shall comply with the enforcement obligations set forth in Section 9 of the Product Development Agreement with respect to the activities under this Agreement.

B. THIRD PARTY CLAIM OF INFRINGEMENT During the License Term, each Party shall comply with the third party infringement claim and indemnification obligations set forth in Section 10 of the Product Development Agreement.

C. INDEMNIFICATION BY iNDx. During the License Term, iNDx shall comply with the indemnification obligations (provided that for the purposes of such 15.3(a) "Agreement" shall mean this Agreement) set forth in Section 15.3 of the Product Development Agreement.

D. INDEMNIFICATION BY NMS. During the License Term, NMS shall comply with the indemnification obligations (provided that for the purposes of such 15.4(a) "Agreement" shall mean this Agreement) set forth in Section 15.4 of the Product Development Agreement.

## IX. EXPORT CONTROL

The Parties to this Agreement hereby agree to be subject to all laws, present and future, of any government having jurisdiction over the Parties or their subsidiaries, assigns or sublicensees. The Parties further represent and warrant that neither will use the Jointly Owned Inventions, Know-How, iCore Technology (as applicable), NMS Owned Inventions (as applicable) and iNDx Owned Inventions (as applicable) of the other Party in any manner that constitutes or facilitates the illegal export of any controlled or otherwise restricted items, including, without limitation, software, algorithms or other data subject to export limitations, including the U.S. Export Administration Regulations, the U.S. International Traffic in Arms Regulations, and Council Regulation (EC) No 428/2009.

# X. GOVERNMENTAL APPROVALS

Each Party shall be responsible for applying for and obtaining any approvals, authorizations, or validations necessary to effectuate the terms of this Agreement under the laws of the appropriate national laws of each of the countries for which the licenses herein apply, as provided in the Product Development Agreement.

# XI. TERMINATION

A. TERMINATION BY MUTUAL AGREEMENT.  This Agreement may be terminated at any time upon the mutual agreement of the parties in writing.

B. TERMINATION FOR MATERIAL BREACH.  In the event of a Material Breach (defined below) by either Party, then the other Party may terminate this Agreement by giving such Party notice of such Material Breach.  The Party receiving such notice shall have thirty (30) days from the date of receipt thereof to cure such Material Breach.  If such Material Breach is not cured within such thirty (30) day period, then the non-breaching Party shall have the right to terminate this Agreement effective as of the end of such period.  In the event such Material Breach is cured during such period, such notice shall be of no force or effect and this Agreement shall not be terminated.

C. MATERIAL BREACH. For the purposes of this Agreement, "Material Breach" means a failure of a Party to perform a material express covenant or obligation under this Agreement (including, without limitation, breach of Section III above) or a breach of a representation or warranty of a Party which failure or breach has had or would reasonably be expected to have a material adverse financial consequence to the non-failing or non-breaching Party or a material adverse effect on the likelihood of success hereunder.

D. TERMINATION BY NMS (CEASING USE OF LICENSE RIGHTS). After the expiration or termination of the Product Development Agreement, this Agreement, including without limitation the perpetual license rights hereunder, may be terminated by NMS upon thirty (30) day's written notice to iNDx. Notwithstanding the foregoing and subject to Section XI(F) below, if upon such termination iNDx is utilizing the license rights pursuant to Section I(C), iNDx may, upon written notice to NMS, choose to preclude the termination of such licenses under Section I(C), whereupon iNDx shall continue to utilize such license rights subject to the continuing obligations set forth in Sections III, IV, VIII, IX, X, XII and XIII (including without limitation all royalty obligations and Field/Alternate Field restrictions set forth herein).

E. WIND-DOWN.  Upon expiration or termination of this Agreement for any reason, all rights granted by a party to the other party shall terminate unless otherwise specified in this Agreement.  Notwithstanding anything else herein, and in addition to and not in limitation of the other provisions of this Agreement, for a period of twelve (12) months following the expiration or termination of this Agreement, each party may, in such party's discretion, continue to market and sell its existing inventory of Products existing prior to the date of expiration or termination of this Agreement and additional Products necessary to meet such party's contractual obligations to third parties, subject to the royalty obligations and Field/Alternate Field restrictions set forth herein.  Royalty payments will continue to be due and payable as set forth in this Agreement and the Product Development Agreement for any Products covered by this Agreement sold or provided beyond the expiration or termination of this Agreement.  The parties' rights and obligations under this Agreement shall continue in effect after termination as necessary for exercise of the parties' rights and performance of obligations under this Section XI(E), and exercise and performance of post-termination rights and obligations set forth elsewhere in this Agreement.

F. AGREEMENT CONCERNING JOINTLY-OWNED INVENTIONS.  Upon expiration or termination of this Agreement for any reason, with respect to the Jointly-Owned Inventions, the Parties agree as follows: (a) each party may use the Jointly-Owned Inventions and neither party has any right or duty of accounting to (excluding any royalty obligations arising under Section XI(D) or XI(E) above) or consulting with the other party with respect to the Jointly-Owned Inventions; (b) to the extent either party desires to license a Jointly-Owned Invention to a third party, such license shall be subject to the other party's consent, such consent not to be unreasonably withheld, delayed or conditioned, and other than licensing to end users in the ordinary course of business which is hereby consented to in advance; (c) to the extent either party desires to institute, prosecute or control any Action with respect to infringement of a Jointly-Owned Invention by a third party, the other party's consent to the institution, prosecution or control of such action shall not be unreasonably withheld, delayed or conditioned; provided further that the parties intend, where possible, to cooperate in the joint enforcement of the Action pursuant to the framework set forth in Section 9.2 of the Product Development Agreement.  This provision shall survive the termination or expiration of this Agreement for any reason.

## XII. NOTICES

Any notice to be given hereunder by NMS to iNDx or by iNDx to NMS shall be in writing and delivered personally, or sent by national overnight delivery service or postage pre-paid registered or certified U.S. mail, and shall be deemed given: when delivered, if by personal delivery or overnight delivery service; or upon if so sent by U.S. mail, three business days after deposit in the mail, and shall be addressed:

If to NMS, to;

Pierre G. Cassigneul
President and CEO
NMS Labs
3701 Welsh Road
Willow Grove, PA 19090

If to iNDx to

20380 Town Center Lane, Suite 218
Cupertino, CA 95014
Attention: Mohan Uttarwar, Chief Executive Officer

or to such other address as any party shall hereafter designate by notice given in accordance with this Section.

## XIII. MISCELLANEOUS PROVISIONS

A. GOVERNING LAW. This Agreement, including all exhibits and schedules and all documents or instruments delivered in connection herewith, and all disputes among the parties under this Agreement will be governed by, and construed and enforced in accordance with and decided pursuant to, the laws of the State of California (and in accordance with federal law where applicable), without regard to any jurisdiction's conflicts or choice of law provisions.

B. VENUE. Except as otherwise provided in this Agreement, any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby shall be brought in the state or federal courts located in the State of California, County of Santa Clara and each of the parties hereto irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of such action or proceeding shall be heard and determined only in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any other court. The parties agree that any party may file a copy of this Section with any court as written evidence of the knowing, voluntary and bargained agreement among the parties irrevocably to waive any objections to venue or to convenience of forum. THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY. The provisions of the Agreement shall be binding upon and shall inure to the benefit of the Parties hereto, their heirs, administrators, successors and assigns.

C. PAYMENT OF EXPENSES. Except as expressly set forth herein, all costs and expenses related to this Agreement and the related transactions, including the fees and expenses of legal counsel, accountants, brokers and other representatives and consultants, shall be borne by the Party incurring such costs and expenses, whether or not such transactions are consummated.

D. ASSIGNMENT. Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by either Party without the prior written consent of the other Party which consent shall not be unreasonably withheld; except that (a) NMS may, without such consent, assign this Agreement or any or all of such rights, interests and obligations to (i) any Affiliate thereof or (ii) a Third Party to whom substantially all of NMS's business or assets is transferred, subject to iNDx's rights set forth in the Agreement; and (b) iNDx may, without such consent, assign this Agreement to (i) an Affiliate or (ii) a Third Party to whom substantially all of iNDx's business or assets (including, without limitation, Inventions and Know-How) have been assigned, subject to NMS's rights set forth in the Agreement. Notwithstanding the foregoing, no permitted

assignment hereunder shall have the effect of relieving the assigning Party of its duties and obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns, and no other person shall have any right, benefit or obligation under this Agreement as a third party beneficiary or otherwise. Any assignment in contravention of this Section XII.D. is void.

E. PUBLIC STATEMENTS AND PRESS RELEASES. The Parties hereto covenant and agree that, except as provided for herein, each will not from and after the date hereof make, issue or release any public announcement, press release, statement or acknowledgment of the existence of, or reveal publicly the terms, conditions and status of, the transactions contemplated herein, without the prior written consent of the other Party as to the content and timed of release of and the media in which such statement or announcement is to be made. No Party shall use the name or proprietary marks of the other Party or any of its Affiliates for advertising or promotional or any other purposes without the prior written consent of such other Party, excluding disclosure to prospective investors, customers and business partners and in such case, only upon the prior review and approval of the other Party.

F. MODIFICATIONS AND AMENDMENTS. This Agreement shall not be modified or otherwise amended except pursuant to an instrument in writing executed and delivered by each of the Parties hereto.

G. WAIVER. The failure of any Party to require the performance of any term of this Agreement, or the waiver of any Party of any breach of this Agreement, shall not prevent a subsequent exercise or enforcement of such terms or be deemed a waiver of any subsequent breach of the same or any other term of this Agreement.

H. COUNTERPARTS. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

I. INVALIDITY. In the event that any one or more of the provisions (or any part thereof) contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

J. CONSTRUCTION. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania, without giving effect to conflicts of law provisions.

K. ENTIRE AGREEMENT. It is the desire and intent of the Parties to provide certainty as to their future rights and remedies against each other by defining the extent of their undertakings herein. This Agreement (including the Product Development Agreement provisions referenced herein) constitutes and sets forth the entire agreement and understanding between the parties with respect to the subject matter hereof and is intended to define the full extent of the legally enforceable undertakings of the Parties hereto, and no promise, agreement or representation, written or oral, which is not set forth explicitly in this Agreement is intended by either Party to be legally binding. Each Party acknowledges that in deciding to enter into this Agreement and to consummate the transactions contemplated hereby it has not relied upon any statements, promises or representations, written or oral, express or implied, other than those explicitly set forth in this Agreement. This Agreement supersedes all previous understandings, agreements and representations between the Parties, written or oral, with respect to the subject matter hereof.

L. SURVIVAL. Each Party's incorporated rights and obligations from the Product Development Agreement (as specifically referenced herein) shall survive expiration or termination of the Product Development Agreement and will continue hereunder during the License Term.

M. NO AGENCY. Nothing in this Agreement shall be construed to make the relationship of the Parties herein a joint venture, an association, a partnership, or make the Parties agents of one another. The Parties are not authorized to act as agents of one another as to any matter or to make any representations to any Third Parties indicating or implying the existence of any such agency relationship and the relationship between the Parties shall be that of independent contractors.

N. RIGHTS UPON INSOLVENCY. All rights and licenses to Jointly Owned Inventions, Know-How, NMS Owned Inventions (as applicable) and iNDX Owned Inventions (as applicable) granted under or pursuant to this Agreement by one Party ("Licensor") to the other Party ("Licensee") are, for all purposes of Section 365(n) of Title 11 of the U.S. Code ("Title 11"), licenses of rights to intellectual property as defined in Title 11. Each party agrees during the term of this Agreement to create and maintain current copies or, if not amenable to copying, detailed descriptions or other appropriate embodiments, of all such Jointly Owned Inventions, Know-How, NMS Owned Inventions (as applicable) and iNDX Owned Inventions (as

applicable). If a case is commenced by or against any Party hereto under Title 11, then, unless and until this Agreement is rejected as provided in Title 11, such Party (in any capacity, including debtor-in-possession) and its successors and assigns (including, without limitation, a Title 11 trustee) shall provide to the other Party all such intellectual property (including all embodiments thereof) held by such Party and such successors and assigns, as the other Party may elect in a written request, immediately upon such request. If a Title 11 case is commenced by or against a Party, this Agreement is rejected as provided in Title 11 and the other Party elects to retain its rights hereunder as provided in Title 11, then such Party (in any capacity, including debtor-in-possession) and its successors and assigns (including, without limitation, a Title 11 trustee) shall provide to the other Party all such intellectual property (including all embodiments thereof) held by such Party and such successors and assigns immediately upon the other Party's written request therefor. All rights, powers and remedies of any Party, as a Licensee hereunder, provided herein are in addition to and not in substitution for any and all other rights, powers and remedies now or hereafter existing at law or in equity (including, without limitation, Title 11) in the event of the commencement of a Title 11 case by or against the other Party. Licensee, in addition to the rights, powers and remedies expressly provided herein, shall be entitled to exercise all other such rights and powers and resort to all other such remedies as may now or hereafter exist at law or in equity (including Title 11) in such event.

IN WITNESS WHEREOF, the Parties hereto intending legally to be bound hereby, have each caused this Agreement to be duly executed as of the date first above written.

NMS Labs

By_____
Name:    Pierre G. Cassigneul
Title:    President and CEO


iNDx Lifecare, Inc.

By_____
Name:    Mohan Uttarwar
Title:    CEO

iNDx Technology, Inc. represents and warrants to NMS Labs that the license rights with respect to the iCore Technology granted by iNDx to NMS hereunder are, and shall remain throughout the License Term, fully authorized and permitted by iNDx Technology, Inc. (including without limitation pursuant to that certain Service and Licensing Agreement between iNDx Technology, Inc. and iNDx Lifecare, Inc.).

Solely with respect to the foregoing representation and guaranteeing the license obligations of iNDx hereunder with respect to the iCore Technology:

iNDx Technology, Inc.

By_____
Name:    VIJAY UTTARWAR
Title:    BOD

applicable).  If a case is commenced by or against any Party hereto under Title 11, then, unless and until this Agreement is rejected as provided in Title 11, such Party (in any capacity, including debtor-in-possession) and its successors and assigns (including, without limitation, a Title 11 trustee) shall provide to the other Party all such intellectual property (including all embodiments thereof) held by such Party and such successors and assigns, as the other Party may elect in a written request, immediately upon such request.  If a Title 11 case is commenced by or against a Party, this Agreement is rejected as provided in Title 11 and the other Party elects to retain its rights hereunder as provided in Title 11, then such Party (in any capacity, including debtor-in-possession) and its successors and assigns (including, without limitation, a Title 11 trustee) shall provide to the other Party all such intellectual property (including all embodiments thereof) held by such Party and such successors and assigns immediately upon the other Party's written request therefor.  All rights, powers and remedies of any Party, as a Licensee hereunder, provided herein are in addition to and not in substitution for any and all other rights, powers and remedies now or hereafter existing at law or in equity (including, without limitation, Title 11) in the event of the commencement of a Title 11 case by or against the other Party.  Licensee, in addition to the rights, powers and remedies expressly provided herein, shall be entitled to exercise all other such rights and powers and resort to all other such remedies as may now or hereafter exist at law or in equity (including Title 11) in such event.

IN WITNESS WHEREOF, the Parties hereto intending legally to be bound hereby, have each caused this Agreement to be duly executed as of the date first above written.

NMS Labs

By  *Pierre G. Cassigneul* (signature)
Name:    Pierre G. Cassigneul
Title:    President and CEO


iNDx Lifecare, Inc.


By_____
Name:    Mohan Uttarwar
Title:    CEO

iNDx Technology, Inc. represents and warrants to NMS Labs that the license rights with respect to the iCore Technology granted by iNDx to NMS hereunder are, and shall remain throughout the License Term, fully authorized and permitted by iNDx Technology, Inc. (including without limitation pursuant to that certain Service and Licensing Agreement between iNDx Technology, Inc. and iNDx Lifecare, Inc.).

Solely with respect to the foregoing representation and guaranteeing the license obligations of iNDx hereunder with respect to the iCore Technology:

iNDx Technology, Inc.


By_____
Name:
Title:

# **EXHIBIT C**

PROOF OF CONCEPT

1.      Successful and timely completion of Milestone 0 - $800,000

2.      Successful and timely completion of Milestones 1-5 - $200,000

Note:  Milestones are shown on Exhibit E.

## **EXHIBIT D**

NOTE

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES REPRESENTED HEREBY HAVE BEEN TAKEN BY THE REGISTERED OWNER FOR INVESTMENT, AND WITHOUT A VIEW TO RESALE OR DISTRIBUTION THEREOF, AND MAY NOT BE SOLD, TRANSFERRED OR DISPOSED OF WITHOUT AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH TRANSFER OR DISPOSITION DOES NOT VIOLATE THE SECURITIES ACT OF 1933, AS AMENDED, THE RULES AND REGULATIONS THEREUNDER OR OTHER APPLICABLE SECURITIES LAWS.**

**iNDx Lifecare, Inc.**

**Convertible Note**

$1,000,000        Dated: October __, 2014

FOR VALUE RECEIVED, the undersigned, iNDx Lifecare, Inc., a Delaware corporation ("Maker"), promises to pay to the order of NMS Labs, a Pennsylvania corporation ("Holder"), in immediately available funds at the office of Holder at 3701 Welsh Road, Willow Grove, PA 19090, or at such other location as Holder may designate in writing from time to time, the principal amount of $1,000,000, or as much thereon as has been drawn, together with interest from the date hereof (computed on the basis of a year of 360 days and charged on the number of actual days elapsed) on the outstanding principal balance, to be fixed at a rate equal to 5% per annum, in accordance with the following terms:

1. <u>Terms of Repayment</u>.

(a) The principal amount of this Note shall be due and payable in full on demand by Holder at any time following the Maturity Date (as defined below), at which time all unpaid interest which has accrued on this Note shall also be due and payable. "Maturity Date" means December 31, 2015, provided, however, that, in the event that Maker demonstrates to the Holder's reasonable satisfaction prior to December 31, 2015, that Maker has adequate funds at such time to continue operations and perform its development obligations under the Product Development Agreement dated as of the above date, by and between Maker and Holder (as such agreement may be amended from time to time, the "Product Development Agreement"), for at least twelve months, then "Maturity Date" means December 31, 2016. The Maker shall have no right to prepay the principal amount of this Note, in whole or in part, without Holder's prior consent, <u>provided that</u> in connection with any such prepayment consented to by Holder, Maker shall also pay any accrued but unpaid interest on such prepaid principal amount, and Holder shall deliver to Maker this Note for full or partial cancellation, as applicable.

(b) Interest on the outstanding principal balance of this Note shall accrue at the rate of 5% per annum and shall be due and payable on the Maturity Date.

2.    <u>Expenses of Collection.</u>  The Maker agrees to pay Holder's costs in collecting and enforcing this Note, including attorney's fees.

3.    <u>Use of Proceeds; Restriction on Indebtedness.</u>  The principal amount loaned to Maker hereunder shall be drawn in two tranches of $800,000.00 and $200,000.00 respectively, and shall be used solely by Maker to fund its obligations all as provided in the Product Development Agreement. Maker hereby agrees that until such time that this Note either converts to Financing Securities (as defined below) pursuant to Section 5 hereof or is satisfied by full payment, no third party shall be permitted to lend money to Maker (except on a pari passu basis with Holder) without the prior written consent of Holder.

4.    <u>Security</u>.  The performance of Maker's obligations under this Note is secured pursuant to the terms of a Security Agreement of even date herewith from Maker to Holder (as such may from time to time be amended, the "Security Agreement").

5.    <u>Event of Default.</u>  An Event of Default under this Note means the occurrence of any of the following events (whether the reason for such Event of Default shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body): (i) nonpayment of all principal and interest when and as due under the terms of this Note; (ii) any other breach of the terms of this Note; (iii) any breach by Maker of any representation, warranty, covenant or agreement of Maker contained in this Note, the Security Agreement or the Product Development Agreement; (iv) any breach by Maker of any License Agreement between Maker and Holder; (v) the institution of any proceedings by or against Maker under any law relating to bankruptcy, insolvency, reorganization or other form of debtor relief or Maker's making an assignment for the benefit of creditors, or the appointment of a receiver, trustee, conservator or other judicial representative for Maker or any of its properties; (vi) an event of bankruptcy or insolvency of Maker; (vii) the suspension of the transaction of the usual business of Maker; (viii) the past or future making of a false representation or warranty by Maker in connection with this Note; (ix) the occurrence of an "Event of Default" under (a) the INDX Lifecare, Inc. Security Agreement by Maker to PLC Diagnostics, Inc. ("PLC") dated as of December 27, 2013 (as the same may be amended from time to time the "PLC Security Agreement"), (b) the Secured Convertible Promissory Note in the original principal amount of $3,100,000.00 from Maker to PLC (as amended from time to time the "PLC Note"); or (c) any other agreement between Maker and PLC; or (x) any breach by Maker or PLC of any of either of their obligations under the Intercreditor Agreement even date herewith by and among Maker, Holder and PLC. Upon the occurrence of an Event of Default, the entire principal and accrued interest under this Note shall accelerate and become immediately due and payable (1) automatically upon the occurrence of the events described in clauses (v) and (vi) of this section, and (2) otherwise at the option of Holder (A) five (5) days after written notice of such Event of Default in the case of clause (i) hereof, or (B) ten (10) days after written notice of any other Event of Default hereunder.

6.    <u>Conversion.</u>  Maker contemplates that it will issue and sell to certain third parties certain equity securities (the "Financing Securities") in Maker's next round of equity financing which will provide Maker with gross proceeds of not less than $5,000,000 (the "Transaction"). Upon the closing of the Transaction, all of the principal and interest due on this Note shall

2

automatically be converted into shares of Financing Securities (which shall have the same rights and privileges as those Financing Securities sold to the third parties participating in the Transaction) at a conversion price equal to the price per share at which the Financing Securities are issued less a ten (10%) percent discount (such price subject to adjustment for stock splits, stock dividends and the like) and on the additional terms and conditions applicable generally to the Transaction.

7.    <u>Investment Intent.</u>  Holder, by acceptance hereof, acknowledges that this Note and the equity securities to be issued upon conversion hereof are being acquired solely for Holder's own account and not as a nominee for any other party, and for investment, and that Holder will not offer, sell or otherwise dispose of this Note or any equity securities to be issued upon conversion hereof except under circumstances that will not result in a violation of applicable federal and state securities laws.

8.    <u>Notices.</u>  Any notice to be given hereunder by Maker to Holder or by Holder to Maker shall be in writing and delivered personally, or sent by national overnight delivery service or postage pre-paid registered or certified U.S. mail, and shall be deemed given: when delivered, if by personal delivery or overnight delivery service; or upon if so sent by U.S. mail, three business days after deposit in the mail, and shall be addressed:

> If to NMS, to:
>
>> Pierre G. Cassigneul
>> President and CEO
>> NMS Labs
>> 3701 Welsh Road
>> Willow Grove, PA  19090
>
> If to iNDx to:
>
>> 20380 Town Center Lane, Suite 218
>> Cupertino, CA 95014
>> Attention: Mohan Uttarwar, Chief Executive Officer

or to such other address as any party shall hereafter designate by notice given in accordance with this Section.

Either of Maker or Holder may from time to time change the address to which notices to it are to be mailed hereunder by notice in accordance with the provisions of this Section 8.

3

9. <u>Amendments.</u>

(a) Any term of this Note may be amended with the written consent of Maker and Holder. Any amendment effected in accordance with this Section 9 shall be binding upon Holder, each future holder and Maker.

(b) No waivers of, or exceptions to, any term, condition or provision of this Note, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision.

10. <u>Agreements of Maker.</u> Maker and any other party now or hereafter liable for the payment of this Note in whole or in part, hereby severally (i) waive demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notice, filing of suit and diligence in collecting this Note, (ii) agree to the release of any party primarily or secondarily liable hereon, (iii) agree that Holder shall not be required first to institute suit or exhaust its remedies hereon against Maker or others liable or to become liable hereon or to enforce its rights against them, and (iv) consent to any extension or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice thereof to any of them.

11. <u>Binding Parties.</u> This Note shall bind Maker and its successors and assigns, and the benefits hereof shall inure to the benefit of Holder and its successors and assigns. Maker shall not assign this Note without the prior written consent of Holder. All references herein to "Maker" and "Holder" shall be deemed to apply to Maker and Holder, respectively, and to their respective successors and assigns.

12. <u>Construction.</u> The parties have participated jointly in the negotiation and drafting of this Note. In the event an ambiguity or question of intent or interpretation arises, this Note shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania, without giving effect to conflicts of law provisions.

13. <u>Section Titles.</u> The Section titles in this Note are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Note.

[Signature page follows]

4

WITNESS the due execution hereof on the date first above written with the intention that this Note shall constitute a sealed instrument.

**iNDx Lifecare, Inc.**

By: _____
    Name: MOHAN UTTARWAR
    Title: CEO

5

**EXHIBIT E**

MILESTONES

**Part I - Graphic representation of the relationship for the milestones**



## EXHIBIT E

### Part II – Milestones Timetable

### Project Development Plan (Oct 7 Tue, 2014)

| Task Name | Start | Finish | Duration |
|---|---|---|---|
| **Kopi Project** | **Thu 5/1/14** | **Mon 10/19/15** | **383 days** |
| Six weeks feasibility plan | Thu 5/1/14 | Fri 6/13/14 | 6.4 wks |
| Development project launch | Mon 11/3/14 | Mon 11/3/14 | 0 days |
| **Assay development (M1,M4)** | **Mon 11/3/14** | **Mon 6/29/15** | **171 days** |
| **Group I - three assay development (M1)** | **Mon 11/3/14** | **Fri 12/19/14** | **35 days** |
| Develop and titrate three individual assays | Mon 11/3/14 | Fri 11/21/14 | 3 wks |
| Integrate all three assays on a single chip | Mon 11/24/14 | Fri 12/5/14 | 2 wks |
| Validate with spiked and real samples | Mon 12/8/14 | Fri 12/19/14 | 2 wks |
| **Group II - three assay development (M1)** | **Mon 12/22/14** | **Fri 2/6/15** | **35 days** |
| **Group III - three assay development (M1)** | **Mon 2/9/15** | **Fri 3/27/15** | **35 days** |
| **Group IV - last two assay development (M1)** | **Mon 3/30/15** | **Fri 5/8/15** | **30 days** |
| **Integrate assays on cartridge (M4)** | **Tue 5/5/15** | **Mon 6/29/15** | **40 days** |
| Port all assays on cartridge | Tue 5/5/15 | Mon 6/1/15 | 4 wks |
| Test and validate | Tue 6/2/15 | Mon 6/29/15 | 4 wks |
| Assay validation (Stability, Interferences, carry over) | Tue 6/30/15 | Mon 7/27/15 | 4 wks |
| **NMS LABS to acquire assay development setup (M6)** | Tue 7/28/15 | Mon 8/24/15 | 4 wks |
| **Hardware and Software Development** | **Tue 7/15/14** | **Mon 6/1/15** | **230 days** |
| Product definition | Tue 7/15/14 | Mon 12/29/14 | 6 mons |
| **Chip modification (M3)** | **Tue 11/4/14** | **Mon 3/16/15** | **95 days** |
| Design the 4X8 chip and run optical simulations | Tue 11/4/14 | Mon 11/17/14 | 2 wks |
| Order lithographic masks | Tue 11/18/14 | Mon 11/24/14 | 1 wk |
| First wafer manufacturing batch | Tue 11/25/14 | Mon 12/22/14 | 4 wks |
| Testing of new design | Tue 12/23/14 | Mon 1/12/15 | 3 wks |
| Design modifications | Tue 1/13/15 | Mon 1/19/15 | 1 wk |
| Order lithographic masks | Tue 1/20/15 | Mon 1/26/15 | 1 wk |
| Second wafer manufacturing batch | Tue 1/27/15 | Mon 2/23/15 | 4 wks |
| Testing of new design | Tue 2/24/15 | Mon 3/16/15 | 3 wks |
| **Reader & Software development (M5, M7, M8)** | Tue 11/4/14 | **Mon 6/1/15** | **150 days** |
| **Electronic Board (M5)** | **Tue 11/4/14** | **Mon 3/2/15** | 85 days |
| Specifications | Tue 11/4/14 | Mon 11/10/14 | 1 wk |
| Board design and parts selection | Tue 11/11/14 | Mon 12/8/14 | 4 wks |
| Parts procurement | Tue 12/9/14 | Mon 1/5/15 | 4 wks |
| Integration and testing | Tue 1/6/15 | Mon 2/2/15 | 4 wks |

| | | | |
|---|---|---|---|
| Modifications + integration + testing | Tue 2/3/15 | Mon 3/2/15 | 4 wks |
| **Optical head (M5)** | **Tue 12/9/14** | **Mon 2/23/15** | **55 days** |
| Specifications | Tue 12/9/14 | Mon 12/15/14 | 1 wk |
| Optical design | Tue 12/16/14 | Mon 12/29/14 | 2 wks |
| Parts procurements | Tue 12/30/14 | Mon 1/26/15 | 4 wks |
| Integration and testing | Tue 1/27/15 | Mon 2/23/15 | 4 wks |
| **Software (M7)** | **Tue 12/30/14** | **Mon 4/27/15** | **85 days** |
| **Embedded SW** | **Tue 12/30/14** | **Mon 3/9/15** | **50 days** |
| Specifications | Tue 12/30/14 | Mon 1/5/15 | 1 wk |
| Coding | Tue 1/6/15 | Mon 2/2/15 | 4 wks |
| Integration with HW & testing | Tue 2/3/15 | Mon 2/16/15 | 2 wks |
| Modifications + coding + testing | Tue 2/17/15 | Mon 3/9/15 | 3 wks |
| **User interface** | **Tue 2/17/15** | **Mon 4/27/15** | **50 days** |
| Specifications | Tue 2/17/15 | Mon 2/23/15 | 1 wk |
| Coding | Tue 2/24/15 | Mon 3/16/15 | 3 wks |
| Integration with HW & testing | Tue 3/17/15 | Mon 4/6/15 | 3 wks |
| Modifications + coding + testing | Tue 4/7/15 | Mon 4/27/15 | 3 wks |
| **Mechanics (M5)** | **Tue 12/30/14** | **Mon 4/6/15** | **70 days** |
| Specifications | Tue 12/30/14 | Mon 1/5/15 | 1 wk |
| Design | Tue 1/6/15 | Mon 1/19/15 | 2 wks |
| Parts manufacturing | Tue 1/20/15 | Mon 3/2/15 | 6 wks |
| Integration and testing | Tue 3/3/15 | Mon 4/6/15 | 5 wks |
| **Enclosure (M8)** | **Tue 1/20/15** | **Mon 3/2/15** | **30 days** |
| Industrial design | Tue 1/20/15 | Mon 2/2/15 | 2 wks |
| Manufacturing | Tue 2/3/15 | Mon 2/23/15 | 3 wks |
| Integration | Tue 2/24/15 | Mon 3/2/15 | 1 wk |
| **Product integration and testing (M8)** | **Tue 4/7/15** | **Mon 6/1/15** | **40 days** |
| First iteration | Tue 4/7/15 | Mon 5/4/15 | 4 wks |
| Second iteration | Tue 5/5/15 | Mon 6/1/15 | 4 wks |
| **Cartridge development (M2,M3,M4)** | **Tue 11/4/14** | **Mon 5/11/15** | **135 days** |
| Cartridge definition | Tue 11/4/14 | Mon 12/1/14 | 4 wks |
| Caridge design | Tue 12/2/14 | Mon 1/12/15 | 6 wks |
| Machine cartridge | Tue 1/13/15 | Mon 1/26/15 | 2 wks |
| Cartridge testing | Tue 1/27/15 | Mon 2/9/15 | 2 wks |
| Design modification + machining + testing | Tue 2/10/15 | Mon 3/2/15 | 3 wks |
| Mold design + manufacture | Tue 3/3/15 | Mon 4/6/15 | 5 wks |
| Parts molding | Tue 4/7/15 | Mon 4/13/15 | 1 wk |
| Cartridge testing | Tue 4/14/15 | Mon 5/11/15 | 4 wks |
| **Integration of assays cartridge and reader (M5,M8)** | **Tue 6/30/15** | **Mon 7/27/15** | **20 days** |
| NMS Product validation & field testing (M9) | Tue 7/28/15 | Mon 10/19/15 | 3 mons |

Notes:

- Milestones must be completed by applicable "Finish" date.

- If a Milestone has more than one "Finish Date", all elements of the Milestone must be separately completed by the applicable "Finish" date for the Milestone to be timely completed.

- Milestone Start and Finish dates may be extended by the agreement of both parties.

**EXHIBIT F**

INSURANCE REQUIREMENTS

1.  Commercial General Liability Insurance in an amount not less than $1 million per occurrence/annual aggregate bodily injury/property damage combined; provided that such insurance shall be increased to $1 million per occurrence on or prior to the first commercial sale of Product(s).

2.  Product Liability Insurance in an amount not less than $1 million per occurrence/annual aggregate bodily injury/property damage combined; provided that neither party shall be required to have such insurance in effect until the first commercial sale of Product(s).

3.  All Risk Property Insurance covering the full replacement value of the insured's property.

4.  Workers Compensation Insurance - statutory limits.

# EXHIBIT 2

# ADDENDUM
## TO
## PRODUCT DEVELOPMENT AGREEMENT

**THIS** Addendum (the "Addendum") to the Product Development Agreement, dated on or about October 22, 2014, (the "Product Development Agreement" or "Agreement") is made and entered into as of June 2, 2015 ("Effective Date") by and between NMS Labs, a Pennsylvania corporation, having its principal office at 3701 Welsh Road, Willow Grove, PA 19090 ("NMS"), and iNDx Lifecare, Inc., a Delaware corporation, having its principal office at 104 Cooper Ct., Los Gatos, CA 95032 ("iNDx"). NMS and iNDx are hereinafter sometime referred to collectively as the "Parties" and individually as a "Party." Initially capitalized words not defined in this Addendum shall have the meaning ascribed to them in the Product Development Agreement or the License Agreement, defined below.

**WHEREAS**, the Parties executed the Product Development Agreement under which they are collaborating in the development of small molecule assay Product based upon their respective technologies and expertise with the intent that a range of such products shall be developed and commercially marketed, in part by NMS and in part by iNDx.

**WHEREAS**, the Parties executed the License Agreement, dated on or about October 22, 2014 (the "License Agreement"), in conjunction with the Product Development Agreement, under which they agreed, *inter alia*, to a mutual license of Jointly Owned Inventions, certain licenses granted by iNDx for NMS, certain licenses granted by NMS for iNDx and a Transfer of Knowledge and Know How from iNDx to NMS.

**WHEREAS**, under the original transaction NMS intended to undertake the development of an oral fluid collection system (the "New Device") using, *inter alia*, the transfer of knowledge under the terms and conditions of the Product Development Agreement and the License Agreement.

**WHEREAS**, NMS is now desirous that iNDx develop to the New Device for use under the terms and conditions of this Addendum, the Product Development Agreement, and the License Agreement.

**WHEREAS**, NMS desires iNDx to develop the New Device for use by the Parties under the terms and conditions of this Addendum, the Product Development Agreement and the License Agreement.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants contained herein, it is agreed by and between the Parties as follows:

1.0     The Addendum. The following is added as an Addendum to the Product Development Agreement:

    a.     The New Device.

(i) Notwithstanding Section 3.3.2(v) of the Product Development Agreement, iNDx agrees to develop the New Device in accordance with the technical specifications set forth in Exhibit A, attached hereto and incorporated herein. Except as set forth herein, the New Device will be a Product as such term is defined in the Product Development Agreement. The New Device shall be considered a Jointly Owned Invention as provided for in Section 7.1.2(c) of the Product Development Agreement, except that the cartridge design and oral collection fluid device for the New Device shall also be considered a Jointly Owned Invention. The Parties right to use the New Device in the Field and in the Alternate Field is covered and controlled by the terms and conditions set forth in the Product Development Agreement. Except as set forth herein, licenses for the New Device will be covered and controlled by the terms and conditions set forth in the License Agreement. Royalties on the sale of the New Device shall be covered by the royalties sections of the Product Development Plan and the License Agreement.

(ii) Payment for the Development Cost of modified cartridge. NMS agrees to pay an additional $500,000 in development costs to iNDx for the development of the New Device in accordance with the following payment schedule:

| Anticipated Date | Milestone | Payment** |
|---|---|---|
| February1, 2015 | previously paid | $100,000 |
| March 15, 2015 | design complete | $100,000 |
| April 15, 2015 | machined cartridge | $100,000 |
| July1, 2015 | molded cartridge | $100,000 |
| October 31, 2015 | final testing | $100,000 |
| **Total** | | **$500,000** |

**Payment shall be made on the date that the milestone has been initiated in accordance with the agreed to technical specifications set forth in Exhibit A, attached hereto and incorporated herein, except that (i) no Milestone may be initiated until the prior Milestones have been satisfactorily completed and (ii) for the final payment which shall be due upon satisfactory completion of final testing. Final testing shall be the determination by NMS, after consultation with expected users of the New Device, that the New Device substantially conforms to the technical specifications set forth in Exhibit A. The technical specifications indicate that some final features and details of the New Device are not yet known (for example, whether a preservative will be needed to preserve the secondary oral fluid sample or, the final cost of the New device to NMS). Notwithstanding the "substantially conforms" standard, and any unknowns described in the technical specifications, iNDx agrees to timely deliver the New Device which will

2

function (x) within the current parameters of the technical specifications set forth in Exhibit A, or within revised specifications jointly agreed upon by the parties, and (y) for total development costs not to exceed $500,000. The parties further acknowledge that the "PRD" (Product Requirements Document) referred to in the technical specifications refers to the current technical specifications attached as Exhibit A, or any agreed upon update of the technical specifications, or a newly created, agreed upon, separate PRD in lieu thereof.

(iii) In developing the New Device, the parties agree that the standards of performance and other provisions set forth in Sections 3.4.1, 4.5 and 7.2.2 of the product development agreement shall apply.

(iv) In the event the New Device has not passed all aspects of final testing to the satisfaction of NMS within 10 days after the date for final testing described in subsection (ii) above, the provisions of Sections 13.4.1 - 13.4.3 shall apply whether or not NMS exercises its right to terminate the Agreement, provided however (a) prior to exercising any rights under this subsection (iv), iNDx shall have a period of 90 days to commence diligent and continuous efforts so as to complete the New Device and have it pass final testing, at iNDx sole cost and expense, and NMS' rights under Sections 13.4.1 – 13.4.3 shall only be exercisable at the end of such 90 day period if the New Device has not passed final testing, or sooner if iNDx ceases diligent and continuous efforts as aforesaid, and (b) at the conclusion of such 90 day period, if the New Device has not passed final testing, NMS shall, in addition to any other remedies under the Agreement, or available at law or in equity, is entitled to recover all amounts paid to iNDx for the development of the New Device.

b.  **Acceleration of the $200,000 Investment**. As additional consideration for iNDx to undertake the development of the New Device, NMS agrees to make the $200,000 investment described in Section 5.1 of the Product Development Agreement on April 1, 2015, if iNDx is able to show their assays working on V1.1 in the desk top application.

c.  **New Investment**. As additional consideration for iNDx agreement to undertake the development of the New Device, NMS agrees to invest an additional $500,000 in iNDx on the Effective Date hereof (the "New Investment") pursuant to a convertible senior secured promissory note in the form attached hereto as Exhibit B (the "Second NMS Note"). The Second NMS Note shall be materially the same as the Note issued by iNDx to NMS on or about October 22, 2014 (the "First NMS Note"). The Second NMS Note shall accrue interest at a rate of 5% per annum and the principal and accrued interest thereon shall be automatically convertible into equity securities of iNDx upon the closing of iNDx's next round of equity financing that provides gross proceeds to iNDx of not less than $5.0M (the "Financing Round") and shall have the other right, privileges, terms and conditions of the securities issued in the Financing Round provided that the conversion price of the Note shall be subject to a 10% discount. If the Financing Round does not close prior to March 31, 2016, the principal and accrued interest under the Second NMS Note shall be due upon demand of the holder thereof, unless iNDx demonstrates it has adequate funds at such time to continue

3

operations and perform its development obligations hereunder for at least nine months, in which event the deadline for closing of the Financing Round shall be extended until December 31, 2016. iNDx agrees that until such time that the Second NMS Note either converts to equity securities or is satisfied by payment, no third party shall be permitted to lend money (except on a pari passu basis with NMS) to iNDx without the consent of NMS, and that the Second NMS Note shall be on a pari passu basis (with respect to all material provisions including, without limitation, payment, interest, conversion price, and lien priority) with that (i) certain $3.1M Secured Convertible Promissory Note (the "PLC Note"), dated December 27, 2013 issued by iNDx to PLC Diagnostics ("PLC") and (ii) the First NMS Note. Prior to the payment of any portion of the investment described in this Section 1.d., the Parties and PLC shall execute an amendment to the intercreditor agreement executed on or about Octobe 22, 2014 by the Parties and PLC (the "Intercreditor Agreement"), and Security Agreement between iNDx and NMS dated October 28, 2014 as is reasonably required by NMS to include the Second NMS Note under the Intercreditor Agreement.

     d.    <u>Royalties.</u>    Sections 6.2.1(a)-(d) and Section 13.4.1 of the Product Development Agreement are hereby deleted and in its place the following is substituted:

> "6.2.1    Within thirty (30) days after the end of each calendar quarter commencing with the first commercial sale of Product(s) by NMS for use in the Field or Alternate Field, NMS will pay to iNDx royalties from Net Sales received by NMS world-wide on the sale of Product(s) as follows:
>
> a.  19.75% of the first $5,000,000 of Net Sales, provided however if iNDx does not timely deliver Devices and cartridges as described in Section 3.4.2(ii) above until the period beginning after (i) 18 months after the Effective Date and ending before the end of the initial two year Term of this Agreement, the royalty payable in this Section 6.2.1(a) shall be 14.75% or (ii) 24 months after the Effective Date, the royalty payable in this Section 6.2.1(a) shall be 9.75%;
>
> b.  14.75% of the second $5,000,000 of Net Sales ($5,000,001 - $10,000,000);
>
> c.  9.75% of the third $5,000,000 of Net Sales ($10,000,001 - $15,000,000); and
>
> d.  4.75% of Net Sales in excess of $15,000,000."
>
> "13.4.1  In the event of termination of this Agreement pursuant to Section 13.1.1, if the Product(s) designed for use in the Field are not yet ready for commercial sale, NMS shall have the rights described in Section 13.4.3 below and if such Product(s) are subsequently sold commercially by NMS, iNDx shall be entitled to receive a royalty from NMS in accordance with Section 6.2 hereof except that the royalties payable in

4

Section 6.2.1(a) shall be reduced to an amount equal to one half of the royalty otherwise payable under Section 6.2.1(a)."

2.0     Agreements to Stay in Effect.   Except as augmented or added herein, all other terms of the Product Development Agreement, including the attachments thereto, and the License Agreement, including the attachments thereto, shall remain in full force and effect.

3.0     Effective Date.   This Addendum shall be effective on the Effective Date as defined in the first sentence hereto.

4.0     Counterparts and Facsimile.   This Addendum may be signed electronically or by facsimile and executed in counterparts.

5.0     Miscellaneous Provisions.   Except as otherwise set forth herein, the miscellaneous provisions of the Product Development Agreement and the License Agreement shall be applicable to this Addendum

6.0     Additional Actions.   The Parties hereto agree to execute any and all necessary documents and take any and all necessary actions required to carry out the terms of this Addendum.

7.0     Binding and Inure.   This Addendum shall be binding upon, and inure to the benefit of the Parties hereto and their legal representatives, successors and assigns.

8.0     Entire Agreement.   This Addendum, the Product Development Agreement, the License Agreement and the ancillary agreement associated therewith together embodies and constitutes the entire understanding between the Parties with respect to the transactions contemplated herein. All prior or contemporaneous agreements, understandings, representations, oral or written, are merged into this Amendment.

9.0     Waiver.   Neither this Addendum nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the Party against which the enforcement of such waiver, modification, amendment, discharge or termination is sought and then only to the extent set forth in such instrument.

10.0     Severability.   If one or more provisions of this Addendum are held to be unenforceable under applicable law, such provision shall be excluded from this Amendment and the balance of the Addendum shall be interpreted as if such provision was so excluded and shall be enforceable in accordance with its terms.

11.0     Expenses.   Except as expressly set forth herein, all costs and expenses related to this Addendum and the related transactions, including the fees and expenses of legal counsel, accountants, brokers and other representatives and consultants, shall be borne by the Party incurring such costs and expenses, whether or not such transactions are consummated.

12.0 <u>Amendment</u>. This Addendum shall not be modified or otherwise amended except pursuant to an instrument in writing executed and delivered by each of the Parties hereto.

13.0 <u>Governing Law</u>. This First Agreement, including all exhibits and schedules and all documents or instruments delivered in connection herewith, and all disputes among the parties under this Agreement will be governed by, and construed and enforced in accordance with and decided pursuant to, the laws of the State of California (and in accordance with federal law where applicable), without regard to any jurisdiction's conflicts or choice of law provisions.

15.0 <u>Venue</u>. Except as otherwise provided in this Agreement, any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby shall be brought in the state or federal courts located in the State of California, County of Santa Clara and each of the parties hereto irrevocably submits to the exclusive jurisdiction of each such court in any such action or proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of such action or proceeding shall be heard and determined only in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby in any other court. The parties agree that any party may file a copy of this Section with any court as written evidence of the knowing, voluntary and bargained agreement among the parties irrevocably to waive any objections to venue or to convenience of forum. THE PARTIES HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE TRIAL BY JURY AND THAT ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS SHALL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.

16.0 <u>Inconsistencies</u>. Except for Section 1 above, any inconsistencies between this Addendum and the Product Development Agreement or the License Agreement shall be interpreted so as not to be inconsistent but if they cannot be so interpreted then any such inconsistency shall be resolved in favor of the Agreement or the License Agreement, as applicable, over the Addendum. With respect to any inconsistency between Section 1 in this Addendum and the Product Development Agreement or the License Agreement, the inconsistency shall be resolved in favor of Section 1 of this Addendum over the Product Development Agreement or the License Agreement, as applicable.

[Signature page follows]

IN WITNESS WHEREOF, the Parties hereto intending legally to be bound hereby have each caused this Addendum to be duly executed as of the date first above written.

NMS Labs

By _____
Name: Pierre G. Cassigneul
Title:   President and CEO


iNDx Lifecare, Inc.

By _____
Name: Mohan Uttarwar
Title:   CEO

*[SIGNATURE PAGE ADDENDUM TO PRODUCT DEVELOPMENT AGREEMENT]*

EXHIBIT 3

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE. THE SECURITIES REPRESENTED HEREBY HAVE BEEN TAKEN BY THE REGISTERED OWNER FOR INVESTMENT, AND WITHOUT A VIEW TO RESALE OR DISTRIBUTION THEREOF, AND MAY NOT BE SOLD, TRANSFERRED OR DISPOSED OF WITHOUT AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH TRANSFER OR DISPOSITION DOES NOT VIOLATE THE SECURITIES ACT OF 1933, AS AMENDED, THE RULES AND REGULATIONS THEREUNDER OR OTHER APPLICABLE SECURITIES LAWS.

iNDx Lifecare, Inc. Convertible Promissory Note

$150,000        Dated: December ___, 2015

FOR VALUE RECEIVED, the undersigned, iNDx Lifecare, Inc., a Delaware corporation ("Maker"), promises to pay to the order of NMS Labs, a Pennsylvania corporation ("Holder"), in immediately available funds at the office of Holder at 3701 Welsh Road, Willow Grove, PA 19090, or at such other location as Holder may designate in writing from time to time, the principal amount of $150,000, or as much thereon as has been drawn, together with interest from the date hereof (computed on the basis of a year of 360 days and charged on the number of actual days elapsed) on the outstanding principal balance, to be fixed at a rate equal to five percent (5%) per annum, in accordance with the following terms. Initially capitalized terms not defined herein shall have the meaning ascribed to them in the Addendum or the Product Development Agreement as such terms are defined below.

1.     <u>Terms of Repayment.</u>

(a)     The principal amount of this Note shall be due and payable in full on demand by Holder at any time following the Maturity Date (as defined below), at which time all unpaid interest which has accrued on this Note shall also be due and payable. "<u>Maturity Date</u>" means _____, 2016. The Maker shall have the right to prepay the principal amount of this Note, in whole or in part, without Holder's prior consent, <u>provided that</u> in connection with any such prepayment, Maker shall also pay any accrued but unpaid interest on such prepaid principal amount, and Holder shall deliver to Maker this Note for full or partial cancellation, as applicable.

(b)     Interest on the outstanding principal balance of this Note shall accrue at the rate of five percent (5%) per annum and shall be due and payable on the Maturity Date.

2.     <u>Expenses of Collection.</u> The Maker agrees to pay Holder's costs in collecting and enforcing this Note, including attorney's fees.

3.     <u>Use of Proceeds; Restriction on Indebtedness.</u> The principal amount loaned to Maker hereunder shall be used solely by Maker to fund its obligations all as

1

provided in the Product Development Agreement dated August 1, 2014 (the "Product Development Agreement"), the Addendum to the Product Development Agreement dated June 2, 2015 (the "Addendum"), the License Agreement dated August 1, 2014 (the "License Agreement"), the Security Agreement dated August 1, 2014 (the "Security Agreement"), and as such agreement may be amended from time to time (collectively the "Party Agreements").  Maker hereby agrees that until such time that this Note either converts to Series B Securities (as defined below) pursuant to Section 5 hereof or is satisfied by full payment, no third party shall be permitted to lend money to Maker (except on a pari passu basis with Holder) without the prior written consent of Holder.

     4.    Event of Default.  An Event of Default under this Note means the occurrence of  any of  the following events (whether the  reason for  such Event  of Default shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body): (i) nonpayment of all principal and interest when and as due under the terms of this Note or any other indebtedness of Maker to Holder; (ii) any other breach of the terms of this Note; (iii) any breach by Maker of any representation, warranty, covenant or agreement of Maker contained in this Note or the Party Agreements; (iv) any breach by Maker of the License Agreement between Maker and Holder; (v) the institution of any proceedings by or against Maker under any law relating to bankruptcy, insolvency, reorganization or other form of debtor relief or Maker's making an assignment for the benefit of creditors, or the appointment of a receiver, trustee, conservator or other judicial representative for Maker or any of its properties; (vi) an event of bankruptcy or  insolvency of  Maker; (vii) the  suspension of  the  transaction of  the usual business of Maker; (viii) the past or future making of a false representation or warranty by Maker in connection with this Note; (ix) the occurrence of an "Event of Default" under (a) the INDX Lifecare, Inc. Security Agreement by Maker to PLC Diagnostics, Inc. ("PLC") dated as of December 27, 2013 (as the same may be amended from time to time the "PLC Security Agreement"), (b) the Secured Convertible Promissory Note in the original principal amount of $3,100,000.00 from Maker to PLC (as amended from time to time the "PLC Note"); or (c) the convertible promissory notes between the Maker and the Holder executed respectively on October 29, 2014 and June 2, 2015, or (d) any other agreement between Maker and PLC; or (e) any breach by Maker or PLC of any of either of their obligations under the Intercreditor Agreement dated October 28, 2014 and as amended June 2, 2015 by and among Maker, Holder and PLC. Upon the occurrence of an Event of Default, the entire principal and accrued interest under this Note shall accelerate and become immediately due and payable (1) automatically upon the occurrence of the events described in clauses (v) and (vi) of this section, and (2) otherwise at the option of Holder (A) five (5) days after written notice of such Event of Default in the case of clause (i) hereof, or (B) ten (10) days after written notice of any other Event of Default hereunder.

     5.    Conversion.  Maker contemplates that it will issue and sell to certain third parties certain equity securities (the "Series B Securities") in Maker's next round of

equity financing which will provide Maker with committed gross proceeds of not less than $3,000,000 (the "Series B Financing"). Upon the closing of the Series B Financing, all of the principal and interest due on this Note shall automatically be converted into shares of Series B Securities (which shall have the same rights and privileges as those Series B Securities sold to the third parties participating in the Series B Financing) at a conversion price equal to the price per share at which the Series B Securities are issued less a twenty-five (25%) percent discount (such price subject to adjustment for stock splits, stock dividends and the like) and on the additional terms and conditions applicable generally to the Series B Financing.

6.  Warrant.  The Maker further promises to grant to the Holder a warrant to purchase Series B Securities under the terms of this paragraph (the "Warrant"). The Holder, at its sole discretion, may opt to purchase from Maker shares of Series B Securities (the "Warrant Shares") in the amount of fifty percent (50%) of the face amount of this Note, or $75,000. The Warrant Shares will be offered to the Holder at the original issuance price of Series B Securities (the "Strike Price"). The Warrant shall allow the Holder to purchase the Warrant Shares at any time for a period of five (5) years from the signing of this Note (the "Execution Period"). Maker shall promptly cause the Warrant to be issued, on terms consistent with this section 6, within three (3) business days of the execution of this Note.

7.  Investment Intent.  Holder, by acceptance hereof, acknowledges that this Note and the equity securities to be issued upon conversion hereof are being acquired solely for Holder's own account and not as a nominee for any other party, and for investment, and that Holder will not offer, sell or otherwise dispose of this Note or any equity securities to be issued upon conversion hereof except under circumstances that will not result in a violation of applicable federal and state securities laws.

8.  Notices.  Any notice to be given hereunder by Maker to Holder or by Holder to Maker shall be in writing and delivered personally, or sent by national overnight delivery service or postage pre-paid registered or certified U.S. mail, and shall be deemed given: when delivered, if by personal delivery or overnight delivery service; or upon if so sent by U.S. mail, three business days after deposit in the mail, and shall be addressed:

If to NMS, to:

Pierre G. Cassigneul
President and CEO
NMS Labs
3701 Welsh Road
Willow Grove, PA 19090

3

If to iNDx to:

        20380 Town Center Lane, Suite 218
        Cupertino, CA 95014
        Attention: Mohan Uttarwar, Chief Executive Officer

or to such ·other address as any party shall hereafter designate by notice given in accordance with this Section. Either of Maker or Holder may from time to time change the address to which notices to it are to be mailed hereunder by notice in accordance with the provisions of this Section 8.

9.    <u>Amendments</u>.

    (a)   Any term of this Note may be amended with the written consent of Maker and Holder. Any amendment effected in accordance with this Section 9 shall be binding upon Holder, each future holder and Maker.

    (b)   No waivers of, or exceptions to, any term, condition or provision of this Note, in any one or more instances, shall be deemed to be, or construed as, a further or continuing waiver of any such term, condition or provision.

10.    <u>Agreements of Maker.</u> Maker and any other party now or hereafter liable for the payment of this Note in whole or in part, hereby severally (i) waive demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notice, filing of suit and diligence in collecting this Note, (ii) agree to the release of any party primarily or secondarily liable hereon, (iii) agree that Holder shall not be required first to institute suit or exhaust its remedies hereon against Maker or others liable or to become liable hereon or to enforce its rights against them, and (iv) consent to any extension or postponement of time of payment of this Note and to any other indulgence with respect hereto without notice thereof to any of them.

11.    <u>Binding Parties.</u> This Note shall bind Maker and its successors and assigns, and the benefits hereof shall inure to the benefit of Holder and its successors and assigns. Maker shall not assign this Note without the prior written consent of Holder. All references herein to "Maker" and "Holder" shall be deemed to apply to Maker and Holder, respectively, and to their respective successors and assigns.

12.    <u>Construction.</u> The parties have participated jointly in the negotiation and drafting of this Note. In the event an ambiguity or question of intent or interpretation arises, this Note shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania, without giving effect to conflicts of law provisions.

4

13.    <u>Section Titles.</u>  The Section titles in this Note are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Note

[Signature page follows]

WITNESS the due execution hereof on the date first above written with the intention that this Note shall constitute a sealed instrument.

**iNDx Lifecare, Inc.**

By:_____

Name:___Mohan Uttarwar_____

Title:_CEO_____

*[SIGNATURE PAGE OF CONVERTIBLE PROMISSORY NOTE]*

EXHIBIT  B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NATIONAL MEDICAL SERVICES, INC.,

Plaintiff,

v.

INDX LIFECARE, INC.,

Defendant.

Case No. 16-cv-04425 NC

**REPORT AND RECOMMENDATION TO GRANT DEFAULT JUDGMENT, AND REQUEST FOR REASSIGNMENT**

Re: Dkt. No. 15

Plaintiff National Medical Services, Inc. (NMS) moves for default judgment against defendant iNDx Lifecare, Inc. (iNDx) to recover amounts due on unpaid loans. Dkt. No. 1. NMS alleges three breach of contract claims and one claim of common count under California law. *Id.* Based on iNDx's failure to defend itself from this motion, the Court finds that a default judgment against iNDx is proper for all claims.

The Court RECOMMENDS that NMS is entitled to $444,885.77 in damages, attorneys' fees, and costs. The Court ORDERS this case to be reassigned to a district court judge.

## I.    BACKGROUND

NMS and iNDx entered into a Product Development Agreement (PDA) to jointly develop small molecule testing and assay products on August 1, 2014. Dkt. No. 1 at 2. NMS's contractual duties included providing iNDx with financing. *Id.* at 1; Dkt. No. 1-1 at 9. As detailed in the PDA, iNDx's contractual duties included (1) developing specific

Case No. 16-cv-04425 NC

prototype devices according to a stipulated schedule and (2) complying with reporting provisions. Dkt. No. 1 at 2-3. NMS fulfilled its duties under the PDA. *Id.* at 3.

On October 2, 2014, the parties entered into an addendum to the PDA (Addendum) to jointly develop a new device and provide iNDx with additional financing. *Id.* at 3, 7. NMS fulfilled its duties under the Addendum. *Id.* at 3.

On December 10, 2015, NMS loaned iNDx $150,000 through an unsecured promissory note (Note) with an annual interest rate of 5% on the outstanding principal balance. *Id.* at 3; Dkt. No. 15-1 at 2. There are a number of ways iNDx could default on the Note (Event of Default), including by breaching the terms of the PDA or Addendum. Dkt. No. 1-3 at 3. Repayment of the outstanding principal and accrued interest becomes due within 10 days of written notice of an Event of Default. *Id.* The outstanding principal and interest becomes immediately due upon initiation of bankruptcy proceedings. *Id.*

In January and February of 2016, NMS made Additional Loans to iNDx totaling $250,000 on the same terms as the Note. Dkt. No. 15-1 at 2. NMS disbursed the loan through wire transfers of $150,000 on January 22, 2016, and $100,000 on February 25, 2016. *Id.*

NMS alleges that iNDx failed to perform many of its material obligations under the PDA and Addendum. *Id.* at 6-7. NMS notified iNDx of its failure to perform and of the ensuing Event of Default. *Id.* NMS alleges it incurred costs as a result of iNDx's breach, including an additional $79,000 loan to iNDx. Dkt. No. 7. iNDx has not repaid the Note, the Additional Loans, or the $79,000 loan after iNDx's breach of the PDA and Addendum.[1] *Id.* at 3.

NMS filed this case on August 5, 2016, and served iNDx on August 7, 2016. Dkt. Nos. 1, 7. NMS alleges three claims for relief for breach of contract under the PDA and Addendum, the Note, and the Additional Loans. Dkt. No. 1 at 4-7. NMS alleges a

---

[1] NMS is not seeking remedies based on the initial $1,000,000 financing to iNDx under the PDA or the $500,000 additional financing through the Addendum in this claim for relief. Dkt. No. 1 at 3, 8.

1   common count claim for the Additional Loans.  *Id.* at 7.

2        On August 19, 2016, iNDx filed a Notice of Bankruptcy and a Request for

3   Automatic Stay, which was granted on August 29, 2016.  Dkt. Nos. 9, 10.  On December

4   16, 2016, the bankruptcy court granted iNDx's motion to voluntarily dismiss its Chapter

5   11 case.  Dkt. No. 11-1.  NMS then filed a Notice of Termination of Automatic Stay on

6   December 29, 2016.  Dkt. No. 11.

7        On February 1, 2017, NMS notified iNDx's bankruptcy counsel that NMS would

8   move for default judgment unless an answer was filed.  Dkt. No. 15-2 at 2.  iNDx failed to

9   answer NMS's complaint.  Dkt. No. 15 at 2.  NMS filed a request for an entry of default,

10  which was granted by the Clerk of Court on February 15, 2017.  *Id.*, Dkt. No. 13.  On

11  March 15, 2017, NMS moved for default judgment.  Dkt. No. 15 at 2.

12       NMS consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c);

13  however, iNDx has not participated in this litigation.  Dkt. No. 8.  Thus, not all parties

14  have consented to the jurisdiction of a magistrate judge.

## II.   LEGAL STANDARD

16       Default may be entered against a party who fails to plead or otherwise defend an

17  action and against whom a judgment for affirmative relief is sought.  Fed. R. Civ. P. 55(a).

18  After entry of default, the Court has discretion to grant default judgment on the merits of

19  the case.  Fed. R. Civ. P. 55(b); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  In

20  deciding whether to grant default judgment, the Court considers the following factors:

21  (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive

22  claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5)

23  the possibility of a dispute concerning material facts; (6) whether the default was due to

24  excusable neglect; and (7) the strong policy favoring decisions on the merits.  *Eitel v.*

25  *McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  The factual allegations of the complaint,

26  except those concerning damages, are deemed admitted by the non-responding parties.

27  *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1000 (N.D. Cal. 2001);

28  *see also Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977) ("[t]he general rule

United States District Court
Northern District of California

1  of law is that upon default the factual allegations of the complaint, except those relating to

2  the amount of damages, will be taken as true").

3  **III.  DISCUSSION**

4      **A.  Jurisdiction**

5      In considering whether to enter a default judgment, courts have "an affirmative duty

6  to look into its jurisdiction over both the subject matter and the parties."  *In re Tuli*, 172

7  F.3d 707, 712 (9th Cir. 1999).

8      **1.  Personal Jurisdiction**

9      "[A] State may authorize its courts to exercise personal jurisdiction over an out-of-

10 state defendant if the defendant has 'certain minimum contacts with [the State] such that

11 the maintenance of the suit does not offend traditional notions of fair play and substantial

12 justice.'"  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011)

13 (alteration in original) (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 316

14 (1945)).

15     Here, the PDA and Addendum stipulate that any action for dispute under the

16 agreements must be brought in Santa Clara County state or federal court, and that each

17 party "irrevocably submits to the exclusive jurisdiction" of that court.  Dkt. Nos. 1-1 at 21

18 (PDA), 1-2 at 7 (Addendum).  iNDx is located in California and maintains an office,

19 conducts business, and has agents or employees in Santa Clara County.  Dkt. No. 1 at 2.

20 Further, the PDA and Addendum both stipulate that the agreements are subject to

21 California law and any disputes may be brought in Santa Clara county.  Dkt. Nos. 1-1 at 21

22 (PDA), 1-2 at 7 (Addendum).  Finally, the underlying events that gave rise to the claim

23 arose in Santa Clara County.  Therefore, the Court may exercise personal jurisdiction over

24 iNDx.[2]

25     **2.  Subject Matter Jurisdiction**

26     Federal courts have subject matter jurisdiction over actions between citizens of

27

28 _____

[2] For these same reasons, venue is proper in this Court.

Case No. 16-cv-04425 NC       4

United States District Court
Northern District of California

1   different states where the amount in controversy exceeds $75,000.  28 U.S.C. § 1332(a)(1).

2       iNDx is a Delaware Corporation with its principal place of business in California.[3]

3   Dkt. No. 23 at 3.  NMS is a Pennsylvania Corporation with its principal place of business

4   in Pennsylvania. *Id.* at 1.  Thus, NMS is diverse from iNDx.  28 U.S.C. § 1332(a)(1).

5       NMS claims damages of $400,000 plus accrued interest, $16,797 in attorneys' fees,

6   and $1,306 in costs.  Dkt. Nos. 1 at 8, 21 at 2 (Second Sullivan Decl.).  This claim meets

7   the amount in controversy requirement and the Court has subject matter jurisdiction.  28

8   U.S.C. § 1132(a).

9       **B.  Service**

10      iNDx was properly served with the complaint on August 8, 2016.  Dkt. No. 7.

11  iNDx is neither a minor nor an incompetent person.  Dkt. No. 15-1 at 2.  NMS also

12  emailed iNDx's bankruptcy attorney advance notice of NMS's intent to move for default

13  judgment on February 1, 2017.  Dkt. No. 18 at 2-3.

14      iNDx was served NMS's request for default on February 10, 2017, and with NMS's

15  motion for default judgment on March 14, 2017.  Dkt. Nos. 7, 15-3.  Thus, the Court is

16  satisfied that service was completed.

17      **C.  Default Judgment**

18          **1.  Merits and Sufficiency of the Complaint**

19      The second and third *Eitel* factors examine the substantive merits and the

20  sufficiency of the complaint.  782 F.2d at 1471-72.  Once a defendant enters default, all of

21  the plaintiff's well-pleaded, factual claims are deemed admitted, except with respect to the

22  amount of damages.  *Shanghai Automation*, 194 F. Supp. 2d at 1000.  Conclusions of law

23  or claims that are legally insufficient are not deemed admitted.  *Cripps v. Life Ins. Co. of*

24

25  ─────────────────────
    [3] NMS's original complaint insufficiently alleged iNDx's citizenship by omitting the
26  company's principal place of business.  Dkt. No. 1.  NMS later submitted a declaration
    attesting to iNDx's citizenship at the time of case filing.  Dkt. No. 23.  The Court finds that
27  the supplemented record sufficiently amends the complaint.  28 U.S.C. § 1653; *see Blue
    Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147-48 (9th Cir. 1998) (plaintiff's
28  submission of sworn affidavits certifying the parties' citizenship cured deficient
    jurisdictional claims without formal amendment to the complaint).

United States District Court
Northern District of California

1  *N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).  NMS's motion seeks recovery for three

2  breach of contract claims and one common count claim.  The Court will examine each in

3  turn.

### a. Breach of Contract (Note)

5  Claim 1 alleges a breach of contract under the Note against iNDx.  Dkt. No. 1 at 4.

6  The Note states that it is governed by the laws of the Commonwealth of Pennsylvania.

7  Dkt. No. 1-3 at 5 (Note).  Under Pennsylvania law, the elements of a breach of contract

8  claim are: (1) existence of a contract, (2) a breach of a duty imposed by the contract, and

9  (3) resulting damages.  *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006).

10  Here, NMS alleges that the Note is a contract between NMS and iNDx.  *Lackner*,

11  892 A.2d at 30; Dkt. No. 1 at 4.  Second, NMS alleges that iNDx failed to perform under

12  the terms of the PDA and Addendum, triggering an Event of Default.  *Lackner*, 892 A.2d

13  at 30; Dkt. No. 1 at 4.  Upon an Event of Default, iNDx has a duty to immediately repay

14  the outstanding principal and accrued interest on the Note.  Dkt. No. 1-3 at 3 (Note).  iNDx

15  has not paid the principal or accrued interest, thus breaching its duty.  Dkt. Nos. 1 at 4,

16  15-1 at 2 (Cassigneul Decl.).  Finally, NMS alleges that it has suffered damages in the

17  amount payable under the terms of the Note.  *Lackner*, 892 A.2d at 30; Dkt. No. 1 at 5.

18  Therefore, taking NMS's complaint as true, the Court finds that NMS sufficiently alleged a

19  claim of breach of contract for iNDx's failure to pay the outstanding principal and accrued

20  interest of the Note.[4]

### b. Breach of Contract (Additional Loans)

22  Claim 2 alleges a breach of the contract for the Additional Loans against iNDx.

23  Dkt. No. 1 at 5.  NMS alleges that it loaned $250,000 to iNDx on the same terms as the

24  Note.  *Id.*  Accordingly, the sufficiency and merits of NMS's breach of contract claim

---

26  [4] A California breach of contract claim must further allege that the plaintiff performed
27  under the contract or had an excuse for non-performance.  *See Amelco Elec. v. City of
Thousand Oaks*, 27 Cal. 4th 228, 243 (2002).  NMS alleges it disbursed the loan to iNDx
28  and fully performed under the terms of the Promissory Note.  Thus, NMS states a breach
of contract claim for relief under California law as well.

*United States District Court*
*Northern District of California*

1   should be analyzed under Pennsylvania law, which requires: (1) existence of a contract, (2)

2   a breach of a duty imposed by the contract, and (3) resulting damages.  *Lackner*, 834 A.2d

3   at 30.

4        First, NMS adequately pleads the existence of a contract.  *Id.*  In Pennsylvania, a

5   contract is formed when parties (1) reach a mutual understanding, (2) exchange

6   consideration, and (3) clearly define the terms of their bargain.  *Weavertown Transp.*

7   *Leasing, Inc. v. Moran*, 834 A.2d 1169, 1172 (Pa. Super. 2003).  NMS alleges that for

8   consideration of its $250,000 loan, iNDx "was to repay [the Additional Loans] on the same

9   terms as the Note."  Dkt. No. 15-1 at 2 (Cassigneul Decl.).  Thus, accepting NMS's

10   allegations as true (1) iNDx agreed to (2) accept NMS's loan in exchange for repayment

11   (3) at the terms delineated in the Note.  *Weavertown*, 834 A.2d at 1172; Dkt. No. 15-1 at 2

12   (Cassigneul Decl.).  This demonstrates the existence of a contract. [5]

13        Second, NMS alleges iNDx had a duty to repay loan principal and interest upon an

14   Event of Default.  *Lackner*, 892 A.2d at 30; Dkt. No. 1 at 5.  iNDx allegedly has not repaid

15   any of the outstanding balance, thereby breaching its duty.  Dkt. No. 1 at 5.

16        Finally, NMS alleges it incurred damages from iNDx's failure to perform and non-

17   repayment of the loan principal and interest.  *Lackner*, 892 A.2d at 30; Dkt. No. 1 at 5.

18   Thus, the Court finds that NMS sufficiently alleged its breach of contract claim for iNDx's

19   failure to repay the Additional Loans. [6]

20        NMS has not alleged the existence of a written document.  In considering the merits

21   of NMS's claims, courts look to the validity of the statute of frauds as an affirmative

22   defense to enforcement of the contract.  *Martino v. Chapman*, No. 06-cv-02407 PCT, 2008

23   WL 110948, at *2 (D. Ariz. Jan. 8, 2008), *aff'd*, 370 F. App'x 828 (9th Cir. 2010).  The

24

25   [5] "California law requires four elements to form a valid contract: (1) parties capable of
    contracting; (2) their mutual consent; (3) a lawful object; and (4) sufficient consideration."
26   *Regents of Univ. of California v. Principal Fin. Grp.*, 412 F. Supp. 2d 1037, 1042 (N.D.
    Cal. 2006);  Cal. Civ. Code § 1550.  NMS has adequately pleaded the existence of a
27   contract under California law as well.
    [6] NMS alleged it fully complied with the terms of the Additional Loans, successfully
28   stating a breach of contract claim under California law as well.  *Amelco Elec.*, 27 Cal. 4th
    at 243.

United States District Court
Northern District of California

1  Court applies the Pennsylvania statute of frauds as the terms stipulate that the contract is

2  governed by Pennsylvania law and NMS did not specify where the contract was created.

3  This contract is not subject to the statute of frauds under Pennsylvania law.  *See* 33 Pa.

4  Stat. Ann. § 1-5 (the statute of frauds applies to leases or interests in land, declarations or

5  creations of trusts, promises to answer for the debts of another, and acceptances of a bill of

6  exchange).[7]

7  ### c.  Breach of Contract (PDA and Addendum)

8  Claim 3 alleges a breach of contract claim under the PDA and Addendum.  Dkt. No.

9  1 at 4.  The contracts stipulate they are to be governed by California law.  Dkt. Nos. 1-1 at

10  21 (PDA), 1-2 at 7 (Addendum).  In California, to state a breach of contract claim, "the

11  plaintiff must demonstrate a contract, the plaintiff's performance or excuse for

12  nonperformance, the defendant's breach, and damage to the plaintiff."  *Amelco Elec. v.*

13  *City of Thousand Oaks*, 27 Cal. 4th 228, 243 (2002).

14  Here, NMS alleges it entered into written contracts with iNDx under the terms of

15  the PDA and Addendum.  *Amelco*, 27 Cal. 4th at 243; Dkt. No. 1 at 5-6.  Second, NMS

16  alleges it performed under the terms of both contracts.  *Amelco*, 27 Cal. 4th at 243; Dkt.

17  No. 1 at 6.  Third, NMS alleges that iNDx breached its duty to perform many of its

18  obligations under the PDA, including failing to deliver fully functional Initial Devices

19  required by § 3.4.2(ii); spending NMS-provided funds on uses not related to the

20  development of products in violation of the PDA; and allowing its financial condition to

21  deteriorate such that NMS was required to pay iNDx's obligations to avoid further

22  damaging product development efforts.  *Amelco*, 27 Cal. 4th at 243; Dkt. No. 1 at 6-7.

23  NMS alleges that iNDx failed to perform its obligations under the Addendum by failing to

24  deliver a functional New Device and by failing to comply with the reporting requirements.

25  *Amelco*, 27 Cal. 4th at 243; Dkt. No. 1 at 7.  Finally, NMS alleges it has suffered a loss of

26

27  [7] In California, contracts to loan more than $100,000 for business purposes by a lender
   engaged in the business of lending must be reduced to writing.  Cal. Civ. Code § 1624.

28  However, NMS is not engaged in the business of lending, so the contract is also not subject
   to the statute of frauds in California.

United States District Court
Northern District of California

$79,000 from an unrepaid loan to iNDx as a result of iNDx's breach. *Amelco*, 27 Cal. 4th at 243; Dkt. No. 1 at 7. Thus, taking NMS's complaint as true, the Court finds NMS successfully alleged claims of breach of contract under the PDA and Addendum.

### d. Common Count (Additional Loans)

Claim 4 alleges a claim of common count for money had and received against iNDx. Dkt. No. 1 at 7. In California, the elements of a claim of common count are: (1) a statement of indebtedness of a certain sum, (2) consideration, and (3) non-payment of the debt. *Farmers Ins. Exchange v. Zerin*, 53 Cal. App. 4th 445, 460 (1997).

Here, NMS alleges it loaned iNDx a total of $250,000 in January and February 2016. Dkt. Nos. 1 at 7, 15-1 at 2 (Cassigneul Decl.). Second, in consideration of its loan, iNDx promised to pay back the principal with interest on the same terms as the Note. *Farmers*, 53 Cal. App. 4th at 460; Dkt. Nos. 1 at 7, 15-1 at 2 (Cassigneul Decl.). Finally, iNDx has not paid back any amount of the loan. *Farmers*, 53 Cal. App. 4th at 460; Dkt. Nos. 1 at 7, 15-1 at 2 (Cassigneul Decl.). Taking NMS's allegations as true, NMS successfully pleaded its claim for common count.

### 2. Other Factors

The Court must also address the possibility of prejudice to the Plaintiff if a default is not entered, the amount of money at stake, the possibility that material facts may be in dispute, the possibility of excusable neglect, and the policy for deciding cases on the merits. *Eitel*, 782 F.2d at 1471-72.

First, if default judgment is not entered, NMS will have no remedy for iNDx's alleged breaches of contract or the common count claim. This would prejudice NMS, and weighs toward granting a default judgment.

Second, "[i]f the sum of money at issue is reasonably proportionate to the harm caused by the defendant's actions, then default judgment is warranted." *Walters v. Statewide Concrete Barrier, Inc.*, No. 04-cv-02259 JSW, 2006 WL 2527776, at *4 (N.D. Cal. Aug. 30, 2006). Here, NMS's first, second, and fourth claims seek relief equaling the outstanding principal of loans iNDx has not repaid plus accrued interest at the agreed-upon

Case No. 16-cv-04425 NC                    9

United States District Court
Northern District of California

1    rate.  *See generally* Dkt. No. 1.  NMS's third claim seeks to recover the amount NMS

2    loaned iNDx to mitigate damage from the latter's breach of the PDA and Addendum.  Dkt.

3    No. 1 at 5-7.  These damages are consistent with the harm caused by iNDx's alleged

4    failure to repay the loan amounts.  This factor supports granting default judgment.

5        Third, the Court considers the possibility of a dispute of material facts.  *Eitel*, 782

6    F.2d at 1471-2.  Here, there is a possibility of a dispute of material facts.

7        Fourth, the Court considers the possibility of the defendant's excusable neglect.  *Id.*

8    at 1472.  iNDx was served notice of the initial complaint on August 8, 2016.  Dkt. No. 7.

9    In its Chapter 11 filings, iNDx also listed this case, by number and other identifying

10   information, on its Statement of Financial Affairs.  Dkt. No. 18-1 at 10 (Sullivan Amended

11   Decl., Exh. B).  Further, NMS's counsel notified iNDx's bankruptcy attorney via a phone

12   call and followed up via email advising of NMS's intent to file for default.  Dkt. No. 15-1

13   at 2 (Sullivan Decl.).  The Court finds that iNDx's default is unlikely due to excusable

14   neglect.

15       Finally, the Court must resolve cases on the merits whenever reasonably possible.

16   *Eitel*, 782 F.2d at 1472.  However, the Court may enter a default judgment when a

17   defendant fails to defend an action.  *PepsiCo. Inc. v. Cal. Security Cans*, 238 F. Supp. 2d

18   1172, 1177 (C.D. Cal. 2002); Fed. R. Civ. P. 55(b).  Here, iNDx has not responded to

19   NMS's claims.  Dkt. No. 18 at 8-9.  Thus, the Court is not precluded from entering a

20   default judgment.

21       Considering all the *Eitel* factors, the Court finds that an entry of default judgment

22   against iNDx would be proper.

23   **D.  Damages**

24       NMS requests damages resulting from the breach of the Note, the PDA and

25   Addendum, and the Additional Loans.  "[A]t the default judgment stage, a plaintiff need

26   only provide admissible evidence as to damages, which includes witness testimony."

27   *NewGen, LLC v. Safe Cig, LLC*, No. 12-cv-09112 RGK, 2013 WL 12124081, at *5 (C.D.

28   Cal. May 10, 2013), *aff'd*, 840 F.3d 606 (9th Cir. 2016) (holding that damages from

United States District Court
Northern District of California

United States District Court
Northern District of California

1  default judgment on a breach of contract claim supported only by plaintiff's testimony was

2  not "clearly erroneous"); *see Bd. of Trustees of the Boilermaker Vacation Trust v. Skelly,*

3  *Inc.*, 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005) ("Plaintiff has the burden of proving

4  damages though testimony or written affidavit").

5      For the first breach of contract claim under the Note, NMS claims it is entitled to

6  $150,000 in outstanding principal plus accrued interest.[8]  Dkt. No. 1 at 5.  NMS submitted

7  the executed Note contract supporting both principal loan amount and the corresponding

8  rate of interest.  Dkt. No. 1-3 at 2 (Note).  NMS also submitted a written declaration

9  asserting that iNDx has not paid any amount due under the Note.  Dkt. No. 15-1 at 2

10  (Sullivan Decl.).  Accordingly, the Court finds that NMS is entitled to damages for breach

11  of the Note amounting to $150,000 in principal and $11,458.33[9] in accrued interest as of

12  June 12, 2017, for a total of $161,458.33.  *NewGen*, 2013 WL 12124081 at *5.

13      Second, NMS claims that iNDx owes $250,000 in principal plus accrued interest for

14  the Additional Loans.[10]  Dkt. No. 1 at 5.  In support of its claim, NMS submitted a written

15  declaration asserting the existence of the loans, the interest rate, and the fact that iNDx has

16  not repaid the loans.  Dkt. No. 15-1 at 2 (Sullivan Decl.).  Accordingly, the Court finds that

17  NMS is entitled to damages for breach of the Additional Loans amounting to $250,000 in

18  principal and $17,131.94 in accrued interest[11] as of June 12, 2017, for a total of

19  $267,131.94.  *NewGen*, 2013 WL 12124081 at *5.

20      Third, NMS claims it provided an additional loan of $79,000 to iNDx to mitigate

21  the effect of iNDx's breach of the PDA and Addendum.  Dkt. No. 1 at 7.  NMS has not

22  offered testimony or documentation to support its assertion of damages for this claim.

23  Thus, NMS has not met its burden to "prove up all damages sought in the complaint."

24

---

25  [8] Interest accrues at a rate of 5.0% per 360-day year.  Dkt. No. 1-3 at 2 (Note). The loan
   was disbursed on December 10, 2015.  Dkt. No. 1 at 3.

26  [9] Note interest of $11,458.33 = $150,000 * 5% * (550 days / 360 days per year)
   [10] The Additional Loans consist of two wire transfers: $150,000 sent on January 22, 2016,

27  and $100,000 sent on February 25, 2016.  Dkt. No. 1 at 3.
   [11] January Additional Loan interest totals $10,562.50 = $150,000 * 5% * (507 days / 360

28  days per year); February Additional Loan interest totals $6,569.44 = $100,000 * 5% * (473
   days / 360 days per year).

1  *PepsiCo,* 238 F. Supp. 2d at 1175; *see also NewGen* 2013 WL 12124081 at \*5, *Bd. of*

2  *Trustees* 389 F. Supp. 2d at 1226.  The Court finds that NMS is not entitled to damages for

3  its third breach of contract claim.

4       Fourth, NMS's request for damages under the common count claim resulting from

5  non-payment of the Additional Loans is denied because recovery for these loans in the

6  amount of $267,131.94 was already granted under NMS's second breach of contract claim.

7       In total, the Court RECOMMENDS the district court find NMS entitled to

8  $428,590.27 in damages.

9       **E.  Attorney Fees and Costs**

10      NMS also seeks to recover attorneys' fees of $16,797 and costs of $1,306.  Dkt. No.

11  21 at 2 (Second Sullivan Decl.).  "A federal court sitting in diversity applies the law of the

12  forum state regarding an award of attorneys' fees."  *Kona Enterprises, Inc. v. Estate of*

13  *Bishop*, 229 F.3d 877, 883 (9th Cir. 2000).  In California, the prevailing party of a contract

14  claim is entitled to reasonable attorneys' fees and costs if the contract provides for such an

15  award.  Cal. Civ. Code § 1717.  Here, the Note stipulates that "[t]he Maker [iNDx] agrees

16  to pay Holder's [NMS's] costs in collecting and enforcing this Note, including attorney's

17  fees.". Dkt No. 1-3 at 2 (Note).  Thus, NMS is entitled to reasonable attorneys' fees and

18  costs.

19      The Court calculates fees by multiplying the  reasonable hourly rate for attorneys in

20  the "relevant legal community" with "comparable skill, experience, and reputation" by the

21  reasonable hours spent on the litigation.  *Cotton v. City of Eureka*, *Cal.* 889 F. Supp. 2d

22  1154, 1161 (N.D. Cal. 2012) (internal citation omitted).  "Generally, when determining a

23  reasonable hourly rate, the relevant community is the forum in which the district court

24  sits."  *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  "[T]he burden

25  is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in

26  line with those prevailing in the community for similar services by lawyers of reasonably

27  comparable skill, experience and reputation."  *Blum v. Stenson*, 465 U.S. 886, 896 n.11

28  (1984).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    NMS's motion for default judgment included a request for, but no accounting of,

2    attorneys' fees and costs.  The Court issued an order to provide attorneys' fees

3    information.  Dkt. No. 20.  NMS complied with the Court's request with the declaration of

4    attorney Christopher Sullivan, but submitted insufficient information for the Court to

5    determine the reasonableness of his hourly rate.  Dkt. No. 21 (Second Sullivan Decl.).

6    NMS provided no additional information regarding his practice area of expertise, years of

7    experience as an attorney, or what constitutes a reasonable rate in the community.

8        The Court may rely on its own familiarity with the legal market to determine the

9    reasonableness of fees.  *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).  NMS

10   requests fees for Sullivan, a partner who bills between $625 and $640 per hour, Roxanne

11   Bahadurji, an associate who bills $320 per hour, and Renee Sevilla and Michaela

12   O'Rourke, two paralegals who bill between $140 and $145 per hour.  Dkt. No. 21 at 3-4

13   (Second Sullivan Decl.).  Sullivan has been a partner since 2014 and was admitted to the

14   California Bar in 1990.[12]  *Id.* at 2.  Based the Court's research and experience, the Court

15   finds that the rates for the associate and paralegals are reasonable.  *See US Foods, Inc. v.*

16   *Lalla Holding Corp.*, No. 13-cv-02328 HRL, 2014 WL 4809073, at *2 (N.D. Cal. Sep. 25,

17   2014), *report and recommendation adopted sub nom.*, No. 13-cv-02328 BLF, 2014 WL

18   5281058 (N.D. Cal. Oct. 15, 2014) (holding that $450 per hour is reasonable for a Bay

19   Area attorney experienced in litigation matters in a default judgment case on a breach of

20   contract claim).  The Court was unable to find awards of damages to support the requested

21   hourly rate of Sullivan, and based on the information provided finds that $500 per hour

22   constitutes a reasonable rate.

23       NMS documented a total of 34.9 attorney hours and 9 paralegal hours related to the

24   initial claim, the request for entry of default, the motion for default judgment, and the

25   supplemental brief in support of default judgment.  The Court finds these hours supported

26   by itemized billing statements reasonable in light of the work performed.   The Court

27

28   [12] The State Bar of California, *Attorney Search*,
     http://members.calbar.ca.gov/fal/Member/Detail/148083 (last accessed May 26, 2017).

United States District Court
Northern District of California

further finds that NMS's stated costs of $1,306 are reasonable. Accordingly, the Court awards NMS $14,989.50 in attorneys' fees[13] plus costs of $1,306 for a total of $16,295.50.

## IV.   CONCLUSION

The Court ORDERS that this case be reassigned to a district court judge because not all parties have consented to magistrate judge jurisdiction.  28 U.S.C. § 636(c).

After considering the *Eitel* factors, the Court RECOMMENDS that the district court GRANT NMS's motion for default judgment against iNDx and award:

1.   Damages on the breach of contract claim for the Note totaling $161,458.33 in principal and accrued interest as of June 12, 2017.

2.   Damages on the breach of contract claim for the Additional Loans totaling $267,131.94 in principal and accrued interest as of June 12, 2017.

3.   Attorneys' fees and costs of $16,295.50.

4.   In total, the Court recommends the district court award NMS $444,885.77 in damages, attorneys' fees, and costs.

Any party may object to this recommendation, but must do so within 14 days of being served.  Fed. R. Civ. P. 72(b).


**IT IS SO ORDERED.**


Dated:  June 12, 2017                        _____

NATHANAEL M. COUSINS
United States Magistrate Judge

---

[13] 14.1 partner hours at $500 per hour totaling $7,050; 20.8 associate hours at $320 per hour totaling $6,656; 4.3 paralegal hours at $140 per hour totaling $602; and 4.7 paralegal hours at $145 per hour totaling $681.50.

EXHIBIT  C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

NATIONAL MEDICAL SERVICES, INC.,

Plaintiff,

v.

iNDx LIFECARE, INC.,

Defendant.

Case No.  5:16-cv-04425-EJD

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND GRANTING THE MOTION FOR DEFAULT JUDGMENT**

Re: Dkt. Nos. 15, 24

On August 5, 2016, National Medical Services, Inc. ("NMS") filed this action against iNDx Lifecare, Inc. to recover amounts due on unpaid loans. The case was stayed on August 29, 2016 for bankruptcy proceedings (Dkt. No. 10) and then reopened on December 29, 2016 (Dkt. No. 11). NMS moved for entry of default on February 10, 2017 (Dkt. No. 12), the Clerk entered default on February 15 (Dkt. No. 13), and NMS moved for default judgment on March 15. Dkt. No. 15.

Before the Court is Magistrate Judge Nathanael M. Cousins's Report and Recommendation to Grant Default Judgment, which recommends an award of $444,885.77 in damages, attorneys' fees, and costs. Dkt. No. 24. The time for objecting to the Report and Recommendation has passed and no objections were filed. Fed. R. Civ. P. 72(b)(2). The Court finds that the Report and Recommendation is thorough and well-founded in fact and law, and adopts it in every respect. NMS's motion for default judgment is GRANTED. Judgment will be entered accordingly, and the Clerk shall then close this file.

**IT IS SO ORDERED.**

Dated: July 10, 2017

_____

EDWARD J. DAVILA
United States District Judge

Case No.: 5:16-cv-04425-EJD
ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND
GRANTING THE MOTION FOR DEFAULT JUDGMENT

United States District Court
Northern District of California