1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUROSEMILLAS, S.A.,

Plaintiff,

v.

PLC DIAGNOSTICS INC., et al.,

Defendants.

Case No.  17-cv-03159-TSH

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 106

## I.    INTRODUCTION

Pending before the Court is a motion for summary judgment filed by Defendants PLC Diagnostics, Inc. ("PLC") and National Medical Services, Inc. ("NMS").  ECF No. 106.  Plaintiff Eurosemillas, S.A. ("Eurosemillas") filed an opposition (ECF No. 123), Defendants filed a reply (ECF No. 125), and the Court held a hearing on February 7, 2019.  Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **GRANTS** Defendants' motion for the following reasons.

## II.    BACKGROUND

### A.    Joint Venture

PLC entered into a joint venture with iNDx Technology, Inc., to form the entity iNDx

Lifecare, Inc. ("iNDx").  Separate Statement of Disputed Material Facts in Support of

Eurosemillas, S.A.'s Opposition to the Motion for Summary Judgment ("Eurosemillas Statement")

¶ 2, ECF No. 123-6.  Under the joint venture agreement, PLC transferred to iNDx all of its

ownership rights in its patents and related intellectual property in exchange for a $3,100,000

secured convertible promissory note dated December 27, 2013.  *Id*. ¶ 4.  The PLC note was

secured by all of iNDx's assets.  *Id*. ¶ 5.  The inventor of the patented technology that is the

subject of the joint venture is Defendant Reuven Duer, who was the President, Chief Science

Officer, and a member of PLC's Board of Directors from March 2007 to March 2017.  Duer

negotiated the joint venture agreement and became iNDx's Chief Science Officer after iNDx was

formed.  *Id*. ¶ 7; Declaration of Reuven Duer ("Duer Decl.") ¶¶ 4, 5, 7, ECF No. 117.

NMS entered into a product development agreement with iNDx dated August 1, 2014.

Eurosemillas Statement ¶ 8.  Pierre Cassigneul is the President and CEO of NMS.  *Id*. ¶ 10;

Declaration of Pierre Cassigneul ("Cassigneul Decl.") ¶ 3, ECF No. 107.  Defendant Eric Rieders

is the Chairman of NMS's Board of Directors.  Eurosemillas Statement ¶ 11.  In connection with

the NMS product development agreement, NMS loaned iNDx $1 million in October 2014.  *Id*. ¶

12.  iNDx granted NMS a security interest in the same collateral that secured the PLC loan.  *Id*. ¶

13.

iNDx, PLC, and NMS signed an Intercreditor Agreement dated October 28, 2014 (the

"Original Intercreditor Agreement").  *Id*. ¶ 15.  In that agreement, iNDx, PLC, and NMS agreed

that NMS's lien on the collateral would have equal priority with PLC's lien.  *Id*. ¶ 15.

iNDx was constantly short of money, and NMS agreed to loan an additional $500,000 to it

on a secured basis in the spring of 2015.  *Id*. ¶ 26.  In light of this new loan, NMS, PLC and iNDx

entered into a June 2, 2015 first amendment to the Original Intercreditor Agreement between

them.  The agreement gave the NMS lien on the new loan the same priority as PLC's lien.  *Id*. ¶

28; Declaration of Douglas Coopersmith ("Coopersmith Decl.") ¶ 5, ECF No. 109; Cassigneul

Decl, ¶¶ 9-10 & Ex. B.

**B.      Eurosemillas**

Eurosemillas is a Spanish company based in Cordoba, Spain.  Javier Cano is the Director

of Business Development for Eurosemillas. Eurosemillas Statement ¶ 17.

In August 2013, Mohan Uttarwar, iNDx's CEO, began discussions about a possible investment by Eurosemillas in iNDx with Cano, his long-time friend. *Id.* ¶ 91. Cano asserts that Uttarwar told him that Duer had represented to Uttarwar that PLC's technology had passed the sample tests in the Prostate Specific Antigen (PSA) test kit that Uttarwar had sent to PLC, in a commercially reasonable manner (i.e. without tuning and adjusting the system for each sample). Declaration of Javier Cano ("Cano Decl."), ¶ 3, ECF No. 123-1.[1] Cano sent Ricardo Merino, a consultant and advisor of Eurosemillas, to meet the iNDx team in California and find out more about the company and its technology. On December 9, 2013, at a meeting held at PLC's office in Chatsworth, California, Duer represented to Merino the state of the PLC technology and assured him that the technology would be ready for market in six months. *Id.* ¶ 4.[2]

Eurosemillas decided to provide $200,000 in financing and joined iNDx's Series A financing round in the spring of 2014. *Id.* ¶ 5. In July of 2014, Uttarwar informed Cano that PLC's exciting technology had attracted the attention of NMS, which had decided to become a strategic partner. *Id.* ¶ 6. In a meeting on October 21, 2014, Duer stated that the PLC technology would be delivered in Q1 2015. *Id.* ¶ 7. Duer further assured Cano that if Eurosemillas loaned money to iNDx, the company's two existing secured creditors (PLC and NMS) would enter into an intercreditor agreement that would grant Eurosemillas *pari passu* rights to the collateral. *Id.* Based on Duer's representations made during the October 21, 2014 meeting, Cano persuaded Eurosemillas's Board of Directors to approve a $250,000 loan to iNDx. *Id.* ¶ 8.

By November 6, 2014, Eurosemillas loaned $250,000 to iNDx via a wire transfer. Eurosemillas Statement ¶ 20. The Eurosemillas loan was secured by the same collateral as the PLC and NMS loans. *Id.* ¶ 21.

---

[1] Uttarwar asserts that he learned in the fall of 2015 that the PSA test had been rigged. Declaration of Mohan Uttarwar ("Uttarwar Decl."), ¶ 43, ECF No. 123-2.
[2] Cano states that he learned that Duer had misrepresented the state of the PLC technology in a phone call in Febraury 2016 in which Rieders informed the iNDx board that the technology would not be ready to go to market until 2018. Cano Decl., ¶ 8.a.

**C.** **Negotiations About a Three-Way Intercreditor Agreement**

On June 29, 2015, iNDx's Uttarwar emailed NMS's Cassigneul. Cassigneul Decl., Ex. C. His email stated in part that "we [iNDx] had taken an additional convertible note for $250k from one of our angel investors in Europe. [T]his was done late last year and the amount was earmarked for European expansion. [W]e are preparing all the documentation & getting ready for series B. [A]ttached is a signature page for you." *Id*. However, nothing was attached. Cassigneul responded, "Can you please provide Doug [Coopersmith, NMS's outside counsel] and myself with the entire agreement that you would like me to sign?" *Id*. Uttarwar replied all and added Kapil Bhatnagar to the thread, asking him to send "the agreement" to Cassigneul and Coopersmith, which he did. Cassigneul Decl., Ex. D.

The attachment to the response is the document at the heart of Eurosemillas's breach of contract claim because Eurosemillas contends it is the intercreditor agreement that NMS, PLC, Eurosemillas and iNDx agreed to. *See* Eurosemillas's opposition brief, ECF No. 123, at 7. The document is dated October 22, 2014 and entitled "Intercreditor Agreement." *Id*. It states that all security interests held by PLC or NMS have the same priority and are *pari passu* to Eurosemillas's security interests. *Id*. (¶ 1 of agreement). It was signed by Eurosemillas, PLC and iNDx, but not NMS. *See id*. (last page).

On August 4, 2014 NMS's Cassigneul responded to Uttarwar, copying his attorney Coopersmith. He stated:

> Our attorney sees several points that need to be amended in[] the SpanCo[3] document. They are:
>
> 1 The Intercreditor Agreement is written as if there are two creditors, not three. This must be fixed in numerous places[.]
>
> 2. The Intercreditor Agreement does not recite that there are two NMS loans, one for $1.0m and one for $500,000, bearing different dates (6/2/2015 is the date for the second Note).
>
> 3 The Intercreditor Agreement must recognize the existence of the prior Intercreditor Agreement between NMS and PLC and its Amendment. The best way to fix this is to recite that and then have this new agreement supercede the prior two.

---

[3] SpanCo is a referece to Eurosemillas. *See* Cassigneul Decl., Ex. D (preface of the intercreditor agreement).

He can do this work but I don't think that NMS should pay for it, or your attorney can do that work.

Let me know your decision **but these changes are necessary for our signature**.

Cassigneul Decl., Ex. E (emphasis added).

On the same day, Uttarwar replied, "I agree with your recommendations." Coopersmith Decl., Ex. A. He copied his attorney on the response and asked him to "please do the needful asap." *Id*. On August 7, 2015 that attorney circulated a revised document. His cover email stated, "All: I have made the changes to the intercreditor agreement recommended by Doug [Coopersmith]. It now reflects three creditors. It now supercedes the prior intercreditor agreement as amended. It now shows the two notes from [NMS]." *Id*. He then asked, "Doug, could you review? I attach a redlined and clean copy." *Id*. "All: once Doug has reviewed and signed off on it, it will have to be resigned by Reuven for PLC, [Uttarwar] for iNDx, and [Cano] for Eurosemillas, and signed by [Cassigneul] for NMS." *Id*. The document that is attached to that email is a three-way intercreditor agreement dated "January __, 2015." *Id*. (On summary judgment, it is undisputed that this intercreditor agreement dated January __, 2015 was not agreed to by the parties. Eurosemillas Statement ¶ 49.)

On August 10, 2015 Coopersmith responded by email. He stated:

This looks fine with the following comments:

1 We had asked for copies of the executed SpanCo Note and Security Agreement. I do not believe I have seen them delivered. Could you please get them for me?

2 The Attached is dated January, 2015. Why this date? When was the SpanCo loan made?

Coopersmith Decl., Ex. B.

iNDx's attorney responded on August 12, 2015 that he was "having some difficulty tying down the date of the loan." *Id*. Coopersmith replied that "[t]he date, as you estimate it, is not a big issue. I am more concerned that the terms of the note and security agreement are as they should be." *Id*. Later that day iNDx's attorney forwarded the note and the security agreement. *Id*.

Coopersmith responded further on August 25, 2015. Coopersmith Decl., Ex. C. He stated

that NMS had "[j]ust three comments" on the revised intercreditor agreement:

> 1. In the Security Agreement, the Recital mentions a "strategic Agreement" between SpanCo and iNDx. Could you please provide us with a copy of that agreement?
>
> 2 In the Security Agreement, Section 1 references the NMS Security Agreement dated November 15, 2014. You need also to reference the Amendment to that Security Agreement dated June 2, 2015.
>
> 3 In the Note, we would like iNDx to have the right to extend the Maturity Date beyond March 31, 2016 under the same terms and conditions it can extend under the NMS notes. We do not want NMS extended and SpanCo paid off.

*Id.*

By September 2015, negotiations with a prospective investor had broken down, leaving iNDx critically short of cash. As a consequence, iNDx's focus shifted to fundraising, and the paperwork clean up fell through the cracks. Uttarwar Decl., ¶ 23.

From December 2015 through January 2016, NMS made two additional unsecured loans to iNDx of $150,000 each, to enable the company to survive and avoid immediate bankruptcy. Eurosemillas Statement ¶ 58. NMS wanted to have these two loans secured by the iNDx collateral and to obtain an agreement from the other two secured lenders that the new NMS loans would have the same level of priority as NMS's prior secured debt. Thus, in February of 2016, NMS directed its attorney to circulate a new draft of a revised intercreditor agreement, picking up from the earlier draft dated January __, 2015. *Id.* ¶ 59.

On March 11, 2016, NMS's counsel circulated an Amended and Restated Intercreditor Agreement among NMS, PLC and Eurosemillas. Eurosemillas Statement ¶ 61; Uttarwar Decl., ¶ 25; Coopersmith Decl., ¶ 17; SAC, Ex. B. On summary judgment, there is no dispute that this document did not become a binding contract either. Eurosemillas Statement ¶ 62; Duer Decl., ¶¶ 22, 24. However, the March 11 cover email from the NMS attorney that circulated the agreement stated that "the attached has been blacklined against *the existing form of Intercreditor Agreement among the three parties*." SAC, Ex. B (emphasis added). And one of the whereas clauses in the blacklined agreement stated, "WHEREAS, *iNDx, PLC, NMS and SpanCo entered into that certain Intercreditor Agreement dated January __, 2015 (the 'Existing Intercreditor Agreement')*, which

such Existing Intercreditor Agreement superseded the Original Intercreditor Agreement," *id.* (emphasis added). There are also other documents in the first half of 2016 that indicate the parties' belief that a three-way intercreditor agreement had been entered into. *See, e.g.*, Uttarwar Decl., Ex. N. By later that year, PLC and NMS figured out it actually hadn't been. *See id.*, Ex. O.

**D.     Foreclosure**

iNDx defaulted on the PLC and NMS loans. Eurosemillas Statement ¶¶ 69, 70. In July 2016, PLC and NMS gave iNDx notice it was in default under their loans and commenced non-judicial foreclosure proceedings against the collateral under the provisions of their respective security agreements with iNDx and the California Uniform Commercial Code. *Id.* ¶ 73. NMS and PLC also served notice of the foreclosure on over 20 parties that may have had an interest in acquiring the collateral. Notices were also published in the San Jose Mercury News and the San Francisco Chronicle. Eurosemillas Statement ¶ 74; Duer Decl., ¶¶ 27-28; Declaration of Eric Rieders ("Rieders Decl.") ¶¶ 27-28, ECF No. 111.

On August 11, 2016, before NMS and PLC completed their nonjudicial foreclosure of the collateral, iNDx filed a voluntary petition under chapter 11 of the Bankruptcy Code. Eurosemillas Statement ¶ 75. After PLC and NMS moved for relief from the automatic stay in Bankruptcy Court to proceed with the non-judicial foreclosure, iNDx stipulated to lifting the automatic stay. *Id.* ¶ 76. On October 19, 2016, NMS and PLC were granted relief from the automatic stay by an order of the Bankruptcy Court to allow them to foreclose upon the collateral. *Id.* ¶ 78. On October 21, 2016, NMS and PLC served an amended notice of disposition of collateral by public foreclosure sale, which scheduled the public foreclosure sale for November 4, 2016. *Id.* ¶ 79. Notice of the foreclosure sale was also served on the iNDx parties asserting liens on iNDx's assets, other creditors, and parties that may have had an interest in acquiring the debtor's assets. *Id.* ¶ 80. On November 4, 2016, NMS and PLC completed their public foreclosure sale of the collateral. *Id.* ¶ 81.

Through LDIP, NMS and PLC credit bid the sum of $1,000,000 at the public foreclosure sale of the collateral, and LDIP took title to the collateral at the conclusion of the sale as the successful bidder. LDIP was also assigned the secured debt of NMS and PLC. Eurosemillas

Statement ¶ 82; Duer Decl., ¶ 31; Rieders Decl., ¶ 31. Eurosemillas did not bid at the public foreclosure sale. Eurosemillas Statement ¶ 83. The security interest Eurosemillas held at the time of the foreclosure sale was to secure repayment of the iNDx debt for the $250,000 it had borrowed, which if paid or satisfied would have resulted in the discharge of the Eurosemillas lien against the collateral. *Id*. ¶ 84.

**E.       Procedural Background**

On June 1, 2017, Eurosemillas filed its initial Complaint, alleging 11 causes of action against PLC, NMS, Duer, Rieders and LDIP. Compl., ECF No. 1. After the Defendants moved to dismiss the Complaint (ECF. No. 12), Eurosemillas filed a notice of non-opposition (ECF No. 18) and a First Amended Complaint (ECF No. 17) on July 19, 2017. The Defendants again moved to dismiss (ECF No. 20), which the Court granted in its entirety on August 28, 2017, with the exception of the breach of contract claim against PLC. ECF No. 26. Eurosemillas's wrongful foreclosure claim was dismissed with prejudice, but the Court granted leave to amend as to the other claims. *Id.* at 12. On September 13, 2017, Eurosemillas filed the operative Second Amended Complaint ("SAC"), ECF No. 27, reasserting its previous claims of breach of contract, breach of the implied covenant of good faith and fair dealing, fraud in the inducement and unfair competition against the same Defendants. On November 15, 2018, NMS and PLC filed the present motion for summary judgment. ECF No. 106. On May 2, 2019, the Court granted judgment on the pleadings on all claims in favor of Duer, Rieders and LDIP without leave to amend. ECF No. 128. What remains are the claims against NMS and PLC, addressed in this order.

## III.   LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than in its favor. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial to defeat the motion. Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.* (citation and quotation marks omitted). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322 (quotation marks omitted).

## IV.   DISCUSSION

### A.     Breach of Contract

Eurosemillas's first claim for relief is for breach of contract. SAC ¶¶ 67-98. In the SAC, Eurosemillas alleges that the January __, 2015 intercreditor agreement that is referred to as the "Existing Intercreditor Agreement" in the recitals in the draft amended intercreditor agreement that NMS's counsel circulated on March 11, 2016 is the contract that PLC and NMS breached.

SAC ¶¶ 28, 80. On summary judgment, Eurosemillas abandons that contention (*see* Eurosemillas Statement ¶ 49) – in fact, there is no evidence that anyone signed the January __, 2015 proposed intercreditor agreement – and now asserts that the October 22, 2014 intercreditor agreement that PLC, iNDx and Eurosemillas signed, but that NMS did not, is the contract PLC and NMS breached. *See* Eurosemillas's opposition brief, ECF No. 123, at 7. Defendants argue that the October 22, 2014 agreement is not a contract at all because NMS did not sign it. In the alternative, they say they did not breach it.

Mutual assent is an essential element of contract formation and requires that "the parties all agree upon the same thing in the same sense." Cal. Civil Code § 1580. Consent to a contract must be mutual and communicated to the other parties. Cal. Civil Code § 1565. "[T]here is no contract until there has been a meeting of the minds on all material points, despite the fact that some terms have been agreed orally, or some action has been taken." *Grove v. Grove Valve & Regulator Co.*, 4 Cal. App. 3d 299, 312 (1970).

The undisputed evidence shows that NMS did not sign the October 22, 2014 intercreditor agreement and rejected its terms. When asked to sign the document, NMS's Cassigneul stated that there were "several points that need to be amended" and that "these changes are necessary for our signature." Those changes were that the agreement needed to be rewritten "in numerous places" to state that there were three creditors, not two; the agreement needed to acknowledge the two different NMS loans; and it needed to acknowledge the prior intercreditor agreement between PLC and NMS and its amendment. Cassigneul's email was an unequivocal rejection of the October 22, 2014 document. Moreover, iNDx (which was also a party to the October 22, 2014 agreement and did sign it) acknowledged NMS's rejection and agreed with NMS's proposed changes. iNDx then circulated a revised intercreditor agreement addressing those comments (this was the January __, 2015 draft). NMS had further comments and edits concerning that draft, and everyone agrees it was not mutually agreed to. It is impossible to read these email exchanges and conclude that NMS agreed to the October 22, 2014 intercreditor agreement. That is simply untrue.

Eurosemillas offers several arguments in response. First, it points to several statements by NMS and PLC in the first half of 2016 that reflect a belief that they had entered into a three-way

10

intercreditor agreement with Eurosemillas providing that each creditor's security interests were on equal footing, i.e., in *pari passu*. Most obviously, NMS circulated a draft amendment to such a three-way intercreditor agreement on March 11, 2016, which necessarily presupposed that one existed. But here is the problem: If there was a three-way intercreditor agreement, what were its terms? The March 11, 2016 draft amendment reflected the belief that the January __, 2015 document was the existing intercreditor agreement, but on summary judgment everyone agrees that was wrong. Eurosemillas now argues that the October 22, 2014 document is the right one, but the evidence is undisputed that NMS rejected it and demanded specific changes to it. For that matter, NMS also insisted on changes to the January __, 2015 document. There is no document that anyone can point to that states the terms of an intercreditor agreement that the three creditors agreed to.

Eurosemillas presents arguments as if all it needs to do is show that PLC and NMS agreed to treat its security interests in *pari passu*, and that's good enough to show the existence of a contract. But it's not. "Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached." *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 209 (2006) (citation and quotation marks omitted). "Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable." *Id.* (citation and quotation marks omitted).

In *pari passu* treatment just addresses the question of lien priority. It leaves unresolved every other term of the contract, such as the treatment of payments, distributions, impairment, specific performance, foreclosure, and so on. Bear in mind that in the SAC, Eurosemillas alleges that PLC and NMS breached the alleged intercreditor agreement by denying its existence, selling the collateral in a sham foreclosure, and refusing to recognize Eurosemillas as a joint owner of the collateral. SAC ¶ 69. Those breach allegations really have nothing to do with lien priority, so documents in which PLC and NMS expressed support for in *pari passu* treatment of Eurosemillas's liens do not suffice to spell out the parties' obligations such that the Court could determine whether they have been performed or breached.

Even if the Court inferred that the contract consisted of those portions of the October 22, 2014 document to which NMS voiced no objection, that would still leave material terms of the contract missing or unclear.  NMS's first objection was that numerous provisions in the October 22 document were written as if there were only two creditors.  As the redlined January __ 2015 draft makes clear (*see* Coopersmith Declaration, Ex. A), this problem afflicted paragraphs 3(a), 3(b), 3(c), 3(d), 4, 5, 8 and 10, governing distributions, impairment, modification, foreclosure and perfection, rendering their interpretation uncertain in the event of a dispute.  NMS's second objection was that the October 22, 2014 alleged agreement did not reference NMS's second loan to iNDx.  This was a significant, material omission that could have resulted in NMS's two loans having different levels of priority as against the Eurosemillas loan.  While in theory the omission of the second loan might have benefited NMS as against Eurosemillas, the priority of the second NMS loan as against the PLC loan would then have been a conundrum, as the amended two-party intercreditor agreement and the October 22, 2014 alleged agreement would have implied different things.  NMS's third objection was the failure of the October 22, 2014 document to recognize the existence of the original, two-party intercreditor agreement and its amendment and to state that it supersedes them.  The supersession provision was critical because the original NMS-PLC intercreditor agreement was dated October 28, 2014, and the amendment was dated June 2, 2015 (*see* Cassigneul Decl., Exs. A & B) – dates that are *later in time* than the October 22, 2014 document.  Without a reference to the two-party agreements and a supersession provision, it would not have been clear which contract governed.  In short, these were not small details.  And the evidence shows these problems were material because they did in fact stop NMS from signing.

Further, the Court cannot simply look at emails and deposition testimony to compose an intercreditor agreement that Eurosemillas, PLC and NMS would have agreed to.  "[W]hen it is a part of the understanding between the parties that the terms of their compact are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon, or it does not become a binding or completed contract."  *Kessinger v. Organic Fertilizers, Inc.*, 151 Cal. App. 2d 741, 749 (1957) (citation and quotation marks omitted).  The October 22, 2014 document was intended as a written contract signed by the parties, as evidenced by the

signature blocks and Uttarwar's request for Cassigneul to sign it and return the signature page.

NMS's refusal to do so means it did not assent in the manner agreed upon.

Next, Eurosemillas suggests that there is evidence that Cassigneul did sign the October 22, 2014 document, but the signature page went missing or was not delivered, although ultimately Eurosemillas seems to back off from that position. Eurosemillas submits a declaration from Uttarwar, which states in paragraph 19: "I followed up by phone with Mr. Cassigneul and Mr. Rieders, both of whom told me, in no uncertain terms, that NMS had signed the Intercreditor Agreement and that their lawyers should be sending me the signed document." But that undated statement is too vague. Cassigneul did sign an intercreditor agreement – two of them, in fact – with PLC. Accordingly, the reference in paragraph 19 to Cassigneul saying he signed "the" intercreditor agreement does not establish that he signed the October 22, 2014 alleged agreement. Further, the clear email correspondence *with Uttarwar* explaining in detail the reasons why NMS declined to sign the October 22, 2014 document means there is no genuine dispute of fact concerning whether it did so.

As noted, Eurosemillas ultimately seems to concede NMS did not sign it. This Court issued an order requiring the parties to file separate statements of facts in connection with summary judgment motions. ECF No. 97. A party opposing a summary judgment motion was required "for each paragraph of the moving party's separate statement of facts," to provide "a correspondingly numbered paragraph indicating whether the party disputes the statement of fact," *id*. Here, in response to Defendants' proposed fact that "NMS did not agree to the terms, and would not sign the draft proposed intercreditor agreement with Eurosemillas dated October 22, 2014," Eurosemillas stated that NMS "ratified" it. Eurosemillas Statement ¶ 33. The ratification assertion disputes a portion of Defendants' proposed fact ("NMS did not agree to the terms . . .") but fails to dispute the rest ("NMS . . . would not sign").

The ratification argument is also unpersuasive. Section 5.1 of the product development agreement between iNDx and NMS provided that:

> iNDx agrees that until such time that the Note either converts to equity securities or is satisfied by payment, *no third party shall be permitted to lend money (except on a pari passu basis with NMS) to iNDx*

13

United States District Court
Northern District of California

> without the consent of NMS, and that the Note shall be on a pari passu basis (with respect to all material provisions including, without limitation, payment, interest, conversion price, and lien priority) with that certain $3.1M Secured Convertible Promissory Note (the "PLC Note") dated December 27, 2013 issued by iNDx to PLC Diagnostics ("PLC"). Prior to the payment of any portion of the investment described in this Section 5.1, PLC shall execute such intercreditor documentation, including assignment of a pari passu portion of its security interest in the collateral servicing the PLC Note, as is reasonably required by NMS.

Uttarwar Decl., ¶ 2 (emphasis changed).

Eurosemillas argues that when NMS found out about the Eurosemillas $250,000 loan to iNDx, NMS did not claim that iNDx breached section 5.1, which required that iNDx not accept third party loans other than on a *pari passu* basis. But this provision, which existed for NMS's protection, was plainly intended to prevent iNDx from obtaining third party loans *higher in priority* than NMS's. Accordingly, NMS's failure to claim breach did not ratify the October 22, 2014 document. Indeed, the two items are unrelated to each other. Despite Eurosemillas's relentless focus on proving that NMS was in agreement that Eurosemillas's loan should be in *pari passu* with NMS's, NMS never disagreed. It objected to *other* material provisions and omissions in the October 22, 2014 document, as discussed above. The reference to lending money on a *pari passu* basis in section 5.1 of the product development agreement just has nothing to do with why NMS refused to sign the three-way intercreditor agreement.

In addition, Eurosemillas argues that NMS ratified the October 22, 2014 document in statements by Rieders and Cassigneul that they would welcome Eurosemillas's loan on a *pari passu* basis, and later that they thought there was a three-party intercreditor agreement in place that placed the three creditors' loans on equal footing. However, those statements about *one term* in a contract do not serve to ratify the contract, especially in the face of undisputed evidence that NMS specifically rejected that proposed contract because of its other terms.

Finally, Eurosemillas argues that even if the October 22, 2014 document is not binding on NMS, it should still be binding on PLC, which did sign it. The Court disagrees. "'[I]f the evidence shows that the signatures of other parties were required as one of the conditions of a completed agreement, it is incomplete and not binding upon those who sign until the others sign.'" *Roth v. Garcia Marquez*, 942 F.2d 617, 626 (9th Cir. 1991) (quoting 1 B. Witkin, *Summary of*

*California Law*, Contracts § 143 (9th ed. 1987)). "Mutual assent or consent is required to create a contract; the agreement is usually shown by manifestations and expressions of consent such as signatures to the contract. When, as in the present situation, two parties execute a contract with the understanding that the approval of a third party is necessary for the agreement to take effect, the contract is not complete until the third party has approved. Until that happens neither party is bound by the agreement." *Santa Clara-San Benito etc. Elec. Contractors' Ass'n v. Local Union No. 332*, 40 Cal. App. 3d 431, 436 (1974); *see also Helperin v. Guzzardi*, 108 Cal. App. 2d 125, 128 (1951) ("When an agreement is signed and handed over with the understanding that it will not be used or become operative until it is signed by another who is expected to join therein, it does not become a contract until the additional signature is obtained.") (citations omitted).

A three-party intercreditor agreement is precisely the type of contract that does not become binding until all three creditors sign. The whole point of the agreement was to modify the senior lien priority held by PLC and NMS to allow Eurosemillas's junior lien to have the same priority. The failure of either NMS or PLC to sign materially changes the economic position of the other secured creditor. It becomes a completely different contract. NMS's refusal to sign meant it was not granting equal priority to Eurosemillas, and NMS retained its senior interest without dilution. Enforcing the contract against PLC alone would effectively dilute PLC's interest disproportionately. This is a situation where it is obvious that the parties did not intend for the contract to be effective unless all three creditors signed it.

Accordingly, the Court grants NMS and PLC summary judgment on Eurosemillas's first claim for relief because the undisputed evidence shows that there was not mutual assent to the October 22, 2014 document that would have made it an enforceable contract. Because the Court finds that no written contract was agreed to, it need not and does not determine if NMS and PLC's conduct would have amounted to a breach.

## B. Breach of the Implied Covenant

The Court's conclusion that there was no three-way intercreditor agreement also forecloses Eurosemillas's second claim for relief for breach of the implied covenant of good faith and fair dealing. "The prerequisite for any action for breach of the implied covenant of good faith and fair

dealing is the existence of a contractual relationship between the parties, since the covenant is an implied term in the contract." *Smith v. City & County of San Francisco*, 225 Cal. App. 3d 38, 49 (1990). "Without a contractual relationship, appellants cannot state a cause of action for breach of the implied covenant." *Id*.; *see also Fortaleza v. PNC Fin. Servs. Group, Inc*., 642 F. Supp. 2d 1012, 1021-22 (N.D. Cal. 2009) ("To establish a breach of an implied covenant of good faith and fair dealing, a plaintiff must establish the existence of a contractual obligation, along with conduct that frustrates the other party's rights to benefit from the contract."). Because the Court has found that there was no contract, Eurosemillas cannot sustain a claim for breach of the implied covenant.

## C.      Fraudulent Inducement

Eurosemillas's third claim is for fraud in the inducement. Fraud in the inducement is a subset of fraud; it "occurs when the promisor knows what he is signing but his consent is induced by fraud." *Rosenthal v. Great W. Fin. Sec. Corp*., 14 Cal. 4th 394, 415 (1996) (citation, quotation marks and emphasis omitted). The elements of fraud are (a) a misrepresentation (false representation, concealment, or nondisclosure), (b) scienter or knowledge of its falsity, (c) intent to induce reliance, (d) justifiable reliance, and (e) resulting damage. *Lazar v. Super. Ct*., 12 Cal. 4th 631, 638 (1996).

Here, Eurosemillas alleges that PLC and NMS committed fraud when they induced Eurosemillas to make its $200,000 investment in the series A financing and then later to loan iNDx $250,000. SAC ¶ 120. All of the fraudulent statements alleged in the SAC appear to have been made by Duer (PLC) and Rieders (NMS). Eurosemillas's opposition brief devotes approximately one page to addressing the fraud claim. The first sentence of the argument states that "Eurosemillas incorporates by reference the legal authority and arguments set forth in its Opposition to the Motion for Judgment on the Pleadings regarding the claim for conspiracy to commit fraud alleged against Mr. Rieders and Mr. Duer." ECF No. 123 at 23. This confirms for the Court that Eurosemillas's fraud claim against PLC and NMS is based on the same fraudulent statements allegedly made by Duer and Rieders.

The Court summarized the fraudulent statement allegedly made by Duer and Rieders in its order granting them (and LDIP) judgment on the pleadings, ECF No. 128. "There are four:"

16

**Six months to market** (Duer). "On December 9, 2013, at a meeting held at PLC's office located at 9568 Topanga Canyon Blvd., Chatsworth, California 91311, Defendant Duer misrepresented to Ricardo Merino of Eurosemillas the state of the PLC technology underlying the Collateral, and assured him that the technology would be ready for market in six (6) months. On October 21, 2014 in a meeting at 4:00-6:45 pm PST at iNDx's office in Los Gatos, Defendant Duer again misrepresented the readiness of the PLC technology underlying Collateral and reassured Javier Cano of Eurosemillas that the technology would be delivered in Q1 2015." [SAC] ¶ 121; *see also id.* ¶¶ 17, 106.

**Passed the sample tests in the PSA** (Duer). "In August 2013, as part of the due diligence before the parties entered into the JV Agreement, PLC and Defendant Duer represented to Mohan Uttarwar of iNDx Technology, Inc., that the PLC technology had passed the sample tests in the PSA (Prostate Specific Antigen) test kit that had been sent to them in July 2013, in a commercially reasonable manner (i.e. without tuning and adjusting the system for each sample)." *Id.* ¶ 17; *see also id.* ¶ 106.

**We *will* enter into an ICA with you** (Duer and Rieders). "On January 29, 2015 at 9:30 am PST, in a phone call, Defendant Rieders of NMS welcomed Plaintiff's loan of $250,000 to iNDx at the same pari passu terms as PLC and NMS and agreed to enter into the Intercreditor Agreement and fulfill their obligations under this contract," *id.* ¶ 124; *see also id.* ¶ 72. "On October 21, 2014 in a meeting at 4:00-6:45 pm PST at iNDx's office in Los Gatos . . . Defendant Duer further assured Javier Cano [of Eurosemillas] that iNDx's existing secured creditors would enter into the Intercreditor Agreement." *Id.* ¶ 121; *see also id.* ¶ 124.

**We *have* entered into an ICA with you** (Rieders). "On February 17, 2016, between 6 p.m. - 7 p.m. PST, the members of iNDx's Board convened via telephone to discuss, among other things, the terms of additional bridge financing that NMS considered providing to iNDx at the time. During that meeting, Defendant Rieders expressly acknowledged the pari passu rights that Plaintiff, PLC and NMS had to the Collateral pursuant to the terms of the Intercreditor Agreement. He made clear that any additional financing extended to iNDx would be contingent on all three existing secured creditors—PLC, NMS and Plaintiff—amending the Intercreditor Agreement." SAC ¶ 75; *see also id.* ¶¶ 76, 77, 82, 83, 85.

ECF No. 128 at 9-10.

On summary judgment, the Court finds this fraud claim deficient. As to Duer's statements that the technology was six months to market, Eurosemillas submits no evidence to show he or PLC believed those statements were false when made. *See Lazar*, 12 Cal. 4th at 638 ("knowledge of falsity" is an element of a fraud claim); *Maganallez v. Hilltop Lending Corp.*, 505 F. Supp. 2d 594, 605 (N.D. Cal. 2007) (same). Further, the statements are opinions or predictions of future

17

events. "[I]t is hornbook law that an actionable misrepresentation must be made about past or existing facts; statements regarding future events are merely deemed opinions." *San Francisco Design Ctr. Assoc's v. Portman Comp's*, 41 Cal. App. 4th 29, 43-44 (1995).

As to Duer's statement that the technology passed the sample tests, there is no admissible evidence that Eurosemillas was ever told this or that the representation was false. Cano's declaration states in paragraph 3 that "Mr. Uttarwar told me that Mr. Duer had represented to him that PLC's technology had passed the sample tests in the Prostate Specific Antigen (PSA) test kit that Mr. Uttarwar had sent to PLC, in a commercially reasonable manner (i.e., without tuning and adjusting the system for each sample)." Eurosemillas is offering the communication from Uttarwar to Cano for the truth of the matter asserted, i.e., that Duer really did tell Uttarwar that the technology passed the sample tests. Uttarwar's statement is not the statement of a party opponent because he worked for iNDx, not any of the Defendants in this action. Also, as a practical matter, Uttarwar submitted a lengthy declaration in support of Eurosemillas's opposition to Defendants' motion for summary judgment in which he accused the Defendants of committing fraud, so there is a very real sense in which Uttarwar is not even aligned with the Defendants. Further, Uttarwar's statement to Cano does not come within any exception to the rule against hearsay in Federal Rule of Evidence 803, or even Rule 804 (although Uttarwar is plainly available as a witness). The Court observes that Uttarwar's lengthy declaration nowhere states that he told Cano that Duer told him the technology had passed the sample tests. Defendants' hearsay objection to paragraph 3 of the Cano declaration is **SUSTAINED**.

The only evidence that this representation, had it been made to Eurosemillas, was actually false is also inadmissible hearsay. The sole evidence of falsity is paragraph 43 of Uttarwar's declaration, which states: "When iNDx could not get the technology to work as late as fall of 2015, I probed Dr. Yunpei Chang, a former PLC Scientist working at iNDx. She told me that the PLC PSA sample test results of August 2013 had been obtained by tuning and adjusting the system for each sample. In other words, the test had been rigged to obtain the desired results. This is tantamount to fraud in the scientific community." (emphasis omitted). A statement by "a *former* PLC Scientist working at iNDx" (emphasis added) does not qualify as a statement of a

party opponent. *See* Fed. R. Evid. 801(d)(2)(E) ("A statement that meets the following conditions is not hearsay:  . . . The statement is offered against and opposing party and: . . . was made by the party's agent or employee on a matter within the scope of that relationship *and while it existed*") (emphasis added).  The statement also does not fall within any of the exceptions to the rule against hearsay in Federal Rule of Evidence 803.  There is no showing that the declarant is unavailable within the meaning of Rule 804, or even so, that the statement would come within any of the exceptions in that rule either.  Accordingly, Defendants' hearsay objection to paragraph 43 of the Uttarwar declaration is **SUSTAINED**.

Duer and Rieders' statements that NMS and PLC intended to enter into an intercreditor agreement with Eurosemillas are not actionable because there is no evidence that the statements were false when made. *See Lazar*, 12 Cal. 4th at 638.  To the contrary, all available evidence shows that NMS and PLC did intend to enter into a three-way intercreditor agreement at the time they said they would.  PLC even signed the October 22, 2014 document, precluding a finding that it had misrepresented its intention to enter into such an agreement.  NMS did not sign, but there is no evidence that its comments and requested changes were anything but sincere.

In addition, the statements that NMS and PLC intended to enter into an agreement with Eurosemillas were predictions of future events. *See San Francisco Design Ctr. Assoc's*, 41 Cal. App. 4th at 43-44.   Further, there was no justifiable reliance by Eurosemillas. *See Lazar*, 12 Cal. 4th at 638 ("justifiable reliance" is an element of fraud).  As the Court explained in the order granting judgment on the pleadings, a promise to enter into a contract in the future is a promise that sometime down the road one will make a binding promise, but it's not the binding promise itself.  Until that binding commitment has actually been entered into, reliance is unjustified.

Finally, all of the statements that NMS and PLC *had* entered into an intercreditor agreement with Eurosemillas post-dated the latter's 2014 investment and loan and could not have induced them.

For these reasons, summary judgment is warranted on Eurosemillas's fraud claim.

**D.     Unfair Competition**

Eurosemillas's fourth claim for relief is for unfair competition under California Business

19

and Professions Code section 17200 (the "UCL"). The UCL "prohibits any unfair competition, which means 'any unlawful, unfair or fraudulent business act or practice.'" *In re Pomona Valley Med. Group*, 476 F.3d 665, 674 (9th Cir. 2007) (quoting Cal. Bus. & Prof. Code § 17200, et seq.). Each prong – fraudulent, unfair, and unlawful – is independently actionable. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007); *Cel-Tech Communc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999). A plaintiff can state a claim if it alleges a "practice offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 719 (2001) (citation and quotation marks omitted). Or, a plaintiff can state a claim if the predicate public policy alleged to be violated is "'tethered' to specific constitutional, statutory or regulatory provisions." *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003).

Eurosemillas's UCL claim incorporates by reference its fraud claim, SAC ¶ 136, and adds allegations that NMS and PLC conducted a sham foreclosure of the collateral, *id.* ¶ 137, and that PLC, the majority shareholder of iNDx, breached its fiduciary duty to iNDx's shareholders, including Eurosemillas. *Id.* ¶¶ 138-40. This claim is defective, however, because Eurosemillas is not entitled to any relief against PLC or NMS under the UCL.

First, nearly all of the declaratory and injunctive relief that Eurosemillas seeks concerns its claims for relief that the Court has just determined do not have merit. For example, Eurosemillas seeks declarations of its rights under the October 22, 2014 alleged intercreditor agreement, *see* SAC, page 27, and injunctive relief unwinding the foreclosure and enforcing Eurosemillas's alleged *pari passu* rights to the collateral. *See id.* at pages 28-29. From the Court's inspection, it appears that every specific form of injunctive relief that Eurosemillas requests and all but two of the requested declarations are untenable in light of the Court's determination that there was no three-way intercreditor agreement. Further, requested declaration #5 (SAC, page 27) falls with the fraud claim.

That leaves requested declaration #4 ("A Declaration that Defendants are liable to Plaintiff for unfair competition under California Business and Professions Code section 17200 et seq.")

and, the Court supposes, the request for "such other and further relief as the Court deems just and proper." SAC, page 30. However, in the absence of a contractual (or other) relationship between Eurosemillas, on the one hand, and NMS and PLC, on the other, there is nothing about the parties' *ongoing* relationship or rights that could be clarified by declaratory relief. Any other declarations under the UCL would be purely about past events, which is an inappropriate use of declaratory relief. *See Osseous Technologies of America, Inc. v. DiscoveryOrtho Partners LLC*, 191 Cal. App. 4th 357, 366 (2010) ("'Declaratory relief operates prospectively, serving to set controversies at rest. If there is a controversy that calls for a declaration of rights, it is no objection that past wrongs are also to be redressed; but there is no basis for declaratory relief where only past wrongs are involved.'") (quoting 5 Witkin, Cal. Procedure (5th ed. 2008) Pleading, § 869, p. 284). And with iNDx having filed for bankruptcy and lost its employees and tangible and intangible assets three years ago, *see* SAC ¶¶ 41, 45, 47, 48, 59, there is no evidence of a continuing threat of misconduct by PLC or NMS to justify any other forms of injunctive relief the Court might come up with on its own. *See In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 130 (2009) ("Injunctive relief [under the UCL] is not available when there is no threat that the misconduct to be enjoined is likely to be repeated in the future").

Second, Eurosemillas is not entitled to restitution from PLC or NMS. "A restitution order against a defendant [under the UCL] . . . requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 336 (2011). "But the economic injury that an unfair business practice occasions may often involve a loss by the plaintiff without any corresponding gain by the defendant, such as, for example, a diminishment in the value of some asset a plaintiff possesses." *Id*. In such cases, a restitution order is not available. *See id*. That is the case here. Eurosemillas did not pay any money to PLC or NMS. Rather, it lent to and invested in iNDx, *see* Eurosemillas Statement ¶ 127, which went bankrupt. Eurosemillas has no restitution claim because PLC and NMS received no money from it.

Accordingly, summary judgment is appropriate on this claim as well.

## V. CONCLUSION

For the foregoing reasons, NMS and PLC's motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

Dated: May 13, 2019

THOMAS S. HIXSON
United States Magistrate Judge